# Exhibit 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**
In Admiralty

**TROY D. DWYER, derivatively on**
**Behalf of Quinby Allie, LLC and**
**Bella Sky, LLC,**

**and**                                                    Civil No: **4:21-cv-37**

**TROY D. DWYER, individually,**

      **Plaintiffs,**
**v.**

**L.D. AMORY AND COMPANY, INCORPORATED,**
**a Virginia corporation,**

**QUINBY J. AMORY,**

**and**

**C. MEADE AMORY,**

      **Defendants, and**

**QUINBY ALLIE, LLC**,
**a Virginia limited liability company**,

**and**

**BELLA SKY, LLC**,
**a Virginia limited liability company,**

      **Nominal Defendants**.

### AMENDED VERIFIED COMPLAINT

      Plaintiff, Troy D. Dwyer, by undersigned counsel, files the following Amended Verified

Complaint, derivatively on behalf of Quinby Allie, LLC and Bella Sky, LLC ("the LLCs"), and

individually, against the Defendants, L.D. Amory and Company, Incorporated, C. Meade

Amory, and Quinby J. Amory, and in support thereof states as follows:

1

## PARTIES AND JURISDICTION

1.      Quinby Allie, LLC and Bella Sky, LLC are each Virginia limited liability companies with their registered offices located in the City of Hampton, Virginia.

2.      Troy D. Dwyer ("Dwyer") is an individual currently residing in the Commonwealth of Massachusetts and is both a member and manager of the LLCs. He owns 50% of the membership interest in the LLCs. Dwyer was a member of the LLCs at the time of all transactions complained of herein, he has continuously been a member of the LLCs to the present.

3.      L. D. Amory and Company, Incorporated ("LDA") is a Virginia corporation with its registered office located in the City of Hampton, Virginia, and regularly conducts business in Virginia.

4.      LDA operates a fish house at 101 S. King Street, Hampton, Virginia 23669, where it unpacks and buys seafood from commercial fishing vessels that land their catch at its fish house. LDA then sells such seafood to third parties either directly or indirectly through various channels.

5.      C. Meade Amory ("Amory") is an individual currently residing in the Commonwealth of Virginia, and is both a member and manager of each of the LLCs. He also serves as the Secretary/Treasurer of LDA, according to the records of the State Corporation Commission of the Commonwealth of Virginia. He further at various times has held himself out as the owner and president of LDA. *See* various articles and websites, attached as **Exhibit A**. Amory also owns 50% of the membership interests in the LLCs.

6.      Quinby J. Amory ("Mrs. Amory") is an individual currently residing in the Commonwealth of Virginia. She is the President of LDA and its sole shareholder.  *See* Va. SCC record for LDA, attached as **Exhibit B**.

7.      This case falls under this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333, 46 U.S.C. § 31343(c)(2), and Rule 9(h) of the Federal Rules of Civil Procedure for the admiralty and maritime claims stated herein. The Court has supplemental and pendant jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. As such, this action is not a collusive one to confer jurisdiction that the court would otherwise lack.

8.      Additionally, the Court has jurisdiction over this action for declaratory relief pursuant to Title 28 of the United States Code, §§ 2201 *et seq*, in that a present controversy exists between plaintiff Dwyer, derivatively on behalf of the LLCs, Amory, and LDA as to certain debts purportedly owed by the LLC's to LDA, and Dwyer asks the Court to adjudicate and determine the validity of such debts. The Court has supplemental and pendant jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## DUTIES OF C. MEADE AMORY

9.      Amory, as manager of the LLCs and owner of a 50% interest in the LLCs, has the ability to control and does control the business and corporate affairs of all of the LLCs. Correspondingly, Amory owed and owes the LLCs fiduciary obligations of good faith, loyalty, and candor, and was and is required to use his utmost ability to control and manage the LLCs in a fair, just, honest, and equitable manner. Amory was and is required to act in accordance with the LLCs' respective operating agreements and in furtherance of the best interests of the LLCs, not in furtherance of his personal interest or benefit and/or not in furtherance of any other entity with which he is associated, including LDA.

10.     Amory, as manager and co-owner of the LLCs, is able to and has, directly and/or indirectly exercised control over the wrongful acts complained of herein.

11.      To discharge his duties, Amory, as manager and co-owner of the LLCs, is required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the LLCs. By virtue of such duties, Amory as manager of the LLCs, was and is required to, among other things:

      a. Exercise good faith to ensure that the affairs of the LLCs were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of LLCs' business;

      b. Exercise good faith to ensure that the LLCs were operated in a diligent, honest, and prudent manner in compliance with all applicable federal and state laws, rules, regulations, requirements, and all contractual obligations, including acting only within the scope of their legal authority; and

      c. Refrain from wasting the LLCs assets or otherwise unduly benefitting himself and/or other entities associated with him at the expense of the LLCs.

12.     Va. Code Ann. § 13.1-1024.1(A) provides that "[a] manager shall discharge his or its duties as a manager in accordance with the manager's good faith business judgment of the best interests of the limited liability company."

## FACTS

13.     On or about July 31, 2014, Dwyer and Amory established Bella Sky, LLC, each as a member with a 50% interest and each designated as a manager. *See* Bella Sky Operating Agreement, attached as **Exhibit C**. The purpose of Bella Sky, LLC was "to buy, sell, hold, manage and operate fishing vessels, together with all equipment and permits and to engage in

any other activities as members shall determine and not prohibited by law, for the purpose of making a profit[.]" **Exhibit C**, p.11. Bella Sky, LLC currently owns the F/V BELLA SKY (Official No. 580932).

14.     On or about May 23, 2019, Dwyer and Amory established Quinby Allie, LLC, each of them as a member with a 50% interest and each designated as a manager, the purpose of which was to acquire and operate a second commercial fishing vessel. *See* Quinby Allie Operating Agreement., attached as **Exhibit D**. Quinby Allie, LLC currently owns the F/V QUINBY ALLIE (Official No. 507438).

15.     Amory manages the LLCs, maintains their principal offices, and keeps their books and records at the location of LDA's fish house facility at 101 S. King Street, Hampton, Virginia 23669.

16.     Dwyer is responsible for maintenance and operation of the vessels owned by the LLCs.

17.     With each of the LLCs, Amory opened bank accounts in the name of each LLC at Truist Bank (f/k/a Branch Banking and Trust Company or "BB&T") (hereinafter referred to as "BB&T" or "Truist"), the same bank where LDA had its accounts. Amory undertook as manager to maintain the books, records, and accounts of the LLCs, with the assistance of employees of LDA that he would designate and who worked for the LLCs under his direction, including Cynthia Triplett ("Triplett").

18.     Triplett is currently employed with LDA as the Controller and/or the person in charge of Accounts Payable. She also handles the financial books and records of the LLCs.

19.     Pursuant to each of the LLCs' Operating Agreements, the managers and members of the LLC were not to contract any loans or indebtedness on behalf of either company, nor any

evidence of indebtedness issued in each company's name, "unless authorized by resolution of the Members." *See* **Exhibits C & D,** at p.5.

20.     Pursuant to each respective LLCs' Operating Agreement, members were to receive reimbursement for expenses reasonably incurred in the performance of their duties.

21.     Amory, by and with the assistance of Triplett, who was an LDA employee under Amory's direction and supervision, exercised complete control and domination over corporate affairs and financial and bookkeeping affairs of the LLCs to the exclusion of Dwyer.

22.     Amory controlled the bank accounts and credit card accounts for each LLC, and maintained the general ledger and other books and records of the LLCs, by and through and with the assistance of LDA employees of his choosing and at his direction.  Triplett also kept the books and records of LDA under Amory's direction.

23.     For each of the LLCs' accounts at BB&T, per Amory's direction, Dwyer had no check-writing, check-signing, wiring, ACH, or other authority to move funds into or out of the accounts, and he rarely received copies of statements of accounts. Amory, however, authorized and directed a designated LDA employee at all pertinent times to have check-writing, check-signing, wiring, ACH, and other authority to transfer funds into and out of the LLCs' bank accounts.

24.     The sole means of the LLCs to earn revenue was and is for each of the vessels to engage in commercial fishing and sell fishing stock to a fish house for the market price of such stock.

25.     Typically a commercial fishing boat will outfit and provision a vessel for each voyage, set sail and fish until the hold is full and/or available species quota is caught, then return to shore to unpack the catch at a commercial fish house. The fish house typically "settles" the

voyage by preparing a settlement sheet showing the price paid for the catch and deductions for expenses of the voyage and vessel (such as fuel, oil, ice, and groceries), and, after expenses, divides the balance between the crew, with the respective shares of each crewmember (agreed to in advance), and the boat (the "boat share").

26.     One of the key tasks of the LLCs' bookkeeper was to calculate and prepare the settlements for each fishing trip voyage, receive the funds of each voyage from the fish house where the voyage landed into the accounts of the LLCs, and then write and send checks to pay for all the items on the settlement sheet: crew shares, fuel and oil expenses, food, ice, and finally to leave the balance of the funds (55% of net revenue from fishing stock) in the LLCs' accounts as the boat share.

27.     The boat share funds from voyages were to be kept in reserve and used to pay for the expenses of the vessels, including mortgage and insurance obligations.

28.     The LLCs' vessels thus paid for the expenses of each fishing voyage out of the stock sale of each trip. Other expenses such as mortgage payments, insurance, and repair and maintenance were to be paid out of the boat share earnings for each vessel.

## BELLA SKY, LLC AND F/V BELLA SKY

29.     In June through July of 2014, Amory and Dwyer sought to purchase another vessel. They already owned the F/V LANGLEY DOUGLAS under another LLC, A & D Fisheries, LLC. They ultimately decided to purchase two vessels and group both vessel permits under one vessel.  They agreed to purchase the F/V BAILEY BOY, understanding the vessel itself was at or near the end of its useful life but believing its fishing permits had value. They also agreed to buy the F/V CATERINA G to replace the F/V BAILEY BOY, though both Amory

and Dwyer understood this vessel was smaller than they would have liked and would require significant alterations.

30.     On July 31, 2014, Dwyer and Amory formed Bella Sky, LLC. On or about August 2014, Bella Sky, LLC bought the F/V BAILEY BOY and F/V CATERINA G, renaming the latter vessel as the F/V BELLA SKY and transferring the permits from the F/V BAILEY BOY to the newly renamed F/V BELLA SKY.  After transferring its permits to the F/ V BELLA SKY, A & D Fisheries, LLC sold the F/V BAILEY BOY to a third party for approximately $25,000.

31.     Thereafter, Dwyer and Amory, by and through Bella Sky, LLC, employed the F/V BELLA SKY (Official No. 615635) in commercial fishing.

32.     In 2017, after the F/V BELLA SKY lost fishing time due to weather and its small size, Dwyer, with the agreement of Amory, began to look for a larger vessel to replace the F/V BELLA SKY. Dwyer found the F/V HUMPBAK (Official No. 580932).

33.     On or about April 2017, Dwyer and Amory, by and through Bella Sky, LLC, sold the smaller F/V BELLA SKY (Official No. 615635) and purchased the F/V HUMPBAK. They also caused the fishing permits from the former F/V BELLA SKY to be transferred to the F/V HUMPBAK, and renamed the F/V HUMPBAK the F/V BELLA SKY. The Official Number of what is the current F/V BELLA SKY remained 580932, which was the F/V HUMPBAK's official number.

34.     Dwyer and Amory obtained a mortgage with BB&T in the original amount of $499,175.00 to purchase the newest F/V BELLA SKY (Official No. 580932), in 2017. Each member personally guaranteed the mortgage, and LDA also guaranteed the mortgage.

35.     After purchasing the larger F/V BELLA SKY, and over the course of approximately two months, Dwyer, for the benefit of Bella Sky, LLC, cleaned, repaired, painted, and otherwise outfitted the vessel, all while located in Scituate, Massachusetts.

36.     F/V BELLA SKY began fishing for ilex squid and other species on June 12, 2017. Dwyer and Amory agreed to change the fish hold arrangement on the Vessel to pump squid out of the hold. Dwyer oversaw those changes to the vessel, which took about a month.

37.     The F/V BELLA SKY (Official No. 580932) was and is Bella Sky, LLC's sole asset.

## QUINBY ALLIE, LLC AND F/V QUINBY ALLIE

38.     On September 11, 2017, the F/V LANGLEY DOUGLAS, owned by A & D Fisheries, LLC, sank and was a total loss.

39.     In November of 2017, Amory and Dwyer agreed to seek another vessel to replace the F/V LANGLEY DOUGLAS. Dwyer, with Amory's agreement, traveled to Seattle, Washington, to inspect various vessels that were built with various holding tank configurations and therefore more stable, safe, and suitable for ilex squid fishing. However, they encountered legal hurdles in bringing West Coast vessels to the East Coast and were unable to do so.

40.     In November 2017, while the F/V BELLA SKY continued to fish, Amory suggested, and Dwyer agreed, that Dwyer would captain a fishing vessel of an acquaintance, the F/V Nadia Lee, and by doing so Dwyer was able to keep other crewmembers from the F/V LANGLEY DOUGLAS working through 2018 and not lose them to other vessels and companies.

41.     In the summer of 2018 through November 2018, Dwyer served as captain of the F/V BELLA SKY.

9

42.     Dwyer again worked on F/V NADIA LEE from November 2018 through the end of April, 2019. By doing this, Dwyer was able to keep all the crew from the F/V LANGLEY DOUGLAS working and not lose them to other vessels and companies.

43.     In January of 2019, Dwyer found a suitable vessel to replace the F/V LANGLEY DOUGLAS, the F/V GULF SPIRIT(Official Number 507438), located in Vancouver, Canada.

44.     Amory and Dwyer agreed Dwyer would inspect the vessel, and in February 2019, Dwyer flew to the West Coast and from there drove to Vancouver to examine the vessel.

45.     Amory and Dwyer agreed to purchase the F/V GULF SPIRIT. However, rather than use A & D Fisheries, LLC to purchase the new vessel, Amory recommended that a new company, Quinby Allie, LLC, be formed to purchase the new vessel.

46.     Quinby Allie, LLC was formed on May 23, 2019.

47.     Quinby Allie, LLC purchased the F/V GULF SPIRIT in June of 2019, renaming it the F/V QUINBY ALLIE, although Amory and Dwyer knew it would need to be redocumented in the U.S. and undergo substantial work before engaging in fishing for their purposes.

48.     After the purchase of the F/V QUINBY ALLIE, in June 2019, Dwyer and other crewmembers travelled to the vessel in Seattle to oversee the vessel's remeasuring and redocumentation.

49.     Dwyer and three crew members worked long days and weeks on the F/V QUINBY ALLIE in Seattle through September 2019, flying home for a four-day break in August.

50.     The F/V QUINBY ALLIE sailed for the East Coast on September 17, 2019, arriving in Hampton, Virginia at the LDA fish house, on October 22, 2019. However fiberglass

work in the fish tanks remained to be done. The workers were not able to complete the work until the end of December 2019.

51.     The F/V QUINBY ALLIE (Official No. 507438) was and is Quinby Allie, LLC's sole asset.

52.     While Dwyer and crewmembers were working on getting the F/V QUINBY ALLIE ready in Seattle, in mid-to-late 2019, the F/V BELLA SKY was tied up at the dock at LDA. Although Amory worked at the LDA fish house facility every day, when Dwyer returned, he found the F/V BELLA SKY had dead batteries, debris on the deck, and mice living inside the vessel, as if no one had checked on the welfare of the vessel the entire time Dwyer was in Seattle.

53.     To get the crews working, Capt. Brad Horrell fished the F/V BELLA SKY in November 2019, and Dwyer took the aforementioned acquaintance's vessel, the F/V NADIA LEE, fishing, until the fiberglass work was complete on the F/V QUINBY ALLIE.

54.     On January 12, 2020, Capt. Brad Horrell sailed the F/V QUINBY ALLIE to Scituate, Massachusetts to be outfitted with new trawl gear.

55.     The F/V QUINBY ALLIE and F/V BELLA SKY (the "Vessel" or "Vessels") fished for fluke in North Carolina from the end of January through the end of March, 2020. When the COVID-19 pandemic began in the U.S., fishing prices bottomed out, and Amory and Dwyer agreed to stop fishing, and tie up both vessels, while prices were so low.

56.     The Vessels returned to fishing in May 2020 and fished until August 2020.

57.     In early 2020, Amory changed the long-term bookkeeper of the LLCs to Cynthia Triplett. Dwyer found it difficult to get the necessary and customary assistance from Triplett as he had in the past with prior LDA employees Amory had assigned to keep the LLCs' books.

11

Triplett refused to prepare the settlement sheets for F/V BELLA SKY and F/V QUINBY ALLIE in 2020. Dwyer resorted to calculating the voyage settlements himself, by hand, and sending them to Triplett to disburse each voyage's revenue appropriately from the LLCs' accounts which she and Amory controlled.

58.     Amory gave Triplett carte blanche authority over the LLCs' books and records, and refused to require her to provide the assistance Dwyer required to operate the vessels. When Dwyer requested Amory designate another LDA employee to keep the LLCs' books, Amory refused.

### COMPANY SALE NEGOTIATIONS AND AMORY TYING UP THE VESSELS

59.     Without informing Dwyer, on or about June 26, 2020, Amory unilaterally approached a bank in Virginia to refinance the F/V QUINBY ALLIE, incurring substantial expenses to Quinby Allie, LLC related to the attempted refinance.

60.     During the summer of 2020, Amory suggested Dwyer buy out his interest in the Vessels with Dwyer taking over the vessel mortgages and also the "liabilities" of the LLCs. Amory and Dwyer met with the registered agent for all the LLCs (and LDA), Thomas Burcher, Esq., at his office in Hampton, Virginia on June 15, 2020.

61.     At that meeting, Amory stated he would like to net approximately $200,000 from the sale of his interests in the LLCs to Dwyer, after Dwyer took on the mortgages and "liabilities" of the LLCs. In July 2020, the National Marine Fisheries Mid-Atlantic Council met and discussed changes to the ilex fishery, possibly instituting a tier system, which Amory speculated would make the Vessels' fishing permits more valuable.

62.     Amory, without consulting with Dwyer, approached a commercial fishing and packing house venture, Town Dock in Point Judith, Rhode Island, to buy Amory's interests in

the LLCs and Vessels, pay off the mortgages and "liabilities", and to net him much more than $200,000, as much as $500,000.

63.     In or about August, 2020, Amory informed the aforesaid bank in Virginia that he was going to sell the F/V QUINBY ALLIE rather than refinance the mortgage.

64.     On August 14, 2020, Dwyer and Amory again met in Hampton, Virginia, while the F/V BELLA SKY was packing out at LDA's fish house, and Amory informed Dwyer of the Town Dock deal.  Dwyer was not interested in a partnership with Town Dock and informed Amory he had spoken with another potential partner to buy out Amory's interest in the LLCs and Vessels.

65.     During this meeting, no agreement was reached.

66.     On August 17, 2020, Amory unilaterally halted the LLC salary payments going to Dwyer, and instructed Dwyer to have no further direct communications and to only communicate with Amory via his lawyer.

67.     On August 25, 2020, Amory, without any notice or explanation to Dwyer, paid $100,000 from Quinby Allie LLC's account to LDA via a check signed by Triplett. *See* Check No. 010170 dated August 25, 2020 from Quinby Allie, LLC's BB&T Account to LDA, **Exhibit E**.

68.     By letter dated September 10, 2020 and emailed to Dwyer on that date, Triplett as controller of LDA and at Amory's direction, informed the LLCs that their debts to LDA were in default to LDA in the amount of $159,868.24 (Quinby Allie, LLC), $423,918.50 (Bella Sky, LLC), and $344,624.84 (A&D Fisheries, LLC). *See* LDA Default Letter, **Exhibit F**.

69.     Dwyer has no knowledge of the basis for the claimed indebtedness and never agreed or consented to the LLCs incurring such debt, much of which goes back to 2012.

70.     The next day, on September 11, 2020, Amory emailed Dwyer, stating, "The settlement checks for the crew were written and mailed. There will be no more checks sent and all accounts will be temporarily frozen. You will have no more direct communication – all communication will need to go through my lawyer – Mike Ware who is copied on this email." See Amory Email, attached as **Exhibit G**. Amory also cancelled and/or froze the company credit cards on or about that same date.

71.     Without any access to the operating funds or credit cards of the LLCs, the Vessels were effectively tied up. Prior to these actions by Amory, the Vessels had been fishing and earning revenue, and would have continued to fish to through the fall and winter of 2020.

72.     Dwyer retained counsel and sought to negotiate a buy-out of Amory's interests. However, in the course of negotiations, it became apparent that the accounts of the LLCs were inscrutable, and Amory claimed large "liabilities" were owed by the LLCs to LDA without any documentation showing how and when these liabilities were incurred. Further, Amory insisted repeatedly that any buyer would have to pay in full all the purported debts to LDA, which requirement would benefit LDA and prejudice the LLCs.

73.     Dwyer is not aware of any resolutions of the members of the LLCs approving incurring debts to LDA, and it is his belief there are no such resolutions.

74.     Dwyer is not aware of any written notes payable, acknowledgment of receipt of funds, request for funds, interest terms, loan payment terms, or any other written indicia of any loans from LDA to the LLCs. On his information and belief, there is no written documentation evidencing any loan terms, loans extended, requests to borrow, requests to disburse funds, receipt of payment of funds, notes payable, promises to pay, payment terms, interest terms or calculations, or any other written indication of  the existence of loans by and between LDA and

14

the LLCs. There are further no resolutions whereby Dwyer authorized or agreed to any such debts or liabilities.

75.     When the Vessels are fishing, their expenses from each trip are paid out of the total earnings from the fish stock that is sold to the packing house, or fish house.  After expenses, the remainder is split with the crew (45%) and the Vessels (55% - the "boat share"). As is indicated by the settlement sheets for the Vessels, the Vessels have always had profitable fishing voyages, with substantial earnings.

76.     Upon information and belief, the Vessels' earnings from fishing, including earnings from the former vessel owned by Bella Sky, LLC (and also named F/V BELLA SKY), were sufficient generally to cover the costs and expenses of the LLCs' operations. Dwyer is further not aware of and did not consent to any capital or profit distributions made to the members, he and Amory, and as such it is and was his belief that the LLCs were sufficiently funded and capitalized.

77.     On January 5, 2021, Dwyer, by counsel, sought an accounting of the books of the LLCs and A & D Fisheries, LLC. Dwyer obtained various financial statements that continued to show large liabilities to LDA without documentation of how they were incurred.  See Aarsheim Email to Ware, attached as **Exhibit H**. The initial financial statements and bank account statements raised significant questions regarding the books and records of the LLCs and the purported debt to LDA.

78.     In particular, the financial statements of the LLCs and A & D Fisheries, LLC showed debts increasing significantly to LDA in the latter part of 2020, from September to December, even though the Vessels were tied up and not incurring costs other than mortgage and insurance.

15

79.     Thereafter, and until approximately March 2021, Dwyer, by counsel, sought additional financial records and accountings for the LLCs, obtaining as stated above incomplete financial statements, bank statements and also account reconciliations and similar items. However, to this date, Dwyer has been unable to obtain the general ledger for each of the LLCs, checking account registers, nor any written documentation of loans made by LDA to the LLCs.

80.     On March 11, 2021, counsel for Dwyer, on behalf of the LLCs, wrote to Amory's counsel, requesting an accounting and specific information about the business affairs of the LLCs, particularly debt to LDA. *See* Letter to Ware, **Exhibit I**. Amory's counsel never responded, though LDA did file the wrongful arrest action discussed below the next day.

81.     In January 2021, Dwyer used his own funds for the working capital to get both Vessels operating and fishing again, and, with the exception of the wrongful vessel arrests contrived and caused by Amory in the name of LDA, he is ensuring the boats fish as much as reasonably possible in order to pay vessel expenses and earn revenue for the LLCs.

**THE VESSEL ARREST, LIENS AND FORECLOSURE EFFORTS IN VIRGINIA**

82.     On February 24, 2021, unbeknownst to Dwyer, Amory caused LDA, by and through Triplett and Mrs. Amory, to give notice of and record with the United States Coast Guard's Vessel Documentation Center false, fraudulent, and unlawful maritime liens for claimed necessaries against the Vessels, though Amory and Mrs. Amory knew or should have known the claimed lien amounts did not arise from providing the Vessels necessaries and as such the purported debt of LDA did not create a maritime lien on the Vessels. *See* Triplett Email (Mar, 25, 2021) with attached Lien Correspondence and Filings, **Exhibit J** hereto.

83.     Mrs. Amory signed the Notices of Claim of Lien that were filed with the Coast Guard. *See* **Exhibit J.**

16

84.     On March 12, 2021, Amory caused LDA, a company of which he is an officer and employee, to file an *in rem* action against the Vessels and *in personam* actions against the LLCs and himself and Dwyer. Verified Complaint in *L.D. Amory and Company Incorporated v. F/V BELLA SKY et al.*, No. 4:21-cv-24 (E.D. Va. 2021), attached as **Exhibit K**. Though the Verified Complaint falsely alleges some negative actions by Dwyer (in an apparent attempt to pierce the corporate veil), it makes no allegations of wrongdoing or malfeasance against Amory even though he is a named defendant.

85.     On Saturday, March 13, 2021, Amory through LDA caused the U.S. Marshal to seize and arrest the F/V QUINBY ALLIE and F/V BELLA SKY, with LDA as the designated substitute custodian. *See* Warrant of Arrest, attached as **Exhibit L**. At that time, F/V QUINBY ALLIE and F/V BELLA SKY had just landed from their respective fishing trips and therefore the arrest interrupted and frustrated the crews' actions in unloading stock and preparing for their next trips.

86.     Amory controlled the actions which lead to the arrest of the Vessels by directing an LDA employee under his authority, Triplett, to locate and retain maritime attorneys who would file the necessary pleadings to arrest the Vessels.

87.     Amory further effected the vessel arrest by directing Triplett to gather records of purported loans of the LLCs to LDA, to include amounts of purported loans to A & D Fisheries, LLC, a company that does not own the Vessels arrested, to use in support of the Verified Complaint. See Exhibit A to Verified Complaint, **Exhibit M** hereto.

88.     Amory, by causing and effecting the arrest of the Vessels, sought to have the Vessels sold at a judicial sale to satisfy the purported loans of LDA. *See* Verified Complaint, Prayer for Relief.

89.     Amory knew or should have known that the purported debt of LDA did not create maritime liens on the Vessels, yet he willfully, in bad faith and with malice caused LDA to assert maritime liens and have the Vessels arrested on the false authority of such liens.

90.     The Vessel arrests, based on purported maritime liens arising from the LDA loans, were wrongful, in direct violation of established law, and wholly unsupported by evidence of actual indebtedness, notes payable, receipt of loan funds by the LLCs, and were not for any necessaries supplied to the Vessels by LDA.

91.     Defendant Quinby J. Amory ("Mrs. Amory") verified the complaint under penalty of perjury under U.S. law on March 10, 2021, identifying herself as president of LDA. See Verification, **Exhibit N**. Her Verification attests the matters set forth in the Complaint "are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters, I believe them to be true." *Id.*

92.     Upon information and belief, Mrs. Amory is not familiar with the business affairs and records of LDA, she has little to no knowledge of the purported loans LDA made over the years to the LLCs upon which the Verified Complaint and vessel arrest was premised, and she has no knowledge of any necessaries provided to the Vessels by LDA.  As such, her Verification was made in violation of 28 U.S.C. § 1746.

93.     Amory is familiar with the business affairs and records of LDA, and he is the only officer of LDA with sufficient knowledge of LDA's transactions with the LLCs to provide the information used to draft the Verified Complaint.

94.     On Saturday, March 13, 2021, Dwyer, on behalf of the LLCs, retained undersigned counsel to move to quash the arrest as unlawful.  Said undersigned counsel filed a Motion to Vacate Order of Warrant of Arrest, Quash the Arrest of the F/V QUINBY ALLIE and

F/V BELLA SKY, for Attorneys' Fees and Costs, and Request for Emergency Hearing and Expedited Relief in the evening of Sunday, March 14, 2021. Thereafter, on Monday, March 15, 2021, LDA caused the Vessels to be released from arrest and dismissed the entire action.

95.     On March 23, 2021, Amory, still seeking to force a sale to the benefit of LDA and detriment of the LLCs, caused LDA, by and through Triplett, to notify the Vessels' mortgage holder, Branch Banking and Trust ("BB&T" or "Truist"), of LDA's recorded maritime liens against the Vessel with the intent to have the mortgage holder declare an event of default and foreclose on the Vessels. *See* **Exhibit J**. Specifically, Ms. Triplett stated: "This action creates a default on the ship mortgages and you are now subject to foreclosure. I would suggest that you immediately come forth with a solution on selling the boats." *Id.*

96.     Dwyer, on behalf of the LLCs, communicated with BB&T thereafter, to assure the bank that he, as member of the LLCs, would endeavor to keep payments current on the mortgages using funds earned by each Vessel from fishing.

## AMORY'S ADDITIONAL BREACHES OF FIDUCIARY DUTY AND PERSONAL MOTIVES

97.     As a result of the sales negotiations and Vessel Arrest, Dwyer has learned numerous facts of Amory's poor management, malfeasance, and or other breaches of Amory's fiduciary duties owed to the LLCs, as follows:

a.  Failing to properly segregate the funds of the LLCs and co-mingling them along with the accounts of A & D Fisheries, LLC;

b.  Failing to properly document all transactions by and between the LLCs and LDA, making it impossible for the LLCs to understand how much, if anything, is owed to LDA, to the benefit of LDA and Amory;

19

c.  On information and belief, causing or allowing the LLCs to pay for, or LDA to pay for and charge the amount against the LLCs as "loans," good, services, and other items that provided no benefit to the LLCs but provided a direct benefit to LDA and Amory, including but not limited to legal services, such as an almost $63,000 payment in 2014 to the law firm Hawkins, Burcher & Boaster for unknown purposes;

d.  On at lease two occasions, failing to deposit the gross vessel earnings for the fishing voyages into the accounts for the LLCs. For a voyage of the F/V BELLA SKY landing on July 17, 2020, LDA failed to deposit the total fishing stock of $40,981.25 into Bella Sky, LLC's BB&T account. On July 24, 2020, F/V QUINBY ALLIE sold $4,652.30 of its fishing stock to LDA yet those funds were never deposited by LDA into Quinby Allie, LLC's BB&T account. Rather, on July 27, 2020, Quinby Allie, LLC received funds in the amount of $78,335.19 for its fish stock sold to Town Dock (and appearing on the July 24, 2020 settlement sheet), but no payment from LDA for the portion of stock sold to LDA (and also appearing on the July 24, 2020 settlement sheet) was received. *See* F/V BELLA SKY's July 17, 2020 Settlement Sheet and corresponding July 2020 B&BT Statement, as well as F/V QUINBY ALLIE's July 24, 2020 Settlement Sheet and corresponding July 2020 BB&T Statement, **Exhibit O**.

e.  Failing to properly administer and distribute fishing trip funds by, on some occasions, failing to duly pay the expenses of a fishing voyage out of the stock earnings from that voyage, including Warrior Fuel Corporation expenses from the summer of 2020 fishing voyages;

f.  Causing or allowing, or failing to properly supervise Triplett who wrote and signed a check for $1,000 out of the Quinby Allie LLC bank account to her boyfriend, Chris

Strickland, on November 19, 2020, for unknown purposes. *See* Check No. 010182 dated November 19, 2020 from Quinby Allie, LLC's BB&T Account to Strickland, **Exhibit P**.

g.   In May and June of 2020, causing LDA, by and through Triplett or by his own actions, to falsify the records of the debt LDA claims the LLCs owe it by entering large amounts of notes payable, or "N/P," by the LLCs on LDA's books, in the total amount of $537,380.79, *see* **Exhibit M**  (three entries on 5/11/20, 5/14/20, and 6/30/20), thereby inflating the LLCs' purported debt to LDA in preparation for LDA to file suit and claim a lien on the debt;

h.   On December 31, 2020, causing LDA by and through Triplett, to further increase the LLCs purported debt to LDA by noting a debit charge to the LLCs of $11,000 for accounting services by LDA, an amount that is arbitrary, and was never invoiced or agreed to by the LLCs, *see* **Exhibit M;**

i.   Causing LDA by and through Triplett or on his own to charge the LLCs interest on undisclosed and apparently arbitrary terms on purported debt amounting to approximately $83,133.10, and accruing. *See* **Exhibit Q** (Annotated Ledger for LDA claimed debt of LLCs filed with Arrest Action) (blue highlighted entries);

j.   Causing LDA, by and through Triplett or on his own, to falsify records of the LDA by moving or reclassifying $356,495.93 of purported debt of A & D Fisheries, LLC to the "loan" accounts of the LLCs, in an attempt to increase the amount LDA purports the LLCs owe and in preparation to assert invalid and inflated liens for necessaries on the Vessels, *see* **Exhibit Q** (yellow marked entries);

k.   Failing to renew the Vessels' fishing permits with the State of Virginia for 2021 as was Amory's responsibility in prior years and failing to inform Dwyer of same;

l.   Causing the LLCs, by and through Triplett whom he supervises as an officer and employee of LDA, to pay $100,000 to LDA in August 25, 2020 (**Exhibit E**), and just two weeks later causing LDA by and through Triplett to put the LLCs on notice of a default to LDA in the total amount of $928,411.58;

m.   Causing LDA, by and through Triplett or on his own, to falsely notify BB&T that the LLCs owed LDA combined debts of $1,092,699.23 with the intent for BB&T to declare an event of default and foreclose on the Vessels, which eventually caused the LLCs to lose a significant amount of income and the judicial sale of their sole assets. *See* **Exhibit J**; and

n.   Such further and other acts as may be proven at trial.

98.   Other acts of Amory leading up to the present constitute acts in which Amory has acted for his own benefit or motivation to the detriment of the LLCs. Although many of the aforesaid acts of misconduct by Amory predate the events that gave rise to this action, the most egregious, secretive, and detrimental acts, including inflating loan amounts of the LLCs and attributing them to the two Vessels while negotiating a sale of the LLCs, and then using such "debt" amounts to arrest the Vessels and force them into foreclosure, occurred when Amory was influenced by his own personal motives which were to the detriment of the LLCs, as follows:

a.   On information and belief, LDA suffered significant cash flow difficulties in 2020 as a result of the COVID-19 pandemic;

b.   Amory sought to falsely increase the loans payable to LDA to improve the financial condition of LDA;

c.  Amory hoped to sell the Vessels and LLCs quickly to obtain significant cash flow for LDA, thereby having the LLCs "bail out" LDA; and

d.  Amory sought to cover a history of malfeasance and poor management of LDA and the LLCs by selling the LLCs and Vessels, instantly recouping the inflated and purported "debt" the LLCs "owed" to LDA.

99.    Dwyer frustrated Amory's personal motives when, in late 2020, Dwyer would not agree to sales terms that allowed LDA's inflated debt claims to be paid by the buyer and instead Dwyer sought further information about the debt.

100.    Amory's aforesaid actions were done with actual malice to the LLCs, knowledge the LLCs would be injured, and were so willful or wanton as to evince a conscious disregard for the rights of the LLCs and Dwyer.

## THE VESSEL ARREST, LIENS AND FORECLOSURE EFFORTS IN MASSACHUSETTS

101.    Upon information and belief, LDA's letter to BB&T ("Truist") dated March 23, 2021 falsely claiming that the LLCs owed LDA combined debts of $1,092,699.23 set the arrest proceedings in motion. *See* **Exhibit J.**

102.    LDA's March 23, 2021 letter claimed that the LLCs owed combined debts that nearly exceeded Truist's outstanding mortgages on those Vessels, believed to be in the range of $1,179,389 at that time.

103.    Upon information and belief, Truist relied on LDA's March 23, 2021 letter in its determination that the Vessels were reportedly in default of their mortgages and to ultimately arrest the Vessels in Massachusetts.

104.    Upon information and belief, Truist would not have arrested the vessels but for the false representations in LDA's March 23, 2021 letter."

105.     In causing LDA to send the March 23, 2021 letter to Truist, Amory breached his fiduciary duty to the LLCs and LDA mispresented the amounts allegedly owed on its falsely claimed loans.

106.     The Defendants used improper methods to cause Truist to arrest and ultimately sell the Vessels in Massachusetts by significantly over inflating LDA's alleged liens and reporting that its lien created a default on the ship mortgages.

107.     On May 20, 2021, Truist filed its Verified Complaint for the *in rem* arrest of F/V QUINBY ALLIE in the United States District Court for the District of Massachusetts. *See* Truist Verified Complaint, F/V QUINBY ALLIE Arrest Action, attached as **Exhibit V.**

108.     On May 21, 2021, Truist filed its Verified Complaint for the *in rem* arrest of F/V BELLA SKY in the United States District Court for the District of Massachusetts. *See* Truist Verified Complaint, F/V BELLA SKY Arrest Action, attached as **Exhibit W**.

109.     On May 25, 2021 in Massachusetts, F/V QUINBY ALLIE was arrested and on June 1, 2021, the F/V BELLA SKY was arrested (hereinafter referred to the "MA Vessel Arrest Actions").

110.     Upon information and belief, LDA's notice of recorded liens set Truist's arrest proceedings in motion.

111.     Due to the Massachusetts arrest actions, F/V QUINBY ALLIE and F/V BELLA SKY have been tied to the dock and unable to earn any fishing income since May and June 2021.

112.     On June 8, 2021, LDA submitted notice that it had revised its liens against both Vessels, in which LDA reduced its lien against F/V BELLA SKY from $501,567.43 to $99,880.59 and its lien against F/V QUINBY ALLIE from $591,131.80 to $198,607.15. *See* ECF No. 27.

113.   On November 15, 2021, LDA submitted its Amended Notices of Claim of Liens against F/V QUINBY ALLIE and F/V BELLA SKY. LDA then alleged liens in the amount of $261,685.57 against F/V QUINBY ALLIE and $202,101.40 against F/V BELLA SKY for a total claim of $463,786.97. *See* LDA's Amended Liens dated November 2021, attached as **Exhibit X.**

114.   Upon information and belief, LDA can now only attempt to substantiate less than half of the amount originally claimed, originally recorded with the Coast Guard, alleged in multiple federal courts, and represented to Truist.

115.   On March 16, 2022, Truist moved to amend the Order of Sale in the Massachusetts Vessel arrest actions and reported the figures owed by the LLCS for the outstanding mortgages and costs related to the arrests at that time were as follows:

- F/V QUINBY ALLIE:        $1,088,560.20
- F/V BELLA SKY:           $  471,343.52

*See* Truist's Motions and Affidavits in both Arrest Actions, attached hereto as **Exhibit Y.**

116.   Truist's outstanding figures include the following for F/V QUINBY ALLIE – principal of $853,657.85, plus interest, *custodia legis*, attorneys' fees, and other costs in the amount of $234,902.24, and for F/V BELLA SKY – outstanding principal of $325,732.78, plus interest, *custodia legis*, attorneys' fees, and other costs in the amount of $145,704.19. *Id.*

117.   On March 22, 2022, the judicial auction took place with the U.S. Marshal.

118.   Tremont Fisheries, LLC submitted the highest bid in the amount of $325,733 for F/V BELLA SKY, which was significantly below F/V BELLA SKY's hull and permit valuation of $1,183,000.

119.   NJUP, LLC submitted the highest bid in the amount of $1,500,000, also significantly below F/V QUINBY ALLIE's hull and permit valuation of $2,180,000.

120.    Truist filed a Motion to Confirm the Vessel Sales in the MA Arrest Actions, and the LLCs have filed Briefs in Opposition. At the time of this filing, that Honorable Court has not yet issued a ruling on Truist's Motions. If that Honorable Court confirms the judicial sales of F/V Bella Sky and F/V Quinby Allie, then that will cause the LLCs to lose their only assets.

121.    Since the Vessels have been detained in the Massachusetts Vessel Arrest Actions, Quinby Allie, LLC and Bella Sky, LLC have lost in excess of approximately $ $2,414,000, and $1,970,000, respectively, in income each Vessel would have earned from fishing trips had the Defendants not caused BB&T/Truist to arrest the Vessels. Dwyer has lost in excess of approximately $250,000 in lost salary as a vessel manager and in crew wages he would have earned as captain of the Vessels.

## RIGHT OF ACTION AND STANDING

122.    As set forth more fully herein, Dwyer has been unable to deal with the co-member of the LLCs, Amory, directly since September 11, 2020, has been unable after numerous requests by himself and by counsel over months prior to filing this action to obtain full and complete answers and accountings as to the business affairs of the LLCs, including how such large debts to LDA were incurred, has been locked out of access to the LLCs' bank accounts, and his recent written request for an accounting of information of the affairs and accounts of the LLCs was completely ignored.

123.    Dwyer, as set forth herein and below, has been oppressed by the actions and breaches of fiduciary duties of Amory, and Amory has exercised complete control and domination over the corporate affairs of the LLCs.

124.     Amory has actively concealed his actions related to the LLCs from Dwyer and has affirmatively blocked and obstructed Dwyer's efforts to gain access to the financial records of the LLCs.

125.     Based on the actions of Amory, and the actions he has caused LDA to take against the LLCs, including seizing their only assets for a judicial sale and informing the mortgage holders of the liens as an event of default, Amory is acting solely for his personal benefit, and/or for the benefit of LDA, a company which he manages and controls, and without any regard for his fiduciary duties owed to the LLCs.

126.     There are no other members or managers of the LLCs other than Dwyer and Amory. As such, the requirement in Va. Code § 13.1-1042(B) and/or Federal Rule of Civil Procedure 23.1, as applicable, that written demand be made on the LLCs to take suitable action prior to filing a derivative action on behalf of the LLCs should be waived here because such demand would be futile. *See Davis v. MKR Dev., LLC*, 295 Va. 488, 814 S.E.2d 179 (2018).

**COUNT ONE**

**Wrongful Arrest – General Maritime Law**
**By Troy D. Dwyer, derivatively on behalf of Bella Sky, LLC and Quinby Allie, LLC**
**Against L. D. Amory and Company, Incorporated,**
**C. Meade Amory, and Quinby J. Amory**

127.     Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.     On March 12, 2021, LDA filed an *in rem* action in this Court against the F/V BELLA SKY and F/V QUINBY ALLIE, claiming as the basis for such *in rem* relief maritime liens for necessaries.

129.     The wrongful arrest complaint was a sham pleading directed by Amory, as indicated by the fact he caused LDA, a company of which he is an officer, employee, and for

27

which he runs the day-to-day affairs, to sue himself personally, but the complaint made no allegations of misconduct by Amory.

130.    LDA knew or should have known that the purported debt of LDA did not create a maritime lien on the Vessels, yet it willfully, in bad faith, and or with gross negligence caused LDA to assert maritime liens and arrest the Vessels on the false authority of such liens.

131.    The vessel arrest, based on purported maritime liens arising from the LDA loans, was wrongful, in direct violation of established law, and wholly unsupported by evidence of actual indebtedness, notes payable, or receipt of loan funds by the LLCs.

132.    Defendant, Mrs. Amory, verified the truth of the complaint under penalty of perjury under U.S. law on March 10, 2021, identifying herself as president of LDA. See Verification, Exhibit N. Her Verification attests the matters set forth in the Complaint "are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters, I believe them to be true." *Id.* Without a verification, the *in rem* action could not be properly filed and accepted by this Court.

133.    Mrs. Amory is not familiar with the business affairs and records of LDA, she has little to no knowledge of the purported loans LDA made over the years to the LLCs upon which the Verified Complaint and Vessel arrest was premised.  As such, her Verification was made in violation of 28 U.S.C. § 1746, and with gross negligence and/or reckless disregard for the truth.

134.    Amory is familiar with the business affairs and records of LDA, and he is the only officer of LDA with sufficient knowledge of LDA's transactions with the LLCs to provide the information used to draft the Verified Complaint.

135.    On March 13, 2021, as set forth above, pursuant to the *in rem* action, LDA caused the U.S. Marshal to seize the LLCs' sole assets, the Vessels, in order to recoup the purported debt owed to LDA in the action. *See* **Exhibit L**.

136.    On March 13, 2021, Dwyer, on behalf of the LLCs, retained counsel to move to quash the arrests as unlawful.  Said undersigned counsel worked through the weekend, negotiating with counsel for LDA in New Jersey, seeking a release of the Vessels and arguing there were no valid liens.  Ultimately, Dwyer, on behalf of the LLCs, and by counsel filed a Motion to Vacate Order of Warrant of Arrest, Quash the Arrest of the F/V QUINBY ALLIE and F/V BELLA SKY, for Attorneys' Fees and Costs, and Request for Emergency Hearing and Expedited Relief in the evening of Sunday, March 14, 2021. *See* Mem. in Supp. of Motion to Quash, attached hereto as **Exhibit R**; **Exhibit Q** (annotated ledger filed with memorandum).

137.    On the morning of March 15, 2021, counsel for LDA caused the Vessels to be released from arrest and later that day dismissed the entire action. As set forth more fully in the Motion to Quash, LDA had no documentation for the purported debt upon which it asserted liens, and LDA did not actually provide any necessaries to the LLCs that were the basis of the liens.  *See* **Exhibits Q & R**.

138.    As set forth more fully in the memorandum in support of the Motion to Quash the Arrest, there are numerous and various reasons why the debt claimed by LDA is invalid, unlawful, time barred, and unenforceable, and LDA knew or should have known this prior to arresting the Vessels. *See* **Exhibits Q & R.**

139.    Much of the debt claimed by LDA in the wrongful arrest action was for another LLC and another vessel, and as such could not by any theory create a lien for necessaries on the two Vessels seized by LDA. *See* **Exhibits Q & R**.

29

140.     LDA knew or show have known the debt it claims and claimed the LLCs owe it do not create maritime liens for necessaries on the Vessels. *See* **Exhibits Q & R**.

141.     As a result of the wrongful arrest of the Vessels, the LLC's have been damaged by incurring attorneys' fees, expenses, and other amounts as may be determined at trial.

142.     The Court should find both LDA, and Mrs. Amory for her acts in falsely and/or with gross negligence verifying the complaint so that the Vessels could be arrested, are liable to the LLCs, and award the LLCs compensatory damages proximately caused by the wrongful arrest, as well as punitive damages in the amount of $500,000.

## COUNT TWO

**Declaratory Relief that the Vessels are Not Subject to Maritime Liens Recorded by LDA under 46 U.S.C. § 31343(c)(2), and Demand for Attorneys' Fees and Costs By Troy D. Dwyer, derivatively on behalf of the LLCs Against L.D. Amory and Company, Incorporated and Quinby J. Amory**

143.     Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.     A maritime lien for necessaries arises when a materialman provides "necessaries" to a vessel, which "includes repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4).

145.     A maritime lien arises by operation of law due to the nature of goods or services provided to a vessel on the order of the owner or person authorized by the owner, on the credit of the vessel, and not by contract or otherwise.  *See, e.g.,* 46 U.S.C. § 31342(a).

146.     On February 24, 2021, LDA recorded a notice of liens for necessaries with the United States Coast Guard against the Vessels, as follows: (a) against the F/V BELLA SKY in the amount of $ 499,175.00, with interests and costs accruing, for liens arising on multiple dates since July 31, 2014 through January 31, 2021, and (b) against the F/V QUINBY ALLIE in the

amount of $594,131.80, with interest and costs accruing, for liens arising on multiple dates since September 21, 2012, through January 31, 2021. *See* **Exhibit J.**

147.    These claims of lien are false, fraudulent, and asserted in bad faith. *See* **Exhibits Q & R**.

148.    Mrs. Amory executed each notice of claim of lien against the Vessels without any good faith basis for believing they were valid, and, as such, is personally liable for her individual action in causing the invalid liens to be recorded. *See* **Exhibit J**.

149.    The liens for necessaries claimed by LDA against the Vessels are not valid maritime liens for necessaries because LDA provided no goods or services to the Vessels that qualify as necessaries under maritime law or statute. *See* **Exhibit J.**

150.    LDA's claimed lien against the F/V BELLA SKY goes back to July 31, 2014, which is almost three years before the F/V BELLA SKY (Official No. 580932) was acquired by Bella Sky, LLC on April 4, 2017. *See* Abstract of Title, p.6, **Exhibit S**.

151.    Likewise, LDA's claimed lien against the F/V QUINBY ALLIE goes back to September 21, 2012, almost seven years before the Vessel was acquired by Quinby Allie, LLC on June 5, 2019 and before Quinby Allie, LLC existed. See Abstract of Title, p.6, **Exhibit T**.

152.    As such, a substantial portion of the lien amount LDA claims against the Vessels, in the approximate amount of $289,748.01, is based on a legal impossibility: amounts LDA purportedly advanced to or provided to the Vessels for necessaries before each respective Vessel was acquired by the LLCs. *See* **Exhibit Q** (entries noted in orange).

153.    LDA, by and through its president, Mrs. Amory, continues to assert these wrongful in invalid liens against the Vessels, even after dismissing its Vessel Arrest action against the Vessels.

154.     Further, to the extent the debt upon which the liens are based are time barred, as set forth in Count Five, this debt cannot form the basis of maritime liens and should be declared invalid and unenforceable.

155.     Accordingly, the Court should declare the F/V BELLA SKY and F/V QUINBY ALLIE are not subject to the liens claimed by LDA, and award the LLCs their costs and attorneys' fees and such other and further relief as it deems appropriate. Such relief should be ordered against both LDA, and also Mrs. Amory, for her own acts in signing and executing each Notice of Claim of Lien so that the wrongful liens could be recorded.

## COUNT THREE

**Breach of Fiduciary Duty**
**By Troy D. Dwyer, Derivatively on Behalf of the LLCs and Individually**
**Against C. Meade Amory**

156.     Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.     Dwyer brings this count derivatively on behalf of the LLCs against defendant, Amory. Amory breached his fiduciary duties to the LLCs as alleged below and described above. Amory further brings this count for his individual injuries separate and apart from the injuries of the LLCs.

158.     Amory, as manager and member of the LLCs, owed fiduciary duties to the LLCs. These fiduciary duties include duties of care, loyalty, good faith, and candor.

159.     Amory's fiduciary duty of loyalty prohibits him from acting in bad faith with respect to the use of funds and assets of the LLCs.

160.     Amory has in the past, and continues to this day, to possess complete and unfettered control and domination over the bank accounts, funds, and other financial resources of

the LLCs, to the point where Triplett at Amory's direction informed Dwyer, via his counsel, on

January 13, 2021, that she denied requests to access the online accounts since "Troy has never

had access to or been an authorized signer on the accounts."  *See* E-mails, **Exhibit U**.

161.    Until Amory froze the LLCs' accounts and credit cards, all funds received by the

Vessels from all fishing trips or other sources were deposited into each LLC's respective bank

account. As such, Amory has had complete and unfettered control and domination over the funds

of the LLCs.

162.    Amory has mismanaged the funds of the LLCs, poorly managed the books and

records of the LLCs, and failed to inform Dwyer when cash contributions were needed from the

members. When in the past Dwyer suggested borrowing from a bank when he believed the

Quinby Allie LLC might need additional funds for refitting the new vessel in the Summer and

Fall of 2019, Amory refused.

163.    In direct, knowing, and willful violation of the LLCs' Operating Agreements,

Amory caused the LLCs to purportedly contract debts, including notes payable, in the amount of

$1,095,699.23. Such purported debt was incurred without a resolution of the members to incur

debt, as the Operating Agreements of each LLC requires, was not the result of legitimate arms-

length transactions, and provided no benefit whatsoever to the LLCs.

164.    Amory has engaged in self-dealing transactions that were not open, fair, and

honest, including acts which serve Amory's personal motives, and that serve to benefit an entity,

LDA, of which Amory is an officer, employee, and runs the day-to-day affairs. Amory's acts

have resulted in the assets of the LLCs being wasted, actually seized by judicial process, subject

to risk of foreclosure, and the accounts of the LLCs to be in such disarray that the LLCs are

subject to large, questionable debts and liens, and potential foreclosure on the Vessels by the mortgagees of the Vessels.

165.    First in Virginia, then again in Massachusetts, Amory, in a direct, knowing, and willful breach of his fiduciary duties to the LLCs, sought by way of improper use and abuse of judicial process to have the only assets of the LLCs, and the only means by which the LLCs could earn revenue, involuntarily sold. In so doing, Amory advanced his personal interests and those of LDA to the detriment of the LLCs.

166.    Amory's personal motivation further caused him to have LDA and Mrs. Amory to record unlawful and invalid liens against the Vessels and notify the mortgage holders in an attempt to force a foreclosure and bank sale of the Vessels, to the detriment of the LLCs.

167.    Amory, by and through Triplett, Mrs. Amory, and LDA, again caused the Vessels to be arrested by falsely notifying BB&T that LDA was owed combined debts of $1,092,699.23. *See* **Exhibit J.**

168.    Due to the willful misconduct of Amory, as set forth herein with the many instances of knowing breach of his fiduciary duty owed to each LLC, Amory is not entitled to the limitation of liability of members and managers under the Virginia LLC Act, Va. Code § 13.1-1025(A), or the business judgment rule, or any other provision of Virginia law.

169.    The wrongful arrest directed by Amory by and through Triplett and Mrs. Amory in Virginia caused the LLCs to incur substantial costs, including attorneys' fees and other expenses in such amount as may be proven at trial.

170.    The Vessel arrests by BB&T/Truist in Massachusetts initiated by Amory by and through Triplett and Mrs. Amory caused the LLCs to incur substantial costs, including lost

fishing revenue, fees incurred by BB&T/Truist for the arrest proceedings, as well as attorneys' fees and other expenses in such amount as may be proven at trial.

171.    As a result of Amory's breach of his fiduciary duty to each of the LLCs, each LLC has been damaged by the claims of substantial debts and liens as follows:

   a.   by the loss of fishing income each Vessel would have earned from fishing trips made after Amory effectively tied up the boats, as set forth above, in an amount in excess of $1,000,000;

   b.   by the loss of fishing income each Vessel would have earned from fishing trips made after Amory caused BB&T/Truist to arrest the Vessels in Massachusetts, as set forth above, in a combined amount in excess of $4,384,000;

   c.   the interest, *custodia legis,* attorneys' fees, and other costs claimed by BB&T/Truist incurred in the Massachusetts Vessel arrest actions in the amount of $234,902.24 for F/V QUINBY ALLIE and $145,704.19 for F/V BELLA SKY and accruing; and

   d.   other further damages in an amount to be determined at trial.

172.    Further as a result of Amory's breach of his fiduciary duty to each of the LLCs, Dwyer suffered a direct and individual injury separate and distinct from injury to the LLCs, and has been damaged by:

   a.   the loss of crew earnings in the approximate amount of $12,000 he would have earned from fishing trips he was unable to take on the Vessels after Amory effectively tied up the boats, as set forth above, and until Dwyer was able to unilaterally restart fishing activities, and

    b.   loss of salary from the LLCs from August 14, 2020 until February 20, 2021, until the time Dwyer was able to reinstate the LLCs' salary after he was able to unilaterally restart fishing activities by the Vessels in the approximate amount of $40,500;

    c.   loss of salary and crew earnings from the LLCs from May/June 2021 until present and accruing, in the approximate amount of $250,000 due to the Vessels being detained in the Massachusetts arrest actions;

    d.   exposure to personal liability as a result of his personal guarantees of the BB&T notes on the Vessels; and

    e.   other further damages in an amount to be determined at trial.

173.    The LLCs have further been damaged as a result of Amory's continuing breach of his fiduciary duties in an amount to be proven at trial, but not less than the wrongful and purported debt claimed by LDA against Bella Sky, LLC in the originally claimed amount of $501,567.43, and against Quinby Allie, LLC in the originally claimed amount of $594,131.80, which since has been revised to $261,685.57 against F/V QUINBY ALLIE and $202,101.40 against F/V BELLA SKY, plus an award of costs, pre-judgment and post-judgment interest as allowed by law, and such other and further relief as the Court deems appropriate.

174.    The Court should further order Amory (1) to make a full and complete accounting of all the receipts disbursements and financial affairs of the LLCs since their inception to the present, and, pursuant to Va. Code 13.1-1028(B)(1) and (2), to provide full access to the records of the LLCs and true and full information regarding the affairs of the LLCs.

## COUNT FOUR

**Removal as Manager of the LLCs and Dissociation as Member**
**of the LLCs under Va. Code § 13.1-1040.1(5)**
**By Troy D. Dwyer, derivatively on behalf of the LLCs**
**Against C. Meade Amory**

175.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    Dwyer brings this Count derivatively on behalf of the LLCs against defendant, Amory.

177.    Due to the improper activities and willful misconduct of Amory, Amory should be removed as manager of the LLCs.

178.    In addition, Amory should be dissociated from the LLCs pursuant to Va. Code § 13.1-1040.1(5) because:

a.    Amory engaged in wrongful conduct that adversely and materially affected the business of the LLCs;

b.    Amory willfully and persistently committed a material breach of the Operating Agreement of each of the LLCs; and

c.    Amory engaged in conduct relating to the business of the LLCs which makes it not reasonably practicable to carry on the business with Amory.

179.    Accordingly, Amory should be removed as manager so that Dwyer can serve as the sole manager of the LLCs.

180.    Further Amory should be expelled from the LLCs, with such dissociation causing Amory, under Va. Code §§ 13.1-1039 and 1040.2(A), to no longer be entitled to participate in the management and affairs of the LLCs or to exercise any rights of a member of the LLCs.

37

## COUNT FIVE

**Declaratory Relief as to Validity and Amount of Debt, 28 U.S.C. § 2201**
**By Troy D. Dwyer, derivatively on behalf of Bella Sky, LLC and Quinby Allie, LLC**
**Against L.D. Amory and Company, Incorporated**

181.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    A present case or controversy exists between the LLCs and LDA with respect to the validity and amount of debt LDA claims is owed to it from the LLCs, and LDA has taken action to collect on the purported debt by wrongful use of judicial process and wrongful assertion of maritime liens against the LLCs Vessels.

183.    Given the actual controversy, and the immediate risk of the Vessels of the LLCs being seized again or foreclosed upon due to LDA's assertion of liens and notice by LDA to the Vessel mortgage holders, declaratory relief is proper under 28 U.S.C § 2201.

184.    LDA claims Bella Sky, LLC owes it $501,567.43, and Quinby Allie, LLC $594,131.80 as a result of the aforementioned unauthorized and unsupported debt. See Verified Complaint ¶ 19.

185.    Any debt allegedly incurred by the LLCs to LDA was incurred due to the unauthorized actions of manager and member Amory, in violation of the Operating Agreement of each LLC, and, in accordance with Va. Code § 13.1-1021.1(2), is not binding against the LLCs.

186.    LDA, through Amory, had actual knowledge the LLCs could not incur debts and liabilities without the consent of Dwyer, and further had actual knowledge that Dwyer had not given such consent. LDA, therefore, had actual knowledge that any such transactions were *ultra vires*.

187.    The Court should declare the debt asserted by LDA against the LLCs to be invalid and unenforceable against the LLCs.

188.    Alternatively, to the extent the Court finds any debt is owed by the LLCs to LDA, the Court should declare the debts asserted that are older than three years from the date of this filing, or approximately $443,202.15, are no longer actionable, enforceable, and collectible.  *See* **Exhibit Q** (entries marked in red and calculations noted); Va. Code § 8.01-246.4.

189.    Finally, should the Court find the LLCs owe debt to LDA in any amount, then Amory, as the manager and member whose actions caused the debts to be incurred, in willful and knowing violation of the Operating Agreements, should be held to be personally responsible for any such debts, and not the LLCs.

## COUNT SIX

**Tortious Interference**
**By Troy D. Dwyer, individually, and derivatively on behalf of Bella Sky, LLC and Quinby Allie, LLC Against L. D. Amory and Company, Incorporated, C. Meade Amory, and Quinby J. Amory**

190.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    In the spring 2021, the Vessels were back regularly fishing and therefore, before the arrests pending in Massachusetts, the LLCs had a valid business expectancy for future fishing profits using the Vessels for the 2021 and 2022 seasons.

192.    The Defendants, including LDA – a business that unpacks and buys seafood from commercial fishing vessels – were well aware that the LLCs had a valid expectancy of future income. Amory not only managed the LLCs finances, but also was aware that the commercial fishing operations were the LLCs' sole source of income and that Dwyer personally relied on and expected income from future fishing trips.

39

193.    Based on the Vessels' productive and profitable fishing operations in prior seasons and in spring 2021 prior to the arrests, as well as earnings for fishing vessels with fishing permits similar to the Vessels, the Vessels would have realized profits from their commercial fishing operations but for the Vessel arrests in Massachusetts in May-June, 2021 and subsequent sale at judicial auction on March 22, 2022.

194.    At all times material hereto, the Defendants have had knowledge of Dwyer and the LLCs' expectant fishing income, and the Defendants have been aware of the great care that Dwyer and the LLCs took to protect the LLCs' business expectancies, as well as the great care that Dwyer took to protect the LLCs' assets, the Vessels.

195.    The Defendants in bad faith controlled the actions which lead to the arrest of the Vessels in Massachusetts by directing Triplett to draft a letter to BB&T (Truist) notifying it of the LDA's knowingly invalid liens. *See* **Exhibit J.**

196.    Through the use of illegal, improper, deceitful and disloyal methods, the Defendants intentionally interfered with the LLCs' expectancies, thus causing both actual and future damage to the LLCs.

197.    As a direct and proximate result of the Defendants' tortious interference, the LLCs have lost profits that would have been derived from the Vessels continuing to fish during the 2021 and 2022 seasons, Dwyer lost income from his lost salary as vessel manager as well as lost income from earnings he expected to generate the Vessels' captain, and BB&T has alleged significant custodial costs and legal fees related to the Massachusetts arrest proceedings.

198.    As a direct and proximate result of the Defendants' tortious interference, due to the Vessels arrests in Massachusetts in May/June 2021, and until the date of trial, the LLCs have lost income in the combined amount of approximately $4,384,000, Dwyer has suffered direct

40

financial harm in the amount of approximately $250,000, and BB&T claims $1,088,560.20 from

F/V QUINBY ALLIE and $471,343.52 from F/V BELLA SKY in outstanding mortgages and

costs related to the Massachusetts arrest, which includes interest, *custodia legis*, attorneys' fees,

and other costs in the amount of $234,902.24 for F/V QUINBY ALLIE and $145,704.19 for F/V

BELLA SKY and accruing.

199.    Dwyer and the LLCs will continue to incur significant damages from the Vessels

begin detained due to the Massachusetts arrest actions.

## COUNT SEVEN
### Accounting
### By Troy D. Dwyer, Individually
### Against C. Meade Amory

200.    Dwyer incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

201.    Amory, as Manager of the LLCs, has always maintained complete control of the

LLCs finances and owes a fiduciary duty to the LLCS.

202.    Amory has caused the LLCs to make unauthorized payments to himself and third

parties for his personal benefit, unauthorized payments to LDA for his personal benefit, and

diverted settlement proceeds from the Vessels' landings to himself.

203.    The LLCs' financial records managed by Amory reveal significant discrepancies

in the application and use of the LLCs' assets.

204.    Dwyer is entitled to obtain an accounting of the LLCs pursuant to Va. Code

§8.01-31.

41

205.    Accordingly, Dwyer moves this Court to order an accounting of the LLCs to make sure that the assets and liabilities of the LLCs are being equitably and appropriately accounted for and managed.

206.    Dwyer moves for Amory to bear the full cost of the accounting.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, Troy D. Dwyer, derivatively on behalf of the Bella Sky, LLC and Quinby Allie, LLC, and individually, demands judgment as follows:

**For Declaratory Relief of Debt and Maritime Liens:**

a.  Issuing a declaratory judgment that the debt and maritime liens claimed by LDA against the LLCs and the Vessels are invalid, non-binding, and unenforceable against the LLCs or the Vessels;

b.  Alternatively, issuing a declaratory judgment that Amory and no one else is liable personally for the debts of the LLCs owed to LDA, if any;

c.  Alternatively, issuing a declaratory judgment that the debts asserted by LDA against the LLCs that are older than three years are no longer actionable, enforceable, and collectible; and

d.  Awarding the LLCs their attorneys' fees and costs incurred in seeking to have the liens for necessaries declared invalid pursuant to 46 U.S.C. § 31343(c)(2), against LDA and Mrs. Amory, jointly and severally;

**For Wrongful Arrest:**

Awarding the LLCs compensatory damages in the amount of $100,000, or such other amount as may be proven at trial, for their attorneys' fees, costs, and expenses incurred as

a result of the wrongful arrest, and punitive damages of $500,000, against LDA, Amory, and Mrs. Amory, jointly and severally.

**For Breaches of Fiduciary Duties by C. Meade Amory:**

a.  Ordering Amory to make a full and complete accounting of the financial affairs, including all notes payable, loan agreements, receipts and disbursements of the LLCs and provide full information about the business and financial condition and other information regarding the affairs of the LLCs, including ordering Amory to provide direct access to the books and records of each LLC, from their inception to the present;

b.  Ordering that Amory be removed as manager for the LLCs, that he be expelled and dissociated from the LLCs, and that he be permanently barred from further participation in the management and affairs of the LLCs, pursuant to Va. Code § 13.1-1040.1(5);

c.  Awarding Dwyer compensatory damages for lost wages for the period when Amory cut off his salary from the LLCs until it was reinstated, and for lost crew wages for the period when the Vessels were unable to fish due to the actions of Amory in the approximate amount of $52,500, or such other amount as may be proven at trial against Amory;

d.  Awarding Dwyer compensatory damages for lost wages from his salary as a vessel manager and for lost crew wages for the period when the Vessels were first detained in the Massachusetts arrest actions caused by Amory from May 25, 2021 to the present date, in the approximate amount of $250,000, or such other amount as may be proven at trial against Amory;

e.  Awarding the LLCs their lost income in the combined amount of over $1,000,000 after Amory effectively tied up the Vessels in 2020, and approximately $4,384,000 for the

period of time when the Vessels were unable to fish from the dates of the Massachusetts arrests until the present date;

f.   Awarding the LLCs the total amount recovered by Truist against the Vessels and/or LLCs in the Massachusetts arrest actions, including but not limited to interest, *custodia legis*, attorneys' fees, and other costs in the amount of $234,902.24 for F/V QUINBY ALLIE and $145,704.19 for F/V BELLA SKY and other amount as may be proven at trial, against Amory;

g.   Awarding the LLCs, and each of them, punitive damages in the amount of $350,000 against Amory;

h.   Awarding the LLCs the costs and disbursements of this action, including reasonable attorneys' fees, accountant and expert fees, costs, and expense pursuant to Va. Code § 13.1-1045, against Amory; and

i.   Granting such other appropriate equitable relief to remedy the breaches of fiduciary duties as alleged herein.

**Tortious Interference:**

a.   Awarding the LLCs their lost fishing income of a combined approximately $4,384,000, or such other amount as may be proven at trial, for the Vessels arrests in Massachusetts in May/June 2021 and through the time of trial;

b.   Awarding Dwyer lost income from his lost salary as vessel manager as well as lost income from earnings he expected to generate as the Vessels' captain in the amount of $250,000 or such other amount as may be proven at trial; and

c.   Awarding the LLCs the total amount recovered by Truist against the Vessels and/or LLCs in the Massachusetts arrest actions, including but not limited to interest, *custodia*

*legis*, attorneys' fees, and other costs in the amount of $234,902.24 for F/V QUINBY

ALLIE and $145,704.19 for F/V BELLA SKY and other amount as may be proven at

trial.

**Accounting:**

    a.  Ordering a neutral, third-party accountant to review the books, records, and accounts of

        the LLCs to adequately determine the present status of the same, history of all

        transactions of the LLCs between July 31, 2014 and the date of filing this Complaint, and

        to fix appropriate values for the LLC's assets for the purpose of liquidation during

        winding up.

    b.  Ordering that Amory bear the full cost of the accounting.

Additionally, the Court should award pre-judgment and post-judgment interest at the legal and

judgment rate of interest as allowed by law, and grant such other and further relief as the Court

deems just and proper.


                           Respectfully submitted,

                           **TROY D. DWYER**, derivatively on behalf
                           of Bella Sky, LLC and Quinby Allie, LLC, and
                           Individually,


                           By:    */s/ Julia A. Rust*
                                  Of Counsel

                           Julia A. Rust, Esq. (VSB No.: 87270)
                           PIERCE MCCOY, PLLC
                           101 West Main Street, Suite 101
                           Norfolk, Virginia 23510
                           Telephone: (757) 216-0226
                           Facsimile: (757) 257-0387
                           julia@piercemccoy.com

and

By: ___/s/ *Kirby L. Aarsheim*_____
        Of Counsel, *Pro Hac Vice*

Kirby L. Aarsheim
BBO No.: 678774
FARRELL SMITH O'CONNELL
AARSHEIM APRANS LLP
27 Congress Street, Suite 109
Salem, MA 01970
Telephone: (978) 744-8918
Facsimile: (978) 666-0383
e-mail: kaarsheim@fsofirm.com

*Counsel for Troy D. Dwyer, derivatively on behalf of Bella Sky, LLC and Quinby Allie, LLC, and Individually*

# Exhibit V

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

**TRUIST BANK,**

    **Plaintiff,**

v.

**F/V QUINBY ALLIE, OFFICIAL
NUMBER 507438, HER ENGINES,
TACKLE, FURNISHINGS, EQUIPMENT,
SUPPLIES, FISHING PERMITS, AND
OTHER APPURTENANCES,** *in rem,*

    **Defendant.**

**Civil Action No.**  21-10835

### VERIFIED COMPLAINT IN ADMIRALTY
### AND PRAYER FOR *IN REM* ARREST

Now comes the Plaintiff, Truist Bank (f/k/a Branch Banking and Trust Company) ("Truist"), by and through undersigned counsel, Clinton & Muzyka, P.C., and as for its Complaint against the F/V QUINBY ALLIE, Official No. 507438, her engines, tackle, furnishings, equipment, supplies, fishing permits, and any and all fishing and other appurtenances, accessories and additions, improvements and replacements (the "Vessel"), *in rem*, for foreclosure of a preferred ship mortgage, states as follows:

    1.    Truist is a bank organized under the laws of the State of North Carolina, with its principal place of business in the State of North Carolina.

    2.    The Vessel is a fishing vessel flagged and documented in the United States.

    3.    Venue is proper in this Court because the Vessel is now, or will be during the pendency of this action, afloat upon the waters of this District.

    4.    This is an admiralty and maritime claim *in rem* within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 50 of 127 PageID# 932
Case 1:21-cv-10835-ADB   Document 1   Filed 05/20/21   Page 2 of 5

2

Claims and Asset Forfeiture Actions. Jurisdiction is proper under 28 U.S.C. § 1333 and under 46 U.S.C. §§ 31321 *et seq*.

5.    On or about September 27, 2019, QUINBY ALLIE, LLC, a Virginia limited liability company with its principal place of business in Hampton, Virginia ("Mortgagor"), duly executed a promissory note payable to Branch Banking and Trust Company (now Truist) in the original principal amount of $998,212.90 (the "Note"). A true and correct copy of the Note is attached hereto as ***Exhibit "A*."

6.    On or about September 27, 2019, Mortgagor was the sole owner of the whole of the Vessel. To secure the payment of the Note, Mortgagor duly executed and delivered to Branch Banking and Trust Company (now Truist) a preferred mortgage upon the Vessel dated September 27, 2019 (the "Preferred Mortgage"). A true and correct copy of the Preferred Mortgage is attached hereto as ***Exhibit "B*."

7.    The Preferred Mortgage was duly recorded with the U.S. Coast Guard's National Vessel Documentation Center on October 1, 2019, at Batch #: 68025100 / Document ID #: 2, in accordance with 46 U.S.C. §§ 31321 *et seq*., and it otherwise fulfills all requirements to constitute a preferred mortgage under that Act.

8.    Mortgagor has defaulted under the Note, the Preferred Mortgage, and related documents. By reason of said defaults, Truist has elected to exercise its option under the Note to accelerate and declare the entire indebtedness secured by the Preferred Mortgage immediately due and payable in full. The principal amount due under the Note as of May 19, 2021 is $878,098.38. Accumulated interest due under the Note as of May 19, 2021 is $16,336.51 and fees and costs in the amount of $3,543.64 have accrued on the Note.

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 51 of 127 PageID# 933
Case 1:21-cv-10835-ADB   Document 1   Filed 05/20/21   Page 3 of 5

3

**WHEREFORE**, Plaintiff, Truist Bank, respectfully prays:

1.      that a warrant of arrest issue against the F/V QUINBY ALLIE, her engines, tackle, furnishings, equipment, supplies, fishing permits, etc., and that all persons claiming any interest therein may be cited to appear and answer this Complaint;

2.      that this Court direct the manner in which the actual notice of the commencement of this civil action shall be given to the Master or other ranking officer or caretaker of the Vessel, and to any person which has recorded a notice of claim of any undischarged lien upon the Vessel;

3.      that the Preferred Mortgage be declared to be a valid and subsisting lien in the sum of $878,098.38 outstanding principal, plus interest at 15.00% from May 20, 2021, $16,336.51 in accumulated interest, and $3,543.64 in accrued fees and costs, together with all amounts required to be disbursed by Truist for the care and preservation and insurance and the cost of any additional insurance on the Vessel, and all other advances, expenses, attorneys' fees, costs and disbursements on Truist herein, with interest at 15.00% per annum thereon, such lien to be prior and superior to the interest, liens, or claims of any and all persons whatsoever, except such persons as may hold preferred maritime liens on the Vessel;

4.      that the F/V QUINBY ALLIE, her engines, tackle, furnishings, equipment, supplies, fishing permits, etc. be condemned and sold to pay the same;

5.      that it be decreed that any and all persons claiming any interest in the Vessel are forever barred and foreclosed of and from all right or equity of redemption or claim of, in or to the mortgaged Vessel and every part thereof; and

6.      that Truist have such other and further relief that law and justice may require.

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 52 of 127 PageID# 934
Case 1:21-cv-10835-ADB   Document 1   Filed 05/20/21   Page 4 of 5

4

**TRUIST BANK**
By its attorneys,
**CLINTON & MUZYKA, P.C.**

"/s/Thomas J. Muzyka"
**Thomas J. Muzyka**
**BBO No. 365540**
**John J. Bromley**
**BBO No. 672134**
Board of Trade Building
One India Street, Suite 200
Boston, MA 02109
(617) 723-9165
F: (617) 720-3489
tmuzyka@clinmuzyka.com
jbromley@clinmuzyka.com

AND

John E. Holloway, Esq. (VSB No. 28145)
Ryan T. Gibson, Esq. (VSB No. 83183)
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: 757-687-7724
Facsimile: 757-687-7510
Email: john.holloway@troutman.com
Email: ryan.gibson@troutman.com
*Counsel for Truist Bank*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

TRUIST BANK,

     **Plaintiff,**

v.                                                                Civil Action No. _____

**F/V QUINBY ALLIE, OFFICIAL**
**NUMBER 507438, HER ENGINES,**
**TACKLE, FURNISHINGS, EQUIPMENT,**
**SUPPLIES, FISHING PERMITS, AND**                    **IN ADMIRALTY**
**OTHER APPURTENANCES,** *in rem,*

     **Defendant.**

## VERIFICATION OF COMPLAINT

     I, Steve Blevins, declare as follows:

     1.     I am the Senior Vice President of Truist Bank, the Plaintiff herein.

     2.     I have read the foregoing Complaint and know the contents thereof.

     3.     The Complaint is true of my own knowledge, except as to the matters therein

stated upon information and belief and, as to those matters, I believe them to be true.

     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.


     Executed this 20th day of May, 2021.

                                 _____
                                   Steve Blevins

# EXHIBIT A

*9700274333000021472*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $998,212.90 | 09-27-2019 | 09-27-2024 | 00002 | | 9700274333 | 15448 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:**  QUINBY ALLIE, LLC; L. D. AMORY AND
COMPANY, INCORPORATED; A & D FISHERIES,
LLC; and BELLA SKY, LLC
101 S KING ST
HAMPTON, VA 23669-4025

**Lender:**  BRANCH BANKING AND TRUST COMPANY
Peninsula - Commercial Loans
737 J Clyde Morris Blvd
Newport News, VA 23601-1538

### IMPORTANT NOTICE

THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.

Principal Amount: **$998,212.90**                              Date of Note:  **September 27, 2019**

**PROMISE TO PAY.**  QUINBY ALLIE, LLC; L. D. AMORY AND COMPANY, INCORPORATED; A & D FISHERIES, LLC; and BELLA SKY, LLC ("Borrower") jointly and severally promise to pay to BRANCH BANKING AND TRUST COMPANY ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nine Hundred Ninety-eight Thousand Two Hundred Twelve & 90/100 Dollars ($998,212.90), together with interest on the unpaid principal balance from September 27, 2019, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 5.500%, until paid in full.  The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.**  Borrower will pay this loan in 59 regular payments of $10,872.88 each and one irregular last payment estimated at $579,063.93. Borrower's first payment is due October 27, 2019, and all subsequent payments are due on the same day of each month after that.  Borrower's final payment will be due on September 27, 2024, and will be for all principal, accrued interest, and all other applicable fees, costs and charges, if any, not yet paid.  Payments include principal and interest.  Unless otherwise agreed or required by applicable law, payments will be applied to any unpaid collection costs, late and other charges and fees, accrued unpaid interest, and principal in such order as Lender may determine in its sole and absolute discretion.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**REAMORTIZATION.** In addition to other rights herein, Lender reserves the right in its sole discretion, from time to time, to (a) adjust any periodic fixed payment in such amounts and at such times to repay principal at the amortization period originally agreed upon and accruals of interest as the same becomes due, and (b) increase Borrower's payments to pay all accruals of interest for the period and accruals of unpaid interest from previous periods.

**PREPAYMENT PENALTY.  Upon prepayment of this Note, Lender is entitled to the following prepayment penalty:  Each prepayment of the principal balance of this Note, whether in whole or in part and whether voluntary, mandatory, upon acceleration or otherwise, shall be made after giving the Lender at least two (2) Banking Days' notice and shall be accompanied by prepayment compensation in the amount deemed necessary by the Lender to compensate the Lender for any losses, costs or expenses which the Lender may incur as a result of such prepayment (the "Prepayment Compensation"). Any prepayment of principal shall also be accompanied by a payment of interest accrued to date on this Note, together with any and all late charges, attorneys' fees and other sums due thereon. "Banking Day" shall mean any day other than a Saturday, Sunday, federal holiday or other day in which the Lender is authorized or required by applicable law to be closed. If the Borrower fails to pay the Prepayment Compensation when due, the amount of the Prepayment Compensation shall thereafter bear interest until paid at the interest rate after default as specified in this Note. All prepayments shall be applied to the principal installments due under this Note in the inverse order of their maturities. The determination of the amount of the Prepayment Compensation due the Lender hereunder shall be made by the Lender in good faith and shall be conclusive and binding upon the Borrower absent manifest error; provided, however, that the Prepayment Compensation shall in no event exceed the maximum prepayment compensation permitted by applicable law and this Note shall be construed to give maximum effect to the provisions contained herein.**
**The Prepayment Compensation shall be calculated as follows:**
**For any principal prepayment of this Note, the Borrower shall pay 1% of the  amount of the outstanding principal balance only when credit is refinanced with another financial institution. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  BRANCH BANKING AND TRUST COMPANY, Peninsula - Commercial Loans, 737 J Clyde Morris Blvd, Newport News, VA 23601-1538.**

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged **5.000% of the regularly scheduled payment.**

**INTEREST AFTER DEFAULT.**  Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 15.000%.  However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

   **Payment Default.**  Borrower fails to make any payment when due under this Note.

Case 1:21-cv-10835-ADB  Document 1-1  Filed 05/20/21  Page 3 of 6

**PROMISSORY NOTE**

**(Continued)**

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf, or made by Guarantor, or any other guarantor, endorser, surety, or accommodation party, under this Note or the related documents in connection with the obtaining of the loan evidenced by this Note or any security document directly or indirectly securing repayment of this Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors, or Borrower files for bankruptcy, or an involuntary bankruptcy petition is filed against Borrower and such involuntary petition remains undismissed for sixty (60) days.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.** Any execution or attachment is levied against the Collateral, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

**Change in Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Collateral such that the present or intended use of the Collateral, as specified in the related documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Collateral.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Borrower and the failure by Borrower to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor, or any other guarantor, endorser, surety, or accommodation party of any of the indebtedness or any Guarantor, or any other guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**CHANGE IN OWNERSHIP - LIMITED LIABILITY COMPANY.** The issue, transfer or sale of an ownership interest of twenty-five percent (25%) or more of the Borrower or Guarantor that is a limited liability company shall constitute an Event of Default under this instrument or agreement.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount.

**LENDER'S REMEDIES.** Upon an Event of Default, in addition to Lender's rights set forth above, Lender may, at its option and without notice to Borrower (i) cease making advances or disbursements; (ii) advance funds necessary to remedy any default or pay any lien filed against any of the Collateral; (iii) take possession of the Collateral or any part thereof; (iv) foreclose Lender's security interest and/or lien on any Collateral in accordance with applicable law; (v) make demand upon any or all Guarantors; and (vi) exercise any other right or remedy which Lender has under the Note or any related documents or which is otherwise available at law or in equity. Upon an Event of Default, Lender may immediately apply the rate specified in the Interest After Default provision set forth above until the Indebtedness has been paid in full or until the default has been satisfactorily cured which may be allowed at the sole discretion of the Lender, and such rate shall apply after judgment. All of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Any election by Lender to pursue any remedy shall not exclude the right to pursue any other remedy unless expressly prohibited by law, and any election by Lender to make expenditures or to take action to perform an obligation of Borrower, or of any Grantor, shall not affect Lender's right to declare a default and exercise its rights and remedies.

**RETURN PAYMENT FEE.** Borrower shall pay to Lender a returned payment fee if the Borrower or any other obligor hereon makes any payment at any time by check or other instrument, or by any electronic means, which is returned to Lender because of nonpayment due to nonsufficient funds.

**ATTORNEYS' FEES; EXPENSES.** Subject to any limits under applicable law, upon default, Borrower agrees to pay Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit, including without limitation legal expenses for bankruptcy proceedings.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Virginia without regard to its conflicts of law provisions. This Note has been accepted by Lender in the Commonwealth of Virginia.**

**CONFESSION OF JUDGMENT.** Upon a default in payment of this Note at maturity, whether by acceleration or otherwise, Borrower hereby irrevocably authorizes and empowers Christina Volzer Bailey and Lowell Patterson as Borrower's attorney-in-fact to appear in the Circuit Court of Fairfax County clerk's office and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal. By a written instrument Lender may appoint a substitute for the above named attorney-in-fact. If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney. Borrower waives the right

Case 1:21-cv-10835-ADB   Document 1-1   Filed 05/20/21   Page 4 of 6

## PROMISSORY NOTE
## (Continued)

**Loan No: 00002**                                                        **Page 3**

to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by (A) a Commercial Security Agreement dated September 27, 2019 made and executed between A & D FISHERIES, LLC and Lender on collateral described as All of Debtor's rights, title and interests in the collateral described below, whether now owned or hereafter acquired, and wherever located: (1) all Inventory, including all returned inventory, (2) all Equipment, including all Accessions thereto, and all manufacturer's warranties, parts and tools therefor; (3) all General Intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, software licenses and all Federal and state fishing permits
(and all species-specific permits associated therewith) now owned or hereafter acquired, including, but not limited to, those that were assigned to, connected with, or appurtenant to F/V LANGLEY DOUGLAS (Official No. 606719) (the "Vessel") and Northeast Federal Fishery Permit 410201, together with all amendments, supplements, renewals and/or replacements therefor; (4) all licenses, allocations, histories and quotas relating to the federal fishing rights in connection with the Vessel, including any renewals of such licenses, allocations, histories and quotas from time to time acquired by Debtor; (5) all supporting Obligations; (6) all proceeds (cash and non-cash) and Products of the foregoing collateral. The foregoing also includes the limited access fishing rights and fishing permit history in the Multispecies, Monkfish, Summer Flounder, Scup, Black Sea Bass, Longfin Squid/butterfish, Illex, Limited Access General Category Scallop, and American lobster fishery as set forth in that certain Confirmation of Permit History dated March 2, 2018. All capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

(B) a Commercial Security Agreement dated September 27, 2019 made and executed between BELLA SKY, LLC and Lender on collateral described as All of Debtor's rights, title and interests in the collateral described below, whether now owned or hereafter acquired, and wherever located: (1) Fishing Vessel "BELLA SKY", Official Number 580932 (the "Vessel") including all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, furniture, tackle, fittings, tools, pumps, radar, loran, electronic equipment, radios, equipment and supplies, and any and all other appurtenances, accessories and additions, improvements and replacements now or hereafter belonging to the Vessel, whether or not removed therefrom, and all related Equipment, including all Accessions thereto, and all manufacturer's warranties therefor, and all parts and tools therefor, all engines, tackle and appurtenances, proceeds, profits and rents; (2) all Inventory, including all returned inventory, (3) all Equipment, including all Accessions thereto, and all manufacturer's warranties, parts and tools therefor; (4) all scallops, fish and other aquacultural products now or hereafter and however and wherever caught and/or harvested by the Vessel; (5) any warehouse receipts and bills of lading now or hereafter issued pertaining to scallops or fish now or hereafter and wherever and however caught and/or harvested by the Vessel; (6) all General Intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, software licenses and all Federal and state fishing permits, now or hereafter acquired, that are assigned, issued to or connected with the Vessel including but not limited to Massachusetts State Commercial Permit No. 006938, Virginia Flounder Permit No. 580932, and Northeast Federal Fishery Permit 330199 (and all species-specific permits associated therewith), , together with all amendments, supplements, renewals and/or replacements therefor; (7) all licenses, allocations, histories and quotas relating to the federal fishing rights in connection with the Vessel, including any renewals of such licenses, allocations, histories and quotas from time to time acquired by Debtor; (8) all supporting Obligations; (9) all proceeds (cash and non-cash) and Products of the foregoing collateral. All capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

(C) a Commercial Security Agreement dated September 27, 2019 made and executed between QUINBY ALLIE, LLC and Lender on collateral described as All of Debtor's rights, title and interests in the collateral described below, whether now owned or hereafter acquired, and wherever located: (1) Fishing Vessel "QUINBY ALLIE", Official Number 507438 (the "Vessel") including all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, furniture, tackle, fittings, tools, pumps, radar, loran, electronic equipment, radios, equipment and supplies, and any and all other appurtenances, accessories and additions, improvements and replacements now or hereafter belonging to the Vessel, whether or not removed therefrom, and all related Equipment, including all Accessions thereto, and all manufacturer's warranties therefor, and all parts and tools therefor, all engines, tackle and appurtenances, proceeds, profits and rents; (2) all Inventory, including all returned inventory, (3) all Equipment, including all Accessions thereto, and all manufacturer's warranties, parts and tools therefor; (4) all scallops, fish and other aquacultural products now or hereafter and however and wherever caught and/or harvested by the Vessel; (5) any warehouse receipts and bills of lading now or hereafter issued pertaining to scallops or fish now or hereafter and wherever and however caught and/or harvested by the Vessel; (6) all General Intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, software licenses and all Federal and state fishing permits, now or hereafter acquired, that are assigned, issued to or connected with the Vessel (and all species-specific permits associated therewith), , together with all amendments, supplements, renewals and/or replacements therefor; (7) all licenses, allocations, histories and quotas relating to the federal fishing rights in connection with the Vessel, including any renewals of such licenses, allocations, histories and quotas from time to time acquired by Debtor; (8) all supporting Obligations; (9) all proceeds (cash and non-cash) and Products of the foregoing collateral. All capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

(D) a Second Preferred Ship Mortgage dated September 27, 2019 made and executed between BELLA SKY, LLC and Lender on a vessel described therein.

(E) a First Preferred Ship Mortgage dated September 27, 2019 made and executed between QUINBY ALLIE, LLC and Lender on a vessel described therein.

**FINANCIAL STATEMENTS.** Borrower agrees to provide Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**REQUIRED INFORMATION FOR A NEW LOAN.** To help the government fight the funding of terrorism and money laundering activities, federal law requires Lender to obtain, verify and record information that identifies each person or entity obtaining a loan including the Borrower's legal name, address, tax identification number, date of birth, driver's license, organizational documents or other identifying documents. Failure to provide the required information will result in a violation of the U.S. Patriot Act and will constitute a default under this instrument or agreement. In addition, none of the Borrower, any of its affiliates, or any of their respective directors, officers, managers, partners, or any other authorized

**PROMISSORY NOTE**

**Loan No: 00002**               **(Continued)**                                    **Page 4**

---

representatives is named as a "Specially Designated National and Blocked Person", on the list published by the U.S. Department of the Treasury Office of Foreign Assets Control (OFAC) at its official website.

**BUSINESS PURPOSE.** This instrument is entered into for a business purpose, does not evidence or constitute a "consumer transaction", as defined in the Uniform Commercial Code, and none of the proceeds of the loan evidenced hereby have been or will be used for personal, family or household purposes.

**USURY SAVINGS CLAUSE.** It is the intention of Lender and Borrower to comply strictly with all applicable usury laws; and, accordingly, in no event shall Lender ever be entitled to charge, collect, or apply as interest any interest, fees, charges, or other payments equivalent to interest, in excess of the maximum rate which the Lender may lawfully charge under applicable state and federal statutes and laws from time to time in effect; and, in the event that Lender ever receives, collects, or applies as interest, any such excess, such amount which, but for this provision, would be excessive interest shall be applied to the reduction of the unpaid principal amount of the Note; and, if said principal amount and all lawful interest thereon is paid in full, any remaining excess shall be refunded to Borrower. All interest paid or agreed to be paid shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan, including any renewals, until payment in full of the principal. Any provision hereof, or of any other agreement between Lender and Borrower, that operates to bind, obligate, or compel Borrower to pay interest in excess of such maximum lawful contract rate shall be construed to require the payment of the maximum rate only. The provisions of this paragraph shall be given precedence over any other provision contained herein or in any other agreement between Lender and Borrower that is in conflict with the provisions of this paragraph.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**CHOICE OF VENUE.** Any legal action with respect to the Indebtedness evidenced by this instrument or agreement may be brought in the courts of the State/Commonwealth/District in which Lender's branch office set forth above is located or in the appropriate United States District Court situated in such State/Commonwealth/District, and Borrower hereby accepts and unconditionally submits to the jurisdiction of such courts. Borrower hereby waives any objection to the laying of venue based on the grounds of forum non conveniens with respect thereto.

**WAIVER OF JURY TRIAL. UNLESS EXPRESSLY PROHIBITED BY APPLICABLE LAW, EACH BORROWER AND LENDER, IF A PARTY HERETO, HEREBY WAIVES THE RIGHT TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF THIS INSTRUMENT OR AGREEMENT, ANY OF THE OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN ANY BORROWER AND LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN AND ENTER INTO THIS INSTRUMENT OR AGREEMENT. EACH BORROWER HEREBY CERTIFIES THAT NEITHER ANY REPRESENTATIVE OF LENDER, NOR LENDER'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. FURTHER, NEITHER ANY REPRESENTATIVE OF LENDER, NOR LENDER'S COUNSEL, HAS THE AUTHORITY TO WAIVE, CONDITION OR MODIFY THIS PROVISION.**

**NOTICES.** Any notice required to be given under this Note shall be given in writing, and shall be effective when actually delivered, when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Note. Any party may change its address for notices under this Note by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**SEVERABILITY.** If a court of competent jurisdiction finds any provision of this Note to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision, illegal, invalid, or unenforceable as to any other circumstances. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Note. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Note shall not affect the legality, validity of enforceability of any other provision of this Note.

**TIME IS OF THE ESSENCE.** Time is of the essence in the performance of this Note.

**INTERPRETATION.** In all cases where there is more than one Borrower, then all words used in this Note in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Note or when this Note is executed by more than one Borrower, the words "Borrower" shall mean all and any one or more of them. The words "Borrower" and "Lender" include the heirs, successors, assigns, and transferees of each of them. Wherever possible, the provisions of this Note shall be interpreted in such a manner to be effective and valid under applicable law, but if any provision shall be determined to be invalid under such law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note. If any one or more of Borrower are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Note.

**UNIFORM COMMERCIAL CODE.** All references to the Uniform Commercial Code or UCC herein shall be to the Uniform Commercial Code as adopted by and under the laws of the jurisdiction governing this instrument or agreement.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. If "Borrower" consists of more than one party, the word "Borrower" as used in this Note shall refer to any one or more of the parties comprising "Borrower," and each of such parties shall be jointly and severally liable pursuant to this Note.

**PROMISSORY NOTE
(Continued)**

Loan No: 00002

Page 5

---

PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.  EACH BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

BORROWER:

QUINBY ALLIE, LLC

By:_____(Seal)
    CHARLES  MEADE  AMORY,  Member/Manager  of
    QUINBY ALLIE, LLC

L. D. AMORY AND COMPANY, INCORPORATED

By:_____(Seal)
    CHARLES MEADE AMORY, Vice-President of L. D.
    AMORY AND COMPANY, INCORPORATED

A & D FISHERIES, LLC

By:_____(Seal)
    CHARLES  MEADE  AMORY,  Member/Manager  of A
    & D FISHERIES, LLC

BELLA SKY, LLC

By:_____(Seal)
    CHARLES  MEADE  AMORY,  Member/Manager  of
    BELLA SKY, LLC

Signed, acknowledged and delivered in the presence of:

X_____
  Witness

X_____
  Witness

# EXHIBIT B

EMAILED Batch #: 68025100 7 Doc #: 2 7 File Date: 10/1/2019 1:49:00 PM

**FIRST PREFERRED SHIP MORTGAGE**

**Vessel: QUINBY ALLIE**

**(Official Number) 507438**

**Date: September 21 , 2019**

**Amount: $998,212.90**

THIS FIRST PREFERRED SHIP MORTGAGE, made by:

**QUINBY ALLIE, LLC** ("Owner"), a Virginia limited liability company whose address is <u>101 South King Street, Hampton, VA  23669,</u> the sole owner of the whole of the vessel QUINBY ALLIE (Official Number 507438), to

**BRANCH BANKING AND TRUST COMPANY,** a North Carolina banking corporation, whose address is: <u>737 J. Clyde Morris Boulevard, 3rd Floor. Newport News, VA  23601,</u> and its successors and assigns ("Mortgagee"), as follows.

W I T N E S S E T H:

THAT WHEREAS, Owner is the borrower, and Mortgagee is the lender, under that certain Loan Agreement dated of even date herewith, by and between Owner and Mortgagee (the "Loan Agreement"); and

WHEREAS, pursuant to the Loan Agreement, Mortgagee has made a term loan to Owner, which is evidenced by a promissory note <u>dated of even date herewith</u> (the "Note") made by Owner in the principal amount of **NINE HUNDRED NINETY EIGHT THOUSAND TWO HUNDRED TWELVE and 90/100 DOLLARS ($998,212.90)**, payable to the order of Mortgagee and further evidenced by certain additional "Loan Documents", as that term is defined in the Loan Agreement.  All capitalized terms used in this Mortgage, but not otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement;

NOW, THEREFORE, in consideration of the foregoing recitals, the loan made pursuant to the Loan Documents, the promises made herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby mortgages and conveys the whole of the following vessel (the "Vessel") to the Mortgagee, its successors and assigns to secure payment of all sums owed by Owner under the Note (including without limitation interest, late charges, attorney's fees, and other sums) and performance of Owner's obligations under the Note and the Loan Documents, as they may be amended, modified, supplemented, restated, and/or replaced.

| Vessel Name | Official Number |
|---|---|
| QUINBY ALLIE | 507438 |

The term "Vessel" shall include all of Owner's right, title and interest in and to all state and federal fishing permits issued to the Vessel by the National Marine Fisheries Service, at the time of this Mortgage and thereafter (and all species-specific permits associated therewith), together with all amendments, supplements, renewals and replacements thereof and thereto (collectively, the "Permit") and any and all of the following described items, now or hereafter belonging to the vessel or normally carried thereon, if any, all of which are subject to the security interest and lien of this Mortgage:   all masts, spars, capstans, spare parts, towers, boilers, cables, engines, machinery, bowsprits, sails, rigging, auxiliary boats, anchors, chains, apparel, furniture, tackle, fittings, tools, pumps, pumping equipment, radar, electronic equipment, radios, other equipment and supplies, and any and all fishing and other appurtenances, accessories and additions, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom.

Except as may otherwise be stated herein, United States Code Title 46, Chapter 313, as amended, shall govern this Mortgage.

## I.     COVENANTS AND WARRANTIES OF OWNER

1.     Owner covenants, represents, and warrants to Mortgagee that:

1.1.   Owner is and shall remain a citizen of the United States entitled to own and operate the Vessel under its Certificate of Documentation and fishery and other operational endorsements, which Owner shall maintain in full force and effect; all actions necessary for the execution, delivery and validity of the Mortgage, the Note and other Loan Documents have been taken; Owner is duly organized as a Virginia limited liability company and is, and shall continue to be, in good standing under the laws of the Commonwealth of Virginia and in any other state where Owner does business; and Owner is authorized to execute the Note, the Loan Documents, and this Mortgage.

1.2.   Owner owns and possesses the Vessel free and clear from all liens and encumbrances and owns and possesses the Permit, free and clear of all liens or sanctions, and transferable under the existing National Marine Fisheries Service replacement provisions and transfer requirements. Owner shall warrant and defend title to and possession of the Vessel, including the Permit, for the benefit of Mortgagee against all other persons and entities.  Owner shall not set up any claim of ownership of the Vessel, including the Permit against Mortgagee.  If the Vessel is subject to a casualty, Owner shall take all actions requested by Mortgagee to transfer the Permit to a replacement vessel on which Mortgagee has a first preferred ship mortgage on the terms of this Mortgage, or take such other action as may be requested by Mortgagee to protect its security interest in the Permit.

1.3.   Owner shall comply with, and not permit the Vessel to be operated contrary to, the laws, treaties, conventions, rules, regulations or orders of the United States, and any state or jurisdiction where they are operated, nor remove the Vessel from the territorial limits of the United States, nor abandon the Vessel in any foreign port.  Owner shall maintain the Permit in full force and effect, free and clear of all liens and sanctions and transferable under existing

National Marine Fisheries Service replacement provisions and transfer requirements. Owner shall do everything necessary to establish and maintain this Mortgage as a First Preferred Ship Mortgage on the Vessel. Owner shall comply with, and not permit the Vessel to be operated contrary to, any navigation limits and other requirements of the insurance carried on the Vessel.

1.4.    Owner (a) agrees to be bound by the provisions of the Mortgage, the Note, and the Loan Documents; (b) consents to being joined, if necessary for complete relief to be granted, in any enforcement action on the Note or Mortgage, or under the Loan Documents, and (c) acknowledges that the Mortgagee is loaning or disbursing funds on the condition that the Note and Loan Documents are validly executed and secured by this Mortgage.

1.5.    Owner, by executing this Mortgage, by receiving money loaned from Mortgagee, by having actual knowledge when executing the Note and other Loan Documents that the Mortgagee intends to secure the Note with this Mortgage, and/or by having such knowledge at any time and not promptly notifying the Mortgagee in writing by certified mail that the Owner did or does not consent to this Mortgage, hereby agrees to this Mortgage.

1.6.    Owner gives Mortgagee the right, upon the occurrence of an "Event of Default", as defined herein, to arrest and repossess the Vessel wherever it may be found and sell it, and if, after deducting from the proceeds of sale all amounts due Mortgagee under the Note or other Loan Documents, including but not limited to costs and attorneys' fees incurred in arresting, repossessing, storing, protecting, and selling the Vessel and costs of cleaning, transporting, commissions, repairs, reconditioning, new equipment, storage and dockage fees, and all other costs determined by Mortgagee, in its reasonable discretion, to be in its interests to incur, there is a deficiency, in that the proceeds are insufficient to pay Mortgagee all amounts due to it, Mortgagee may sue Owner for the deficiency in any appropriate state or federal court and in the event of suit, recover any costs and attorneys' fees it incurs in such suit and any costs and attorneys' fees previously mentioned in this paragraph.

1.7.    Neither Owner, nor Owner's agent or masters of the Vessel, has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the Vessel any lien other than to Mortgagee or for crew's wages or salvage, without Mortgagee's written consent. Owner shall keep prominently posted on the Vessel, a U. S. Coast Guard certified copy of this Mortgage and a notice that the Vessel is subject to a Mortgage in favor of Mortgagee, that no liens may be placed upon the Vessel without the written permission of Mortgagee, and that the Vessel may not be leased to or chartered by any third party without Mortgagee's prior written consent, which consent shall not be unreasonably withheld. Owner will also promptly cause a copy of this Mortgage, certified by the U. S. Coast Guard, to be kept on the Vessel and in the office of Owner from which the Vessel is chartered, available for inspection, and will exhibit the same and with the Vessel's papers upon demand to any person having business with the Vessel. Owner will take such other appropriate steps from time to time as will give notice to the world that Owner's right, title and interest in and to the Vessel is subject to this Mortgage, and that, except for this Mortgage and the other Loan Documents, Owner has no right, power or authority to suffer or permit any liens or claims against the Vessel.

1.8.    Owner shall pay when due all taxes, assessments, license fees, governmental charges, fines and penalties imposed upon the Vessel and promptly discharge any and all liens and claims upon the Vessel.  Owner shall at all times keep the Vessel in good repair, appearance and working order.  If on the date of this Mortgage the Vessel has an ABS Classification Certificate and/or Load Line Certificate, Owner shall take all action necessary to maintain the Vessel's current ABS Classification, and Owner shall maintain the Vessel according to its standards, including all repairs, replacements, and dry-dockings. Owner shall take all action necessary to maintain the Vessel's Load Line Certificate, and Owner shall maintain the Vessel according to its standards, including all repairs, replacements, and dry-dockings.  Owner will provide the Mortgagee with copies of the renewals of the ABS Classification and the Load Line Certificate.

1.9.    If the Vessel shall be libeled, arrested, attached, detained or repossessed by any third party, seized or levied upon or taken into custody under process or under color of liens and claims upon the Vessel, Owner shall immediately notify Mortgagee, confirmed in writing, by letter sent by certified mail and discharge or release, and recover the Vessel within twenty (20) days.

1.10.   Owner shall at all reasonable times afford Mortgagee complete opportunity to inspect the Vessel and immediately upon request by Mortgagee, Owner shall state the exact location of the Vessel.  Owner shall promptly, and in any event when due, pay all charges for repairs or other services to the Vessel, goods, supplies, wages, fuel, dockage, storage fees, or any other necessaries, not disputed, within thirty (30) days to the creditor, with immediate written notice of any such disputed amount sent to Mortgagee.  Owner shall promptly inform Mortgagee in writing whenever the total of undisputed charges for the above items not paid within thirty (30) days after the due date exceeds Five Thousand and 00/100 Dollars ($5,000.00).  Owner shall also notify Mortgagee promptly of any collision, allision, or other accident in which the Vessel is involved, or of damage to the Vessel that requires repair or which may affect its value.

1.11.   Owner shall not, without the prior written consent of Mortgagee, sell, transfer, or mortgage the Vessel, or any interest in the Vessel, or merge or consolidate with any other person, firm or corporation, or dissolve.

1.12.   From time to time, Owner shall execute and deliver such other instruments and assurances as Mortgagee may require to perfect or continue this Mortgage and to enforce the terms of this Mortgage, the Note, or other Loan Documents, for operation of the Vessel, or sale of the Vessel by Mortgagee upon the occurrence of an "Event of Default" as defined below.

## II.    INSURANCE

2.1     Owner shall, at its expense, keep the Vessel fully insured under a marine insurance policy or policies providing (1) hull and machinery coverage in an amount not less than the full market value of the Vessel; (2) protection and indemnity coverage in the standard form and amounts acceptable to Mortgagee; (3) collision liability coverage; (4) Jones Act, workers compensation and employers' liability coverage if not included in the Protection and Indemnity coverage; (5) Oil Pollution Act liability coverage in an amount not less than One Million Dollars ($1,000,000.00), (6) CERCLA environmental/pollution liability coverage in an amount not less

than Five Million and 00/100 Dollars ($5,000,000.00), and (7) such further risks as may be commercially reasonable or reasonably specified by Mortgagee from time to time.

2.2     The hull and machinery policy shall provide that losses payable under the policy shall be paid to Mortgagee, its successors and assigns, and shall include a Breach of Warranty endorsement in favor of Mortgagee, protecting Mortgagee's interest in an amount not less than the full market value of the Vessel, which interest shall not be impaired or invalidated by any breach of a warranty or condition under the policy, other than a change in title or ownership of the Vessel.

2.3     The policies shall include all additional endorsements or coverages reasonably specified by Mortgagee. All such policies shall be taken in Owner's name, shall identify Mortgagee as an additional insured, and shall be in amounts or policy limits subject to Mortgagee's approval unless the amounts or policy limits are otherwise specified herein. Owner shall notify, and Owner and/or Mortgagee shall request all insurers and their agents to agree to notify Mortgagee, at least twenty (20) days in advance, of any cancellation or material change in any insurance coverage. Certified copies of policies and binders shall be delivered to Mortgagee with satisfactory evidence that all premiums and charges have been paid. Owner shall maintain such insurance unimpaired by any act, breach of warranty or otherwise, during the life of this Mortgage. Mortgagee may at any time request proof from the Owner that the insurance is in force. Failure by Owner to furnish proof within seven (7) days of receiving a request from Mortgagee shall constitute an "Event of Default" as defined below, and, in addition to any other rights or remedies, Mortgagee shall have the option, but shall not be required, to procure such insurance at Owner's sole cost and expense, to be paid by Owner upon demand by Mortgagee.

## III.   DEFAULT

3.1.   Any one or more of the following events shall be an "Event of Default":

    (a)   **Payment Defaults**. If any payment due on the Note or under the other Loan Documents is not made when due.

    (b)   **Other Defaults**. Owner's failure to comply with or to perform any term, obligation, covenant or condition in this Mortgage, the Note, other Loan Documents, or any other agreement between the Owner and Mortgagee.

    (c)   **Insolvency**. The dissolution, merger, consolidation or termination of Owner's existence as a going business, Owner's insolvency or inability to pay debts as they mature, the appointment of a receiver for Owner's property, any assignment for the benefit of creditors, or the commencement of any processing under any bankruptcy or insolvency laws by or against Owner (except as creditor of a third party).

    (d)   **Creditor or Forfeiture Proceedings**. The entry of a judgment against Owner, or the commencement of foreclosure or forfeiture proceeding, repossession, or any other act by any creditor of Owner or by any governmental agency, against the

Vessel or any collateral securing the indebtedness, including garnishment of any of Owner's deposit accounts with Mortgagee; provided, however, the foregoing shall not apply to garnishment against third-parties from Owner's operating account.

(e)  **Breach of Warranties**.  The breach of any of Owner's covenants, representations or warranties in this Mortgage, the Note, or other Loan Documents.

(f)  **Deterioration of Vessel**.  Any deterioration or impairment of the Vessel or any depreciation in the value of the Vessel, which causes the Vessel, in the reasonable judgment of Mortgagee, to become unsatisfactory as to value.  Mortgagee may from time to time require that the Vessel be surveyed and appraised, and Owner shall cooperate with Mortgagee's surveyor to permit access to, and inspection of, the Vessel.  Each survey and appraisal shall be performed at Owner's sole cost and expense; provided, however, Owner shall not be obligated to pay the cost of surveys or appraisals performed more frequently than once every two (2) years.

(g)  **Fraud or Misrepresentation**.  Owner commits fraud or makes a material misrepresentation, or omits to disclose facts necessary to keep any representation made from misleading, at any time in connection with this Mortgage or the Note.

Notwithstanding the foregoing, if Owner has not been given more than one (1) notice of the same breach or default within the preceding twelve (12) months, the breach or default may be cured (and no Event of Default shall be deemed to have occurred) if Owner, after written notice from the Mortgagee to Owner demanding cure of such default: (i) cures the default within seven (7) days if it is a payment default and (ii) thirty (30) days if it is a default other than a payment default.  The Owner's right to cure, however, shall not apply to (a) default of Owner's obligation to insure the Vessel, (b) defaults which are not susceptible to cure (such as without limitation a report, certificate or financial information statement or incorrect representation or warranty which is false or misleading), (c) default in payment at maturity, (d) appointment of a receiver or other custodian of the Owner's or guarantor's assets, (e) sale or other transfer of the Vessel, (f) a lien on the Vessel other than allowed by the Loan Documents, (g) financial reporting requirements, or (f) defaults for which cure periods are already stated.  Further, if during any cure period the Mortgagee's collateral or lien priority is threatened, the Mortgagee may take reasonable actions at the Owner's expense to protect the Mortgagee's interests.

3.2.  If an Event of Default occurs in addition to any other rights and remedies provided to Mortgagee under applicable law, the Note or other Loan Documents, Mortgagee may:

(a)  Accelerate and declare immediately due and payable all the unpaid principal, accrued interest, any late charges, and, as permitted by applicable law, any other amounts due under the Note, the other Loan Documents, or this Mortgage, after which these amounts shall earn interest at the default rate of interest provided in the Note. Any arrest and repossession of the Vessel by Mortgagee, or suit on the Mortgage, Note, or other Loan Documents or other action taken by Mortgagee authorized in (b) through (e) below, shall also constitute such a declaration by

Mortgagee, even if no such declaration, or demand for payment, has been made previously to Owner.

(b)    Bring suit in federal or state court against the Vessel and/or Owner, and in such action, recover all costs of suit, including reasonable attorneys' fees. Owner consents to the appointment of a substitute custodian selected by Mortgagee. Mortgagee may also obtain appointment of a receiver for the Vessel. Mortgagee may at any time dismiss any action and take possession of the Vessel and exercise all powers given under this Mortgage, including those given in section (d) below.

(c)    Recover judgment for any amounts due and collect it out of the property of Owner.

(d)    In addition to all other remedies provided, repossess the Vessel without legal process, or use state legal process to do so, at any time, wherever the Vessel may be, and, without being responsible for loss or damage, hold and in Mortgagee's or Owner's name, sell, lease, charter, operate, transfer, or otherwise use the Vessel for the time and upon the terms as Mortgagee deems advisable. Mortgagee may sell the Vessel free from any claim by Owner, and the sale may include the Permit and all appurtenances on board the Vessel at the time it or they are retaken by Mortgagee or normally on board but removed by Owner; provided, however, Mortgagee shall not have any rights in or to any cargo on board the Vessel. If Mortgagee elects, repossession and sale may take place under state law and this Mortgage shall not be used to prevent election to use state law remedies. To the extent permitted by law, the sale may be public or private, with at least twenty-one (21) days prior written notice to Owner, without having the Vessel present, and Mortgagee may be the purchaser and for payment may pay all or part of the indebtedness secured by this Mortgage. Owner agrees that it will cooperate fully to permit peaceful repossession, and will disclose promptly the exact location of the Vessel to permit Mortgagee to obtain possession of any or all of them.

(e)    For purposes of dealing with the Vessel following any Event of Default, Mortgagee and its agents are irrevocably appointed the true and lawful attorneys of Owner in Owner's name and stead for all purposes, including but not limited to selling the Vessel and doing all things (including execution of documents) necessary to the sale and to protect Mortgagee's interest in the Permit.

3.3.    If an Event of Default occurs, Owner and any other person aboard the Vessel shall immediately leave the Vessel upon the oral or written request of Mortgagee, and shall leave the Vessel in good, clean and neat condition. If the Vessel is arrested or detained by any officer of any Court or by any authority, Owner hereby authorizes Mortgagee, its agents and appointees, to receive or take possession of the Vessel, load and/or discharge cargo, and to defend any action or discharge any lien. All expenses incurred by Mortgagee as a result of such action shall be added to the indebtedness secured by this Mortgage. If the Mortgagee pays any lien or claim, this shall be an Event of Default by Owner, and Mortgagee may immediately enter on and use the Vessel as it sees fit and this shall be regarded as a lawful repossession.

3.4.    Each and every power or remedy given to Mortgagee shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often as deemed necessary by Mortgagee.  No delay or omission by Mortgagee shall impair any right, power or remedy, and no waiver of any default shall waive any other default.

3.5.    Mortgagee may apply the net proceeds of any judicial or other sale, and any charter, management, operation or other use of the Vessel by Mortgagee, of any claim for damages, of any judgment, and of any insurance proceeds received by Mortgagee (except to the extent paid to Owner or applied in payment or repairs or otherwise for Owner's benefit) (hereinafter "Proceeds") as follows:

    FIRST: to the payment of all reasonable attorneys' fees, court costs, and any other expenses, losses, charges or damages incurred or advances made by Mortgagee in the protection of its rights or caused by Owner's default with interest at the default rate of interest in effect hereunder, and to provide adequate indemnity against any liens claiming priority over this Mortgage.

    SECOND: to the payment of all interest (including any interest accruing at the default rate of interest), to date of payment, on the Note and any or all sums secured by this Mortgage, and to any balances of such proceeds to the payment next of all matured installments of principal and then of all unmatured installments or principal in the inverse order of their maturity.

If, after deducting from the Proceeds the amounts above, there is a deficiency, Mortgagee may collect the deficiency from the Owner and, in doing so, may apply, without prior notice, any deposits or other assets of the Owner to payment of the deficiency.

3.6.    All advances and expenditures which Mortgagee in its reasonable discretion may make for repairs, insurance, payment of liens or other claims, defense of suits, or for any other purpose related to this Mortgage, the Note or under the Loan Documents, and all damages sustained by Mortgagee because of a default, shall be paid by Owner on demand or, at Mortgagee's option, shall be added to the unpaid balance of the Note and paid by Owner.  Mortgagee shall not be obligated to make any such advances or expenditures, nor shall their making relieve Owner of any obligation or default related to the advances or expenditure.

## IV.    POSSESSION UNTIL DEFAULT

Until an Event of Default occurs, Owner shall be permitted to retain actual possession and use of the Vessel.

## V.    MISCELLANEOUS PROVISIONS

5.1.    Time is material and of the essence in this Agreement.  Mortgagee waives no rights by accepting late or partial payments, or by delaying enforcing any of its rights hereunder.  No

changes, additions, or deletions in any terms shall be valid unless signed by an authorized officer of Mortgagee.

5.2. Any provisions deemed invalid under any law, rule or regulation of any governmental agency shall not affect any other provision hereof.

5.3. This Mortgage is additional security given to Mortgagee as incentive to advance funds under the Note and pursuant to the terms of the other Loan Documents.

5.4. This Mortgage shall be governed according to the laws of the United States and the Commonwealth of Virginia, without reference to any law regarding choice of law.

5.5. Nothing shall be construed to impose any obligation on Mortgagee to extend, or continue to extend, any credit at any future time.

As of this date first written above, Owner has caused this Mortgage to be executed in its name by a person authorized to do so.

**QUINBY ALLIE, LLC**

By: _____ (SEAL)
        C. Meade Amory, Manager

COMMONWEALTH OF VIRGINIA,
CITY/COUNTY OF _Newport News_

On this _27th_ day of September 2019, before me, a notary in and for the State and City or County aforesaid, personally appeared C. Meade Amory, Manager of QUINBY ALLIE, LLC, who     is     personally     known     to     me     or     who     has     produced _____ as identification, and executed foregoing instrument, on behalf of said corporation.

_____
Notary Public

Notary Registration Number: _7175047_

My Commission Expires: _April 30, 2020_

STAMP            ARETHEA V. WALKER
                         NOTARY PUBLIC
                 COMMONWEALTH OF VIRGINIA
              MY COMMISSION EXPIRES APR. 30, 2020
                    COMMISSION # 7175047

4831-6541-5592, v. 1

Page 9

JS 44 (Rev. 10/20)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

Truist Bank

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas J. Muzyka, Clinton & Muzyka, P.C., 1 India Street, Suite 200, Boston, MA 02109  (617) 723-9165

### DEFENDANTS

F/V QUINBY ALLIE (O.N. 507438) its engines, tackle, gear, and appurtenances, In Rem

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | | ☐ 8 Multidistrict Litigation - Direct File |

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
46 U.S.C. §31321

Brief description of cause:
In Rem action for the arrest of the F/V QUINBY ALLIE concerning foreclosure of preferred ships mortgage, . . .

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 878,098.38 plus accumulated interest and costs

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE  May 20, 2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Truist Bank vs. F/V QUINBY ALLIE (O.N. 507438) its engines, gear and
   appurtenances, In Rem

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local
   rule 40.1(a)(1)).

   [ ]   I.        160, 400, 410, 441, 535, 830*, 835*, 850, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

   [ ]   II.       110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

   [✔]  III.      120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362,
                  365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555, 560, 625,
                  690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

              *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this
   district please indicate the title and number of the first filed case in this court.

   n/a

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

                                                                        YES [ ]        NO [✔]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?    (See 28 USC
   §2403)
                                                                        YES [ ]        NO [✔]

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

                                                                        YES [ ]        NO [✔]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

                                                                        YES [ ]        NO [✔]

7. Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of
   Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

                                                                        YES [ ]        NO [✔]

   A.       If yes, in which division do all of the non-governmental parties reside?

            Eastern Division [ ]              Central Division [ ]              Western Division [ ]

   B.       If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
            residing in Massachusetts reside?

            Eastern Division [✔]             Central Division [ ]              Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes,
   submit a separate sheet identifying the motions)

                                                                        YES [ ]        NO [✔]

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Thomas J. Muzyka and John J. Bromley, Clinton & Muzyka, P.C.

**ADDRESS** Board of Trade Building, One India Street, Suite 200, Boston, MA  02109

**TELEPHONE NO.** (617) 723-9165

                                                                        **(CategoryForm1-2019.wpd )**

# Exhibit W

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**TRUIST BANK,**

     **Plaintiff,**

    **v.**

**F/V BELLA SKY, OFFICIAL**
**NUMBER 580932, HER ENGINES,**
**TACKLE, FURNISHINGS, EQUIPMENT,**
**SUPPLIES, FISHING PERMITS, AND**
**OTHER APPURTENANCES,** *in rem,*

     **Defendant.**

Civil Action No. _21-CV-10841_

**VERIFIED COMPLAINT IN ADMIRALTY**
**AND PRAYER FOR *IN REM* ARREST**

Now comes the Plaintiff, Truist Bank (f/k/a Branch Banking and Trust Company)

("Truist"), by and through undersigned counsel, Clinton & Muzyka, P.C., and as for its Complaint

against the F/V BELLA SKY, Official No. 580932, her engines, tackle, furnishings, equipment,

supplies, fishing permits, and any and all fishing and other appurtenances, accessories and

additions, improvements and replacements (the "Vessel"), *in rem,* for foreclosure of a preferred

ship mortgage, states as follows:

    1.    Truist is a bank organized under the laws of the State of North Carolina, with its

principal place of business in the State of North Carolina.

    2.    The Vessel is a fishing vessel flagged and documented in the United States.

    3.    Venue is proper in this Court because the Vessel is now, or will be during the

pendency of this action, afloat upon the waters of this District.

    4.    This is an admiralty and maritime claim *in rem* within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 74 of 127 PageID# 956
Case 1:21-cv-10841-ADB   Document 1   Filed 05/21/21   Page 2 of 6

2

Claims and Asset Forfeiture Actions.  Jurisdiction is proper under 28 U.S.C. § 1333 and under 46 U.S.C. §§ 31321 *et seq.*

5.     On or about April 5, 2017, BELLA SKY, LLC, a Virginia limited liability company with its principal place of business in Hampton, Virginia ("Mortgagor"), duly executed a promissory note payable to Branch Banking and Trust Company (now Truist) in the original principal amount of $499,175.00 (the "$499,175.00 Note").  A true and correct copy of the $499,175.00 Note is attached hereto as ***Exhibit "A."***

6.     On or about April 5, 2017, and at all times mentioned herein, Mortgagor was the sole owner of the whole of the Vessel.  To secure the payment of the $499,175.00 Note, Mortgagor duly executed and delivered to Branch Banking and Trust Company (now Truist) a first preferred mortgage upon the Vessel dated April 5, 2017 (the "First Preferred Mortgage").  A true and correct copy of the First Preferred Mortgage is attached hereto as ***Exhibit "B."***

7.     The First Preferred Mortgage was duly recorded with the U.S. Coast Guard's National Vessel Documentation Center on April 6, 2017, at Batch #: 43210500 / Document ID #: 6, in accordance with 46 U.S.C. §§ 31321 *et seq.*, and it otherwise fulfills all requirements to constitute a preferred mortgage under that Act.

8.     On or about September 27, 2019, Mortgagor duly executed a promissory note payable to Branch Banking and Trust Company (now Truist) in the original principal amount of $998,212.90 (the "$998,212.90 Note").  A true and correct copy of the $998,212.90 Note is attached hereto as ***Exhibit "C."***

9.     To secure the payment of the $998,212.90 Note, Mortgagor duly executed and delivered to Branch Banking and Trust Company (now Truist) a second preferred mortgage upon

the Vessel dated September 27, 2019 (the "Second Preferred Mortgage").  A true and correct copy of the Second Preferred Mortgage is attached hereto as ***Exhibit "D."***

10.     The Second Preferred Mortgage was duly recorded with the U.S. Coast Guard's National Vessel Documentation Center on October 1, 2019, at Batch #: 68025700 / Document ID #: 2, in accordance with 46 U.S.C. §§ 31321 *et seq*., and it otherwise fulfills all requirements to constitute a preferred mortgage under that Act.

11.     Mortgagor has defaulted under the $499,175.00 Note, the First Preferred Mortgage, and related documents.  By reason of said defaults, Truist has elected to exercise its option under the $499,175.00 Note to accelerate and declare the entire indebtedness secured by the First Preferred Mortgage immediately due and payable in full.  The principal amount due under said note as of May 19, 2021 is $336,369.35.  Accumulated interest due under said note as of May 19, 2021 is $4,323.43 and fees and costs in the amount of $3,819.39 have accrued on said note.

12.     Mortgagor has also defaulted under the $998,212.90 Note, the Second Preferred Mortgage, and related documents.  By reason of said defaults, Truist has elected to exercise its option under the $998,212.90 Note to accelerate and declare the entire indebtedness secured by the Second Preferred Mortgage immediately due and payable in full.  The principal amount due under said note as of May 19, 2021 is $878,098.38.  Accumulated interest due under said note as of May 19, 2021 is $16,336.51 and fees and costs in the amount of $3,543.64 have accrued on said note.

**WHEREFORE**, Plaintiff, Truist Bank, respectfully requests:

1.      that a warrant of arrest issue against the F/V BELLA SKY, her engines, tackle, furnishings, equipment, supplies, fishing permits, etc., and that all persons claiming any interest therein may be cited to appear and answer this Complaint;

2.      that this Court direct the manner in which the actual notice of the commencement of this suit shall be given to the Master or other ranking officer or caretaker of the Vessel, and to any person which has recorded a notice of claim of any undischarged lien upon the Vessel;

3.      that the First Preferred Mortgage be declared to be a valid and subsisting lien in the sum of \$336,369.35 outstanding principal, plus interest at 15.00% from May 20, 2021, \$4,323.43 in accumulated interest, and \$3,819.39 in accrued fees and costs, together with all amounts required to be disbursed by Truist for the care and preservation and insurance and the cost of any additional insurance on the Vessel, and all other advances, expenses, attorneys' fees, costs and disbursements on Truist herein, with interest at 15.00% per annum thereon, such lien to be prior and superior to the interest, liens, or claims of any and all persons whatsoever, except such persons as may hold preferred maritime liens on the Vessel;

4.      that the Second Preferred Mortgage be declared to be a valid and subsisting lien in the sum of \$878,098.38 outstanding principal, plus interest at 15.00% from May 20, 2021, \$16,336.51 in accumulated interest, and \$3,543.64 in accrued fees and costs, together with all amounts required to be disbursed by Truist for the care and preservation and insurance and the cost of any additional insurance on the Vessel, and all other advances, expenses, attorneys' fees, costs and disbursements on Truist herein, with interest at 15.00% per annum thereon, such lien to be prior and superior to the interest, liens, or claims of any and all persons whatsoever, except such persons as may hold preferred maritime liens on the Vessel;

5.      that the F/V BELLA SKY, her engines, tackle, furnishings, equipment, supplies, fishing permits, etc. be condemned and sold to pay the same;

6.      that it be decreed that any and all persons claiming any interest in the Vessel are forever barred and foreclosed of and from all right or equity of redemption or claim of, in or to the mortgaged Vessel and every part thereof; and

7.      that Truist have such other and further relief that law and justice may require.

**TRUIST BANK**
By its attorneys,
**CLINTON & MUZYKA, P.C.**

"/s/Thomas J. Muzyka"
**Thomas J. Muzyka**
**BBO No. 365540**
**John J. Bromley**
**BBO No. 672134**
Board of Trade Building
One India Street, Suite 200
Boston, MA 02109
(617) 723-9165
F: (617) 720-3489
tmuzyka@clinmuzyka.com
jbromley@clinmuzyka.com

AND

John E. Holloway, Esq. (VSB No. 28145)
Ryan T. Gibson, Esq. (VSB No. 83183)
TROUTMAN PEPPER HAMILTON SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, Virginia 23462
Telephone: 757-687-7724
Facsimile: 757-687-7510
Email: john.holloway@troutman.com
Email: ryan.gibson@troutman.com
*Counsel for Truist Bank*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**TRUIST BANK,**

     **Plaintiff,**

**v.**                                     Civil Action No. _____

**F/V BELLA SKY, OFFICIAL**
**NUMBER 580932, HER ENGINES,**
**TACKLE, FURNISHINGS, EQUIPMENT,**
**SUPPLIES, FISHING PERMITS, AND**        **IN ADMIRALTY**
**OTHER APPURTENANCES,** *in rem,*

     **Defendant.**

## VERIFICATION OF COMPLAINT

    I, Steve Blevins, declare as follows:

    1.    I am the Senior Vice President of Truist Bank, the Plaintiff herein.

    2.    I have read the foregoing Complaint and know the contents thereof.

    3.    The Complaint is true of my own knowledge, except as to the matters therein

stated upon information and belief and, as to those matters, I believe them to be true.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

    Executed this 20th day of May, 2021.

                                        Steve Blevins

# EXHIBIT B

04/06/2017 18:30 FAX  5087463055                                              ☒ 009/014

FAXED Batch #: 43210500 / Doc #: 6 / File Date: 4/6/2017 4:05:00 PM

This **Preferred Mortgage**, on the vessel (s): **BELLA SKY**

Official Number: **580932**                                  April  5 , 2017

Amount of Mortgage $499,175.00

**Bella Sky, LLC of 101 South King Street, Hampton, VA 23669 (Sole Owner)**
hereinafter called "Owner" to

**Branch Banking and Trust Company of 737 J Clyde Morris Blvd, Newport
News, VA 23601 hereinafter called "Mortgagee"**
                            **Witnesseth:**
        Whereas, the maker, Mortgagor herein, is the sole owner of the whole of the vessel (if
more than one vessel is mortgaged hereunder, the term "vessel" means each such Vessel)
hereinafter named and described, and is justly indebted to the Mortgagee, as evidenced by
promissory note dated
April  5 , 2017, in the principal amount of **$499,175.00** (the "Note") payable to the order of
Mortgagee as follows:  Payable with such maturity, and with such rate of interest, and with such
further terms and conditions all is therein provided, and has agreed to give this Mortgage as
security, and has authorized and directed the execution and delivery hereof.
        NOW, THEREFORE, in consideration of the premises and for other good and valuable
considerations, receipt of all of which is hereby acknowledged, and to secure payment of said
indebtedness and interest and other sums that hereafter may become due pursuant hereto and
the performance of all covenants hereof, Owner by these presents mortgages and conveys unto
Mortgagee, its successors and assigns, the whole of the Vessel named below and further
described in her (their) last marine document (s) issued and identified as follows:

|  Name  |  Official Number  |
|---|---|
| **BELLA SKY** | 580932 |

together with all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats,
anchors, chains, tackle, apparel, furniture, fittings, tools, pumps, equipment and supplies and all
fishing and other appurtenances and accessories and additions, improvements and replacements
now or hereafter belonging thereto, whether or not removed there from, all of which shall be
deemed to be included in the term "vessel" herein, **including all fishing permits and catch
records and fishing history, and said document (s) being deemed included herein by
reference: Northeast Federal Fishing Permit Number: 330199 and Massachusetts State
Commercial Permit No. 006938.**

        TO HAVE AND TO HOLD all and singular the above described vessel unto Mortgagee,
its successors and assigns forever;
        PROVIDED, HOWEVER, that if Owner, his heirs, executors, administrators or its
successors or assigns shall perform and observe all and singular the terms, covenants and
agreements herein, then this Mortgage shall cease, otherwise to remain in full force and effect.
        Nothing herein shall be deemed or construed to subject to the lien hereof any property
other than a vessel as the term us used in Chapter 313 of Title 46, United States Code, as
amended.
        Owner agrees to pay said indebtedness with interest thereon as herein and in said note
provided, and to perform and observe the further terms, covenants and agreements herein, and
to hold the vessel subject thereto.

1

NATIONAL VESSEL DOCUMENTATION CENTER
U.S. COAST GUARD
I HEREBY CERTIFY THIS IS A TRUE COPY OF THE
RECORDS OF THIS OFFICE.
DOCUMENTATION OFFICER
. DATE  4-16-19 @ 8:00 am

NVDC File Date: Page 9 of 14 received on 4/6/2017 4:01:35 PM [Eastern Daylight Time]

04/06/2017  16:50 FAX  5087463055                                                    ☑010/014

## Article I. - Particular covenants of Owner

Owner Covenants as follows:

1. Owner is and shall continue to be a citizen of the United States entitled to own and operate the Vessel under her marine document, which Owner shall maintain in full force and effect; and all action necessary for the execution, delivery and validity hereof and of said note has been duly taken. If a corporation, Owner is duly organized and is and shall continue to good standing under the laws of the State of Virginia and authorized to do business and in good standing in any other State wherein Owner regularly does business.

2. Owner lawfully owns and possesses the vessel free from all liens and encumbrances whatsoever except as may herein below be specified and shall warrant and defend title to and possession of all and every part thereof for the benefit of Mortgagee against all persons whomsoever. Owner shall not set up against Mortgagee and / or any assignee under any past or future transaction.

3. Owner shall at his (its) own expense, keep the vessel fully and adequately insured under usual full marine insurance with policy valuation not exceeding the amount insured and, in the aggregate as to all vessels mortgaged herein, at least in the amount 110% of the unpaid principal balance of this mortgage, and shall maintain insurance to cover protection and indemnity risks, tower's liability risks if the vessel performs towage, employees' compensation and / or other risks and liabilities from time to time specified by Mortgagee. All insurance shall be taken out in the name of Owner and shall by its terms be payable to the mortgagee for account of Mortgagee and Owner as their respective interest may appear, and all policy forms, underwriters and amounts shall be subject to mortgagee's approval. Owner shall notify, and shall request underwriters to provide reasonable advance notice to Mortgagee of any cancellation or other material changes in any insurance coverage. All policies, binders and cover notes shall be delivered to Mortgagee with evidence satisfactory to it that all premiums and other charges therefore have been fully paid. Owner shall maintain all such insurance unimpaired by any act, breach of warranty or otherwise. The insurance shall provide that the Mortgagee be paid in the event of loss, notwithstanding any breach of warranty.

4. Owner shall comply with and not permit the vessel to be operated contrary to any provisions of the laws, treaties, conventions, rules, regulations or orders of the United States, any State and / or any other jurisdiction wherein operated, and/or of any department or agency thereof, nor remove the vessel from the limits of the United States save on voyages with the intent of returning, nor abandon the vessel in any foreign port. Owner shall do everything necessary to establish and maintain this Mortgage as a Preferred Mortgage on said vessel.

5. Neither the Owner, Agent nor Master of the vessel has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the vessel or any part thereof any lien whatsoever other than to the Mortgagee or for crew's wages or salvage.

6. Owner shall place and keep prominently in the pilot house (if any), chart room or Master's cabin or elsewhere on the Vessel as specified by Mortgagee any notice of this Mortgage required by Mortgagee, and shall keep a proper copy hereof with the Ship's papers and exhibit the same to all persons having business with the vessel, and to Mortgagee on demand.

7. Owner shall pay when due all taxes, assessments, government charges, fines and penalties lawfully imposed and promptly discharge any and all liens whatsoever upon the vessel. Owner shall at his (its) own expense at all times maintain the vessel in thorough repair and working order and shall make all proper renewals and replacements.

2

NVDC File Date: Page 10 of 14 received on 4/6/2017 4:01:35 PM [Eastern Daylight Time]

04/06/2017 16:50 FAX   5087463055                                                    ☑ 011/014

8. If the vessel shall be libeled, attached, detained, seized or levied upon or taken into custody under process or under color of any authority, Owner shall forthwith notify Mortgagee by telegram, confirmed by letter, and forthwith obtain the discharge or release the vessel therefrom, and in any event within fifteen (15) days after such libel, attachment, detention, seizure, levy or taking into custody.

9. Owner shall at all times afford Mortgagee complete opportunity to inspect the vessel and cargoes and papers thereof, and to examine Owner's related accounts and records: and shall certify quarterly and, if Mortgagee requests, monthly, that all wages and all other claims whatsoever which might have given rise to lien upon the vessel have been paid.

10. Owner shall not, without prior written consent of Mortgagee, sell or mortgage the vessel or any interest therein nor charter her except to persons and for uses lawful for American vessels and then only provided said insurance be unaffected thereby or adequately replaced: nor, if a corporation:, merge or consolidate with any other person, firm or corporation, or dissolve.

11. From time to time Owner shall execute and deliver such other and further instruments and assurance as in the opinion of Mortgagee's counsel may be required to subject the vessel more effectually to the lien hereof and to the payment of said indebtedness and for operation of the vessel as herein provided, and to effectuate sales as provided in paragraph (C) of Section I of Article II.

12. The Mortgagor will reimburse the Mortgagee promptly for any and all expenditures which the mortgagee may elect to make from time to time to protect the security granted hereunder in the event of the Mortgagor's failure to do so, (hereafter "Advance") including, without limitation of the foregoing, payment of taxes, repairs, insurance premiums, the discharge of any lien, libel or seizure of the Vessel, and expenses, including attorney's fees, incurred by the Mortgagee in retaking or selling the Vessel; and any such Advance made by the Mortgagee shall be for the account of the Mortgagor, and the making thereof by the Mortgagee shall not cure the Mortgagor's default in that regard nor constitute a waiver of any right or remedy granted to the Mortgagee hereunder, and all sums so expended by the Mortgagee or any liability incurred by it shall be deemed to be an indebtedness of the Mortgagor and secured by this Mortgage, and until paid shall bear interest at the annual rate of interest provided in the Note.

## ARTICLE II. - DEFAULT

1. In any one or more of the following events, herein termed "events of default," viz:

(a) Default in the punctual payment of the principal of the Note secured hereby or any installment thereof, or in the due and punctual performance of any provision of Sections 3,4,5,6,8, and 10 or Article I hereof, or attempt to violate Sections 4 or 10 of Article I hereof, or default continuing for fifteen (15) days in the performance of any other covenant herein: or

(b) Commission of any act of bankruptcy by Owner or approval by any court of a petition or answer asking for reorganization, arrangement, extension or other relief under any bankruptcy law; or appointment of a receiver for Owner or any Owner's property or the taking of any court of any action comparable thereto; or rendition of a final judgment against Owner for the payment of money and failure of Owner to discharge the same within ninety (90) days or stay the execution thereof pending appeal; or Mortgagee's conclusion in good faith at any time that, through actual or prospective impairment of Owners net current asset position, net worth, asset-liability ratio, or earnings, or through prospective violation or any provision of this Mortgage, Mortgagee is in danger of losing said debt or any part thereof, by delaying collection thereof until the time above limited for the payment thereof;

3

NVDC File Date: Page 11 of 14 received on 4/6/2017 4:01:35 PM [Eastern Daylight Time]

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 83 of 127 PageID# 965
Case 1:21-cv-10841-ADB   Document 1-2   Filed 05/21/21   Page 5 of 6
04/06/2017 16:51 FAX   5087463055                                                    ☑ 012/014

NVDC File Date: Page 12 of 14 received on 4/6/2017 4:01:35 PM [Eastern Daylight Time]

{then, and in every such case, Mortgagee may}

(A) Declare the principal of said Note and all accrued interest thereon to be and they shall then become and be due and payable forthwith, after which they shall bear interest at the highest legal rate per annum.

(B) Recover judgment for, and collect out of any property of Owner, any amount thereby or otherwise due hereunder; and / or collect all earned charter hire and freight monies relating to services performed by the vessel, Owner hereby assigning to Mortgagee such earned charter hire and freight monies then owing; and / or

(C) Retake the vessel without legal process at any time wherever the same may be, and without being responsible for loss or damage, hold and in Mortgagee's or in Owner's name lease, charter, operate or otherwise use the vessel for such time and on such terms as the Mortgagee may deem advisable, being accountable for net profits, if any, and with the right dock the vessel free of charge at Owner's premises or elsewhere at Owner's expense; and / or sell the vessel, free from any claim by Owner of any nature whatsoever, in the manner provided by law; to the extent permitted by law, such sale may be public or private without notice, without having the vessel present, and / or Mortgagee may become the purchaser.

For such purpose Mortgagee and its agents are hereby irrevocably appointed the true and lawful attorneys of Owner in his (its) name and stead to make all necessary transfers of the vessel thus sold.

2. In the event that the vessel shall be arrested or detained by any office of any court or by any other authority, Owner hereby authorizes Mortgagee, its officers, representatives and appointees, in the name of the Owner or of Mortgagee, to receive or to take possession thereof, and to defend any action and / or discharge any lien.

3. Each and every power or remedy herein given to Mortgagee shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often as may be deemed expedient by Mortgagee. No delay or omission by Mortgagee shall impair any right, power or remedy, and no waiver of any default shall waive any other default. In any suit Mortgagee shall be entitled to obtain appointment of a receiver of the vessel and the earnings thereof, who shall have full rights and powers to use and operate the vessel, and to obtain a decree ordering and directing the sale and disposition thereof.

4. The net proceeds of any judicial of other sale, and any charter, management, operation or other use of the vessel by Mortgagee, or any claim for damages, or any judgment, and any insurance received by Mortgagee (except to the extent paid to Owner or applied in payment of repairs or otherwise for Owner's benefit) shall be applied as follows:

FIRST: To the payment of all attorney's fees, court costs, and any other expenses, losses, charges, damages incurred or advances made by Mortgagee in the protection of its rights or caused by Owner's default hereunder or under the Note secured hereby, with default interest at the highest legal rate per annum; and to provide adequate indemnity against any liens for which priority over this Mortgage is claimed;

SECOND: To the payment of all interest, to date of payment, on the Note and any or all other sums secured hereby, and as to any balance of such proceeds, to the payment next of any or all matured installments of principal and then of any or all unmatured installments of principal in the inverse order of their maturity.

Mortgagee shall be entitled to collect any deficiency from Owner. Owner shall be entitled to any surplus, subject to set-off in favor of Mortgagee for any other indebtedness of Owner

4

04/06/2017 16:51 FAX   5087463055                                                                  ☑013/014

5. All advances and expenditures which Mortgagee in its discretion may make, including payments for repairs insurance, payment of liens or other claims, defense of suits, or for any other purpose whatsoever related hereto or to said Note and all damages sustained by Mortgagee because of defaults, shall be repaid by Owner on demand with interest at highest legal rate per annum, and until so paid shall be a debt due from Owner to Mortgagee secured by the lien hereof. Mortgagee shall not be obligated to make any such Advances, nor shall the making thereof relieve Owner of any obligation or default with respect thereto:

### ARTICLE III. - Possession Until Default

Until one or more of the events of default hereinbefore described, Owner shall be permitted to retain actual possession and use of the vessel.

### ARTICLE IV. - Sundry Provisions

All covenants and agreements of Owner herein contained shall bind Owner, his heirs, executors, administrators and assigns, or its successors and assigns, and shall endure to the benefit of Mortgagee and its successors and assigns.  Following any assignment hereof, any reference herein to "Mortgagee" shall be deemed to refer to the assignee.  If more than one person is the owner herein, "his" shall mean "their", if the owner is a corporation, the word "His" shall be construed to mean corporation

FUTURE ADVANCES   This mortgage is executed for the purpose of securing not only the payment of the above described Note but also to secure all future Advances made by the holder of said Note to the mortgagor; and said Note to the mortgagor shall remain in full force and effect to secure all future Advances and all renewals or extension of the above described note.

### ARTICLE V.

For the purpose of Chapter 313 of Title 46, United States Code as amended, the amount of this mortgage is **$499,175.00.**

**IN WITNESS WHEREOF, THE MORTGAGOR** has executed this mortgage the day and year first written above.  Owner has executed this Mortgage or, if a corporation, has caused this Mortgage to be executed in its name and by its proper officer (s) thereunto duly authorized.

Bella Sky, LLC

by: _____
Troy Dwyer, Managing Member

#### ACKNOWLEDGMENT

STATE OF Massachusetts          COUNTY OF Bristol

Be it known that personally appeared before me **Troy Dwyer** who acknowledged herself to be the **Managing Member** of **Bella Sky, LLC** and being authorized to do so, executed the foregoing Instrument by order of the members of said Limited Liability Company at whose order he signed his name and acknowledged the within instrument to be the free act and deed of said Limited Liability Company.

**IN TESTIMONY WHEREOF,** I have hereunto set my hand this 5 day of **April, 2017.**

_____
(Notary Signature)

Commission Expires: Dec 3 2021

5



CHRISTINE M. TRAVERS
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
December 03, 2021

NVDC File Date: Page 13 of 14 received on 4/6/2017 4:01:35 PM [Eastern Daylight Time]

# EXHIBIT C

*9700274333000021472*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $998,212.90 | 09-27-2019 | 09-27-2024 | 00002 | | 9700274333 | 15448 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** QUINBY ALLIE, LLC; L. D. AMORY AND
COMPANY, INCORPORATED; A & D FISHERIES,
LLC; and BELLA SKY, LLC
101 S KING ST
HAMPTON, VA 23669-4025

**Lender:** BRANCH BANKING AND TRUST COMPANY
Peninsula - Commercial Loans
737 J Clyde Morris Blvd
Newport News, VA 23601-1538

**IMPORTANT NOTICE**

THIS INSTRUMENT CONTAINS A CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS YOU
MAY HAVE AS A DEBTOR AND ALLOWS THE CREDITOR TO OBTAIN A JUDGMENT AGAINST YOU WITHOUT ANY FURTHER NOTICE.

**Principal Amount: $998,212.90**                                    **Date of Note: September 27, 2019**

**PROMISE TO PAY.** QUINBY ALLIE, LLC; L. D. AMORY AND COMPANY, INCORPORATED; A & D FISHERIES, LLC; and BELLA SKY, LLC ("Borrower") jointly and severally promise to pay to BRANCH BANKING AND TRUST COMPANY ("Lender"), or order, in lawful money of the United States of America, the principal amount of Nine Hundred Ninety-eight Thousand Two Hundred Twelve & 90/100 Dollars ($998,212.90), together with interest on the unpaid principal balance from September 27, 2019, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 5.500%, until paid in full. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in 59 regular payments of $10,872.88 each and one irregular last payment estimated at $579,063.93. Borrower's first payment is due October 27, 2019, and all subsequent payments are due on the same day of each month after that. Borrower's final payment will be due on September 27, 2024, and will be for all principal, accrued interest, and all other applicable fees, costs and charges, if any, not yet paid. Payments include principal and interest. Unless otherwise agreed or required by applicable law, payments will be applied to any unpaid collection costs, late and other charges and fees, accrued unpaid interest, and principal in such order as Lender may determine in its sole and absolute discretion. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**REAMORTIZATION.** In addition to other rights herein, Lender reserves the right in its sole discretion, from time to time, to (a) adjust any periodic fixed payment in such amounts and at such times to repay principal at the amortization period originally agreed upon and accruals of interest as the same becomes due, and (b) increase Borrower's payments to pay all accruals of interest for the period and accruals of unpaid interest from previous periods.

**PREPAYMENT PENALTY.** Upon prepayment of this Note, Lender is entitled to the following prepayment penalty: Each prepayment of the principal balance of this Note, whether in whole or in part and whether voluntary, mandatory, upon acceleration or otherwise, shall be made after giving the Lender at least two (2) Banking Days' notice and shall be accompanied by prepayment compensation in the amount deemed necessary by the Lender to compensate the Lender for any losses, costs or expenses which the Lender may incur as a result of such prepayment (the "Prepayment Compensation"). Any prepayment of principal shall also be accompanied by a payment of interest accrued to date on this Note, together with any and all late charges, attorneys' fees and other sums due thereon. "Banking Day" shall mean any day other than a Saturday, Sunday, federal holiday or other day in which the Lender is authorized or required by applicable law to be closed. If the Borrower fails to pay the Prepayment Compensation when due, the amount of the Prepayment Compensation shall thereafter bear interest until paid at the interest rate after default as specified in this Note. All prepayments shall be applied to the principal installments due under this Note in the inverse order of their maturities. The determination of the amount of the Prepayment Compensation due the Lender hereunder shall be made by the Lender in good faith and shall be conclusive and binding upon the Borrower absent manifest error; provided, however, that the Prepayment Compensation shall in no event exceed the maximum prepayment compensation permitted by applicable law and this Note shall be construed to give maximum effect to the provisions contained herein.

The Prepayment Compensation shall be calculated as follows:

For any principal prepayment of this Note, the Borrower shall pay 1% of the amount of the outstanding principal balance only when credit is refinanced with another financial institution. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: BRANCH BANKING AND TRUST COMPANY, Peninsula - Commercial Loans, 737 J Clyde Morris Blvd, Newport News, VA 23601-1538.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 15.000%. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.



**PROMISSORY NOTE**
**Loan No: 00002**                                      **(Continued)**                                              **Page 2**

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default In Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf, or made by Guarantor, or any other guarantor, endorser, surety, or accommodation party, under this Note or the related documents in connection with the obtaining of the loan evidenced by this Note or any security document directly or indirectly securing repayment of this Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, or a trustee or receiver is appointed for Borrower or for all or a substantial portion of the assets of Borrower, or Borrower makes a general assignment for the benefit of Borrower's creditors, or Borrower files for bankruptcy, or an involuntary bankruptcy petition is filed against Borrower and such involuntary petition remains undismissed for sixty (60) days.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Execution; Attachment.** Any execution or attachment is levied against the Collateral, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

**Change In Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Collateral such that the present or intended use of the Collateral, as specified in the related documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Collateral.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Borrower and the failure by Borrower to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor, or any other guarantor, endorser, surety, or accommodation party of any of the indebtedness or any Guarantor, or any other guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**CHANGE IN OWNERSHIP - LIMITED LIABILITY COMPANY.** The issue, transfer or sale of an ownership interest of twenty-five percent (25%) or more of the Borrower or Guarantor that is a limited liability company shall constitute an Event of Default under this instrument or agreement.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, immediately due and payable, and then Borrower will pay that amount.

**LENDER'S REMEDIES.** Upon an Event of Default, in addition to Lender's rights set forth above, Lender may, at its option and without notice to Borrower (i) cease making advances or disbursements; (ii) advance funds necessary to remedy any default or pay any lien filed against any of the Collateral; (iii) take possession of the Collateral or any part thereof; (iv) foreclose Lender's security interest and/or lien on any Collateral in accordance with applicable law; (v) make demand upon any or all Guarantors; and (vi) exercise any other right or remedy which Lender has under the Note or any related documents or which is otherwise available at law or in equity. Upon an Event of Default, Lender may immediately apply the rate specified in the Interest After Default provision set forth above until the indebtedness has been paid in full or until the default has been satisfactorily cured which may be allowed at the sole discretion of the Lender, and such rate shall apply after judgment. All of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Any election by Lender to pursue any remedy shall not exclude the right to pursue any other remedy unless expressly prohibited by law, and any election by Lender to make expenditures or to take action to perform an obligation of Borrower, or of any Grantor, shall not affect Lender's right to declare a default and exercise its rights and remedies.

**RETURN PAYMENT FEE.** Borrower shall pay to Lender a returned payment fee if the Borrower or any other obligor hereon makes any payment at any time by check or other instrument, or by any electronic means, which is returned to Lender because of nonpayment due to nonsufficient funds.

**ATTORNEYS' FEES; EXPENSES.** Subject to any limits under applicable law, upon default, Borrower agrees to pay Lender's attorneys' fees and all of Lender's other collection expenses, whether or not there is a lawsuit, including without limitation legal expenses for bankruptcy proceedings.

**GOVERNING LAW.  This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Virginia without regard to its conflicts of law provisions.  This Note has been accepted by Lender in the Commonwealth of Virginia.**

**CONFESSION OF JUDGMENT.** Upon a default in payment of this Note at maturity, whether by acceleration or otherwise, Borrower hereby irrevocably authorizes and empowers Christina Volzer Bailey and Lowell Patterson as Borrower's attorney-in-fact to appear in the Circuit Court of Fairfax County clerk's office and to confess judgment against Borrower for the unpaid amount of this Note as evidenced by an affidavit signed by an officer of Lender setting forth the amount then due, attorneys' fees plus costs of suit, and to release all errors, and waive all rights of appeal.  By a written instrument Lender may appoint a substitute for the above named attorney-in-fact.  If a copy of this Note, verified by an affidavit, shall have been filed in the proceeding, it will not be necessary to file the original as a warrant of attorney.  Borrower waives the right

# PROMISSORY NOTE
## (Continued)

**Loan No: 00002**

Page 3

to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing warrant and power to confess judgment will be deemed to exhaust the power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void; but the power will continue undiminished and may be exercised from time to time as Lender may elect until all amounts owing on this Note have been paid in full.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by (A) a Commercial Security Agreement dated September 27, 2019 made and executed between A & D FISHERIES, LLC and Lender on collateral described as All of Debtor's rights, title and interests in the collateral described below, whether now owned or hereafter acquired, and wherever located: (1) all Inventory, including all returned inventory, (2) all Equipment, including all Accessions thereto, and all manufacturer's warranties, parts and tools therefor; (3) all General Intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, software licenses and all Federal and state fishing permits

(and all species-specific permits associated therewith) now owned or hereafter acquired, including, but not limited to, those that were assigned to, connected with, or appurtenant to F/V LANGLEY DOUGLAS (Official No. 606719) (the "Vessel") and Northeast Federal Fishery Permit 410201, together with all amendments, supplements, renewals and/or replacements therefor; (4) all licenses, allocations, histories and quotas relating to the federal fishing rights in connection with the Vessel, including any renewals of such licenses, allocations, histories and quotas from time to time acquired by Debtor; (5) all supporting Obligations; (6) all proceeds (cash and non-cash) and Products of the foregoing collateral. The foregoing also includes the limited access fishing rights and fishing permit history in the Multispecies, Monkfish, Summer Flounder, Scup, Black Sea Bass, Longfin Squid/butterfish, Illex, Limited Access General Category Scallop, and American lobster fishery as set forth in that certain Confirmation of Permit History dated March 2, 2018. All capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

(B) a Commercial Security Agreement dated September 27, 2019 made and executed between BELLA SKY, LLC and Lender on collateral described as All of Debtor's rights, title and interests in the collateral described below, whether now owned or hereafter acquired, and wherever located: (1) Fishing Vessel "BELLA SKY", Official Number 580932 (the "Vessel") including all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, furniture, tackle, fittings, tools, pumps, radar, loran, electronic equipment, radios, equipment and supplies, and any and all other appurtenances, accessories and additions, improvements and replacements now or hereafter belonging to the Vessel, whether or not removed therefrom, and all related Equipment, including all Accessions thereto, and all manufacturer's warranties therefor, and all parts and tools therefor, all engines, tackle and appurtenances, proceeds, profits and rents; (2) all Inventory, including all returned inventory, (3) all Equipment, including all Accessions thereto, and all manufacturer's warranties, parts and tools therefor; (4) all scallops, fish and other aquacultural products now or hereafter and however and wherever caught and/or harvested by the Vessel; (5) any warehouse receipts and bills of lading now or hereafter issued pertaining to scallops or fish now or hereafter and wherever and however caught and/or harvested by the Vessel; (6) all General Intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, software licenses and all Federal and state fishing permits, now or hereafter acquired, that are assigned, issued to or connected with the Vessel including but not limited to Massachusetts State Commercial Permit No. 006938, Virginia Flounder Permit No. 580932, and Northeast Federal Fishery Permit 330199 (and all species-specific permits associated therewith), , together with all amendments, supplements, renewals and/or replacements therefor; (7) all licenses, allocations, histories and quotas relating to the federal fishing rights in connection with the Vessel, including any renewals of such licenses, allocations, histories and quotas from time to time acquired by Debtor; (8) all supporting Obligations; (9) all proceeds (cash and non-cash) and Products of the foregoing collateral. All capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

(C) a Commercial Security Agreement dated September 27, 2019 made and executed between QUINBY ALLIE, LLC and Lender on collateral described as All of Debtor's rights, title and interests in the collateral described below, whether now owned or hereafter acquired, and wherever located: (1) Fishing Vessel "QUINBY ALLIE", Official Number 507438 (the "Vessel") including all masts, boilers, cables, engines, machinery, bowsprits, sails, rigging, boats, anchors, chains, furniture, tackle, fittings, tools, pumps, radar, loran, electronic equipment, radios, equipment and supplies, and any and all other appurtenances, accessories and additions, improvements and replacements now or hereafter belonging to the Vessel, whether or not removed therefrom, and all related Equipment, including all Accessions thereto, and all manufacturer's warranties therefor, and all parts and tools therefor, all engines, tackle and appurtenances, proceeds, profits and rents; (2) all Inventory, including all returned inventory, (3) all Equipment, including all Accessions thereto, and all manufacturer's warranties, parts and tools therefor; (4) all scallops, fish and other aquacultural products now or hereafter and however and wherever caught and/or harvested by the Vessel; (5) any warehouse receipts and bills of lading now or hereafter issued pertaining to scallops or fish now or hereafter and wherever and however caught and/or harvested by the Vessel; (6) all General Intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, software licenses and all Federal and state fishing permits, now or hereafter acquired, that are assigned, issued to or connected with the Vessel (and all species-specific permits associated therewith), , together with all amendments, supplements, renewals and/or replacements therefor; (7) all licenses, allocations, histories and quotas relating to the federal fishing rights in connection with the Vessel, including any renewals of such licenses, allocations, histories and quotas from time to time acquired by Debtor; (8) all supporting Obligations; (9) all proceeds (cash and non-cash) and Products of the foregoing collateral. All capitalized terms used herein that are not otherwise defined herein shall have the meanings assigned to them in the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

(D) a Second Preferred Ship Mortgage dated September 27, 2019 made and executed between BELLA SKY, LLC and Lender on a vessel described therein.

(E) a First Preferred Ship Mortgage dated September 27, 2019 made and executed between QUINBY ALLIE, LLC and Lender on a vessel described therein.

**FINANCIAL STATEMENTS.** Borrower agrees to provide Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**REQUIRED INFORMATION FOR A NEW LOAN.** To help the government fight the funding of terrorism and money laundering activities, federal law requires Lender to obtain, verify and record information that identifies each person or entity obtaining a loan including the Borrower's legal name, address, tax identification number, date of birth, driver's license, organizational documents or other identifying documents. Failure to provide the required information will result in a violation of the U.S. Patriot Act and will constitute a default under this instrument or agreement. In addition, none of the Borrower, any of its affiliates, or any of their respective directors, officers, managers, partners, or any other authorized

**PROMISSORY NOTE**
**(Continued)**

Loan No: 00002

Page 4

representatives is named as a "Specially Designated National and Blocked Person", on the list published by the U.S. Department of the Treasury Office of Foreign Assets Control (OFAC) at its official website.

**BUSINESS PURPOSE.** This instrument is entered into for a business purpose, does not evidence or constitute a "consumer transaction", as defined in the Uniform Commercial Code, and none of the proceeds of the loan evidenced hereby have been or will be used for personal, family or household purposes.

**USURY SAVINGS CLAUSE.** It is the intention of Lender and Borrower to comply strictly with all applicable usury laws; and, accordingly, in no event shall Lender ever be entitled to charge, collect, or apply as interest any interest, fees, charges, or other payments equivalent to interest, in excess of the maximum rate which the Lender may lawfully charge under applicable state and federal statutes and laws from time to time in effect; and, in the event that Lender ever receives, collects, or applies as interest, any such excess, such amount which, but for this provision, would be excessive interest shall be applied to the reduction of the unpaid principal amount of the Note; and, if said principal amount and all lawful interest thereon is paid in full, any remaining excess shall be refunded to Borrower. All interest paid or agreed to be paid shall, to the maximum extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan, including any renewals, until payment in full of the principal. Any provision hereof, or of any other agreement between Lender and Borrower, that operates to bind, obligate, or compel Borrower to pay interest in excess of such maximum lawful contract rate shall be construed to require the payment of the maximum rate only. The provisions of this paragraph shall be given precedence over any other provision contained herein or in any other agreement between Lender and Borrower that is in conflict with the provisions of this paragraph.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**CHOICE OF VENUE.** Any legal action with respect to the Indebtedness evidenced by this Instrument or agreement may be brought in the courts of the State/Commonwealth/District in which Lender's branch office set forth above is located or in the appropriate United States District Court situated in such State/Commonwealth/District, and Borrower hereby accepts and unconditionally submits to the jurisdiction of such courts. Borrower hereby waives any objection to the laying of venue based on the grounds of forum non conveniens with respect thereto.

**WAIVER OF JURY TRIAL. UNLESS EXPRESSLY PROHIBITED BY APPLICABLE LAW, EACH BORROWER AND LENDER, IF A PARTY HERETO, HEREBY WAIVES THE RIGHT TO TRIAL BY JURY OF ANY MATTERS OR CLAIMS ARISING OUT OF THIS INSTRUMENT OR AGREEMENT, ANY OF THE OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH OR OUT OF THE CONDUCT OF THE RELATIONSHIP BETWEEN ANY BORROWER AND LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN AND ENTER INTO THIS INSTRUMENT OR AGREEMENT. EACH BORROWER HEREBY CERTIFIES THAT NEITHER ANY REPRESENTATIVE OF LENDER, NOR LENDER'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. FURTHER, NEITHER ANY REPRESENTATIVE OF LENDER, NOR LENDER'S COUNSEL, HAS THE AUTHORITY TO WAIVE, CONDITION OR MODIFY THIS PROVISION.**

**NOTICES.** Any notice required to be given under this Note shall be given in writing, and shall be effective when actually delivered, when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Note. Any party may change its address for notices under this Note by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**SEVERABILITY.** If a court of competent jurisdiction finds any provision of this Note to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision, illegal, invalid, or unenforceable as to any other circumstances. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Note. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Note shall not affect the legality, validity or enforceability of any other provision of this Note.

**TIME IS OF THE ESSENCE.** Time is of the essence in the performance of this Note.

**INTERPRETATION.** In all cases where there is more than one Borrower, then all words used in this Note in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Note or when this Note is executed by more than one Borrower, the words "Borrower" shall mean all and any one or more of them. The words "Borrower" and "Lender" include the heirs, successors, assigns, and transferees of each of them. Wherever possible, the provisions of this Note shall be interpreted in such a manner to be effective and valid under applicable law, but if any provision shall be determined to be invalid under such law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note. If any one or more of Borrower are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Note.

**UNIFORM COMMERCIAL CODE.** All references to the Uniform Commercial Code or UCC herein shall be to the Uniform Commercial Code as adopted by and under the laws of the jurisdiction governing this instrument or agreement.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Each Borrower understands and agrees that, with or without notice to Borrower, Lender may with respect to any other Borrower (a) make one or more additional secured or unsecured loans or otherwise extend additional credit; (b) alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of any indebtedness, including increases and decreases of the rate of interest on the indebtedness; (c) exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any security, with or without the substitution of new collateral; (d) apply such security and direct the order or manner of sale thereof, including without limitation, any non-judicial sale permitted by the terms of the controlling security agreements, as Lender in its discretion may determine; (e) release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; and (f) determine how, when and what application of payments and credits shall be made on any other indebtedness owing by such other Borrower. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. If "Borrower" consists of more than one party, the word "Borrower" as used in this Note shall refer to any one or more of the parties comprising "Borrower," and each of such parties shall be jointly and severally liable pursuant to this Note.

## PROMISSORY NOTE
## (Continued)

**Loan No: 00002**                                                                    **Page 5**

PRIOR TO SIGNING THIS NOTE, EACH BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. EACH BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

THIS NOTE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS NOTE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**BORROWER:**

**QUINBY ALLIE, LLC**

By: _____ (Seal)
    CHARLES MEADE AMORY, Member/Manager of
    QUINBY ALLIE, LLC

**L. D. AMORY AND COMPANY, INCORPORATED**

By: _____ (Seal)
    CHARLES MEADE AMORY, Vice-President of L. D.
    AMORY AND COMPANY, INCORPORATED

**A & D FISHERIES, LLC**

By: _____ (Seal)
    CHARLES MEADE AMORY, Member/Manager of A
    & D FISHERIES, LLC

**BELLA SKY, LLC**

By: _____ (Seal)
    CHARLES MEADE AMORY, Member/Manager of
    BELLA SKY, LLC

Signed, acknowledged and delivered in the presence of:

X _____
    Witness

X _____
    Witness

LaserPro, Ver. 19.1.10.016  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - VA  C:\LFL-PROD\CPI\LPL\G20.FC  TR-118477  PR-192

# EXHIBIT D

**SECOND PREFERRED SHIP MORTGAGE**

Vessel: **BELLA SKY**
(Official Number 580932)

Date: September 27th, 2019

Amount: $998,212.90

THIS SECOND PREFERRED SHIP MORTGAGE, made by:

**BELLA SKY, LLC** ("Owner"), a Virginia limited liability company whose address is <u>101 South King Street, Hampton, VA  23669,</u> the sole owner of the whole of the vessel BELLA SKY (Official Number 580932), to

**BRANCH BANKING AND TRUST COMPANY**, a North Carolina banking corporation, whose address is: <u>737 J. Clyde Morris Boulevard, 3rd Floor, Newport News, VA  23601</u>, and its successors and assigns ("Mortgagee"), as follows.

W I T N E S S E T H :

THAT WHEREAS, Owner is in the business of catching, buying, and selling seafood; and

WHEREAS, Owner is an affiliate of Quinby Allie, LLC, a Virginia limited liability company ("Affiliate"), which is also in the business of catching, buying, and selling seafood; and

WHEREAS, Owner and Affiliate both benefit from being able to trade with each other; and

WHEREAS, Owner will benefit from a $998,212.90 loan from Mortgagee to Affiliate; and

WHEREAS, Owner is a co-borrower, Affiliate is the borrower, and Mortgagee is the lender, under that certain Loan Agreement entered into contemporaneously herewith, by and between Affiliate and Mortgagee (the "Loan Agreement"); and

WHEREAS, pursuant to the Loan Agreement, Mortgagee has made a term loan to Affiliate, which is evidenced by a promissory note entered into contemporaneously herewith (the "Note") made by Affiliate in the principal amount of **NINE HUNDRED NINETY EIGHT THOUSAND TWO HUNDRED TWELVE and 90/100 DOLLARS (998,212.90)**, payable to the order of Mortgagee and further evidenced by certain additional "Loan Documents", as that term is defined in the Loan Agreement.  All capitalized terms used in this Mortgage, but not otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement; and

WHEREAS, in consideration of the Loan Documents, Owner has agreed to secure the Note with a preferred ship mortgage on the Vessel (as defined below);

NOW, THEREFORE, in consideration of the foregoing recitals, the loan made pursuant to the Loan Documents, the promises made herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner hereby mortgages and conveys the whole of the following vessel (the "Vessel") to the Mortgagee, its successors and assigns to secure payment of all sums owed by Affiliate under the Note (including without limitation interest, late charges, attorney's fees, and other sums) and performance of Affiliate's obligations under the Note and the Loan Documents, as they may be amended, modified, supplemented, restated, and/or replaced.

| Vessel Name | Official Number |
|---|---|
| BELLA SKY | 580932 |

The term "Vessel" shall include all of Owner's right, title and interest in and to all state and federal fishing permits issued to the Vessel by the National Marine Fisheries Service, at the time of this Mortgage and thereafter, including but not limited to Massachusetts State Commercial Permit No. 006938, Virginia Flounder Permit No. 580932, and **Northeast Federal Fishery Permit Number 330199** (and all species-specific permits associated therewith), together with all amendments, supplements, renewals and replacements thereof and thereto (collectively, the "Permit") and any and all of the following described items, now or hereafter belonging to the vessel or normally carried thereon, if any, all of which are subject to the security interest and lien of this Mortgage:   all masts, spars, capstans, spare parts, towers, boilers, cables, engines, machinery, bowsprits, sails, rigging, auxiliary boats, anchors, chains, apparel, furniture, tackle, fittings, tools, pumps, pumping equipment, radar, electronic equipment, radios, other equipment and supplies, and any and all fishing and other appurtenances, accessories and additions, improvements and replacements now or hereafter belonging thereto, whether or not removed therefrom.

Except as may otherwise be stated herein, United States Code Title 46, Chapter 313, as amended, shall govern this Mortgage.

## I.   COVENANTS AND WARRANTIES OF OWNER

1.      Owner covenants, represents, and warrants to Mortgagee that:

1.1.    Owner is and shall remain a citizen of the United States entitled to own and operate the Vessel under its Certificate of Documentation and fishery and other operational endorsements, which Owner shall maintain in full force and effect; all actions necessary for the execution, delivery and validity of the Mortgage, the Note and other Loan Documents have been taken; Owner is duly organized as a Virginia limited liability company and is, and shall continue to be, in good standing under the laws of the Commonwealth of Virginia and in any other state where Owner does business; and Owner is authorized to execute this Mortgage.

Page 2

1.2.    Owner owns and possesses the Vessel free and clear from all liens and encumbrances (except for the amended First Preferred Ship Mortgage described herein) and owns and possesses the Permit, free and clear of all liens or sanctions (except for the perfected security interest of Mortgagee in the Permit), and transferable under the existing National Marine Fisheries Service replacement provisions and transfer requirements.  Owner shall warrant and defend title to and possession of the Vessel, including the Permit, for the benefit of Mortgagee against all other persons and entities.  Owner shall not set up any claim of ownership of the Vessel, including the Permit against Mortgagee.  If the Vessel is subject to a casualty, Owner shall take all actions requested by Mortgagee to transfer the Permit to a replacement vessel on which Mortgagee has a first preferred ship mortgage on the terms of this Mortgage, or take such other action as may be requested by Mortgagee to protect its security interest in the Permit.

1.3.    Owner shall comply with, and not permit the Vessel to be operated contrary to, the laws, treaties, conventions, rules, regulations or orders of the United States, and any state or jurisdiction where they are operated, nor remove the Vessel from the territorial limits of the United States, nor abandon the Vessel in any foreign port.  Owner shall maintain the Permit in full force and effect, free and clear of all liens and sanctions and transferable under existing National Marine Fisheries Service replacement provisions and transfer requirements. Owner shall do everything necessary to establish and maintain this Mortgage as a Second Preferred Ship Mortgage on the Vessel.  Owner shall comply with, and not permit the Vessel to be operated contrary to, any navigation limits and other requirements of the insurance carried on the Vessel.

1.4.    Owner (a) agrees to be bound by the provisions of the Mortgage; (b) consents to being joined, if necessary for complete relief to be granted, in any enforcement action on the Note or Mortgage, or under the Loan Documents, and (c) acknowledges that the Mortgagee is loaning or disbursing funds on the condition that the Note and Loan Documents are validly executed and secured by this Mortgage.

1.5.    Owner, by executing this Mortgage, by Affiliate receiving money loaned from Mortgagee, by having actual knowledge of Affiliate having executed the Note and other Loan Documents that the Mortgagee intends to secure the Note with this Mortgage, and/or by having such knowledge at any time and not promptly notifying the Mortgagee in writing by certified mail that the Owner did or does not consent to this Mortgage, hereby agrees to this Mortgage.

1.6.    Subject to the provisions of any prior mortgage, Owner gives Mortgagee the right, upon the occurrence of an "Event of Default", as defined herein, to arrest and repossess the Vessel wherever it may be found and sell it, and if, after deducting from the proceeds of sale all amounts due Mortgagee under the Note or other Loan Documents, including but not limited to costs and attorneys' fees incurred in arresting, repossessing, storing, protecting, and selling the Vessel and costs of cleaning, transporting, commissions, repairs, reconditioning, new equipment, storage and dockage fees, and all other costs determined by Mortgagee, in its reasonable discretion, to be in its interests to incur, there is a deficiency, in that the proceeds are insufficient to pay Mortgagee all amounts due to it, Mortgagee may sue Owner for the deficiency in any appropriate state or federal court and in the event of suit, recover any costs and attorneys' fees it incurs in such suit and any costs and attorneys' fees previously mentioned in this paragraph.

Page 3

1.7.    Neither Owner, nor Owner's agent or masters of the Vessel, has or shall have any right, power or authority to create, incur or permit to be placed or imposed on the Vessel any lien other than to Mortgagee or for crew's wages or salvage, without Mortgagee's written consent.  Owner shall keep prominently posted on the Vessel, a U. S. Coast Guard certified copy of this Mortgage and a notice that the Vessel is subject to a Mortgage in favor of Mortgagee, that no liens may be placed upon the Vessel without the written permission of Mortgagee, and that the Vessel may not be leased to or chartered by any third party without Mortgagee's prior written consent, which consent shall not be unreasonably withheld.  Owner will also promptly cause a copy of this Mortgage, certified by the U. S. Coast Guard, to be kept on the Vessel and in the office of Owner from which the Vessel is chartered, available for inspection, and will exhibit the same and with the Vessel's papers upon demand to any person having business with the Vessel.  Owner will take such other appropriate steps from time to time as will give notice to the world that Owner's right, title and interest in and to the Vessel is subject to this Mortgage, and that, except for this Mortgage and the other Loan Documents, Owner has no right, power or authority to suffer or permit any liens or claims against the Vessel.

1.8.    Owner shall pay when due all taxes, assessments, license fees, governmental charges, fines and penalties imposed upon the Vessel and promptly discharge any and all liens and claims upon the Vessel.  Owner shall at all times keep the Vessel in good repair, appearance and working order.  If on the date of this Mortgage the Vessel has an ABS Classification Certificate and/or Load Line Certificate, Owner shall take all action necessary to maintain the Vessel's current ABS Classification, and Owner shall maintain the Vessel according to its standards, including all repairs, replacements, and dry-dockings. Owner shall take all action necessary to maintain the Vessel's Load Line Certificate, and Owner shall maintain the Vessel according to its standards, including all repairs, replacements, and dry-dockings.  Owner will provide the Mortgagee with copies of the renewals of the ABS Classification and the Load Line Certificate.

1.9.    If the Vessel shall be libeled, arrested, attached, detained or repossessed by any third party, seized or levied upon or taken into custody under process or under color of liens and claims upon the Vessel, Owner shall immediately notify Mortgagee, confirmed in writing, by letter sent by certified mail and discharge or release, and recover the Vessel within twenty (20) days.

1.10.    Owner shall at all reasonable times afford Mortgagee complete opportunity to inspect the Vessel and immediately upon request by Mortgagee, Owner shall state the exact location of the Vessel.  Owner shall promptly, and in any event when due, pay all charges for repairs or other services to the Vessel, goods, supplies, wages, fuel, dockage, storage fees, or any other necessaries, not disputed, within thirty (30) days to the creditor, with immediate written notice of any such disputed amount sent to Mortgagee.  Owner shall promptly inform Mortgagee in writing whenever the total of undisputed charges for the above items not paid within thirty (30) days after the due date exceeds Five Thousand and 00/100 Dollars ($5,000.00).  Owner shall also notify Mortgagee promptly of any collision, allision, or other accident in which the Vessel is involved, or of damage to the Vessel that requires repair or which may affect its value.

1.11.   Owner shall not, without the prior written consent of Mortgagee, sell, transfer, or mortgage the Vessel, or any interest in the Vessel, or merge or consolidate with any other person, firm or corporation, or dissolve.

1.12.   From time to time, Owner shall execute and deliver such other instruments and assurances as Mortgagee may require to perfect or continue this Mortgage and to enforce the terms of this Mortgage, the Note, or other Loan Documents, for operation of the Vessel, or sale of the Vessel by Mortgagee upon the occurrence of an "Event of Default" as defined below.

## II.    INSURANCE

2.1    Owner shall, at its expense, keep the Vessel fully insured under a marine insurance policy or policies providing (1) hull and machinery coverage in an amount not less than the full market value of the Vessel; (2) protection and indemnity coverage in the standard form and amounts acceptable to Mortgagee; (3) collision liability coverage; (4) Jones Act, workers compensation and employers' liability coverage if not included in the Protection and Indemnity coverage; (5) Oil Pollution Act liability coverage in an amount not less than One Million Dollars ($1,000,000.00), (6) CERCLA environmental/pollution liability coverage in an amount not less than Five Million and 00/100 Dollars ($5,000,000.00), and (7) such further risks as may be commercially reasonable or reasonably specified by Mortgagee from time to time.

2.2    The hull and machinery policy shall provide that losses payable under the policy shall be paid to Mortgagee, its successors and assigns, and shall include a Breach of Warranty endorsement in favor of Mortgagee, protecting Mortgagee's interest in an amount not less than the full market value of the Vessel, which interest shall not be impaired or invalidated by any breach of a warranty or condition under the policy, other than a change in title or ownership of the Vessel.

2.3    The policies shall include all additional endorsements or coverages reasonably specified by Mortgagee. All such policies shall be taken in Owner's name, shall identify Mortgagee as an additional insured, and shall be in amounts or policy limits subject to Mortgagee's approval unless the amounts or policy limits are otherwise specified herein. Owner shall notify, and Owner and/or Mortgagee shall request all insurers and their agents to agree to notify Mortgagee, at least twenty (20) days in advance, of any cancellation or material change in any insurance coverage. Certified copies of policies and binders shall be delivered to Mortgagee with satisfactory evidence that all premiums and charges have been paid. Owner shall maintain such insurance unimpaired by any act, breach of warranty or otherwise, during the life of this Mortgage. Mortgagee may at any time request proof from the Owner that the insurance is in force. Failure by Owner to furnish proof within seven (7) days of receiving a request from Mortgagee shall constitute an "Event of Default" as defined below, and, in addition to any other rights or remedies, Mortgagee shall have the option, but shall not be required, to procure such insurance at Owner's sole cost and expense, to be paid by Owner upon demand by Mortgagee.

## III.    DEFAULT

3.1.    Any one or more of the following events shall be an "Event of Default":

(a)   **Payment Defaults**.  If any payment due on the Note or under the other Loan Documents is not made when due.

(b)   **Other Defaults**.  Owner's failure to comply with or to perform any term, obligation, covenant or condition in this Mortgage or any other agreement between the Owner and Mortgagee; or Affiliate's failure to comply with or to perform any term, obligation, covenant or condition in the Note, other Loan Documents, or any other agreement between the Affiliate and Mortgagee.

(c)   **Insolvency**.  The dissolution, merger, consolidation or termination of Owner's existence as a going business, Owner's insolvency or inability to pay debts as they mature, the appointment of a receiver for Owner's property, any assignment for the benefit of creditors, or the commencement of any processing under any bankruptcy or insolvency laws by or against Owner (except as creditor of a third party).

(d)   **Creditor or Forfeiture Proceedings**.  The entry of a judgment against Owner, or the commencement of foreclosure or forfeiture proceeding, repossession, or any other act by any creditor of Owner or by any governmental agency, against the Vessel or any collateral securing the indebtedness, including garnishment of any of Owner's deposit accounts with Mortgagee; provided, however, the foregoing shall not apply to garnishment against third-parties from Owner's operating account.

(e)   **Breach of Warranties**.  The breach of any of Owner's covenants, representations or warranties in this Mortgage; or the breach of any of Affiliate's covenants. Representations or warranties in the Note, or other Loan Documents.

(f)   **Deterioration of Vessel**.  Any deterioration or impairment of the Vessel or any depreciation in the value of the Vessel, which causes the Vessel, in the reasonable judgment of Mortgagee, to become unsatisfactory as to value.  Mortgagee may from time to time require that the Vessel be surveyed and appraised, and Owner shall cooperate with Mortgagee's surveyor to permit access to, and inspection of, the Vessel.  Each survey and appraisal shall be performed at Owner's sole cost and expense; provided, however, Owner shall not be obligated to pay the cost of surveys or appraisals performed more frequently than once every two (2) years.

(g)   **Fraud or Misrepresentation**.  Owner commits fraud or makes a material misrepresentation, or omits to disclose facts necessary to keep any representation made from misleading, at any time in connection with this Mortgage or the Note.

(h)   **Default Under Prior Mortgage**.  Default under the terms of a first preferred ship mortgage securing payment of a note dated April 5, 2017, executed by Owner to Mortgagee in the original principal amount of $499,175.00 and filed in the

Page 6

records of the National Vessel Documentation Center, Batch 43210500, Doc ID 6 (the "First Preferred Ship Mortgage").

Notwithstanding the foregoing, if Owner has not been given more than one (1) notice of the same breach or default within the preceding twelve (12) months, the breach or default may be cured (and no Event of Default shall be deemed to have occurred) if Owner, after written notice from the Mortgagee to Owner demanding cure of such default: (i) cures the default within seven (7) days if it is a payment default and (ii) thirty (30) days if it is a default other than a payment default. The Owner's right to cure, however, shall not apply to (a) default of Owner's obligation to insure the Vessel, (b) defaults which are not susceptible to cure (such as without limitation a report, certificate or financial information statement or incorrect representation or warranty which is false or misleading), (c) default in payment at maturity, (d) appointment of a receiver or other custodian of the Owner's or guarantor's assets, (e) sale or other transfer of the Vessel, (f) a lien on the Vessel other than allowed by the Loan Documents, (g) financial reporting requirements, or (f) defaults for which cure periods are already stated. Further, if during any cure period the Mortgagee's collateral or lien priority is threatened, the Mortgagee may take reasonable actions at the Owner's expense to protect the Mortgagee's interests.

3.2.     If an Event of Default occurs in addition to any other rights and remedies provided to Mortgagee under applicable law, the Note or other Loan Documents, Mortgagee may:

(a)     Accelerate and declare immediately due and payable all the unpaid principal, accrued interest, any late charges, and, as permitted by applicable law, any other amounts due under the Note, the other Loan Documents, or this Mortgage, after which these amounts shall earn interest at the default rate of interest provided in the Note. Any arrest and repossession of the Vessel by Mortgagee, or suit on the Mortgage, Note, or other Loan Documents or other action taken by Mortgagee authorized in (b) through (e) below, shall also constitute such a declaration by Mortgagee, even if no such declaration, or demand for payment, has been made previously to Owner.

(b)     Bring suit in federal or state court against the Vessel and/or Owner, and in such action, recover all costs of suit, including reasonable attorneys' fees. Owner consents to the appointment of a substitute custodian selected by Mortgagee. Mortgagee may also obtain appointment of a receiver for the Vessel. Mortgagee may at any time dismiss any action and take possession of the Vessel and exercise all powers given under this Mortgage, including those given in section (d) below.

(c)     Recover judgment for any amounts due and collect it out of the property of Owner.

(d)     In addition to all other remedies provided, repossess the Vessel without legal process, or use state legal process to do so, at any time, wherever the Vessel may be, and, without being responsible for loss or damage, hold and in Mortgagee's or Owner's name, sell, lease, charter, operate, transfer, or otherwise use the Vessel for the time and upon the terms as Mortgagee deems advisable. Mortgagee may

sell the Vessel free from any claim by Owner, and the sale may include the Permit and all appurtenances on board the Vessel at the time it or they are retaken by Mortgagee or normally on board but removed by Owner; provided, however, Mortgagee shall not have any rights in or to any cargo on board the Vessel. If Mortgagee elects, repossession and sale may take place under state law and this Mortgage shall not be used to prevent election to use state law remedies. To the extent permitted by law, the sale may be public or private, with at least twenty-one (21) days prior written notice to Owner, without having the Vessel present, and Mortgagee may be the purchaser and for payment may pay all or part of the indebtedness secured by this Mortgage. Owner agrees that it will cooperate fully to permit peaceful repossession, and will disclose promptly the exact location of the Vessel to permit Mortgagee to obtain possession of any or all of them.

(e)     For purposes of dealing with the Vessel following any Event of Default, Mortgagee and its agents are irrevocably appointed the true and lawful attorneys of Owner in Owner's name and stead for all purposes, including but not limited to selling the Vessel and doing all things (including execution of documents) necessary to the sale and to protect Mortgagee's interest in the Permit.

3.3.     If an Event of Default occurs, Owner and any other person aboard the Vessel shall immediately leave the Vessel upon the oral or written request of Mortgagee, and shall leave the Vessel in good, clean and neat condition. If the Vessel is arrested or detained by any officer of any Court or by any authority, Owner hereby authorizes Mortgagee, its agents and appointees, to receive or take possession of the Vessel, load and/or discharge cargo, and to defend any action or discharge any lien. All expenses incurred by Mortgagee as a result of such action shall be added to the indebtedness secured by this Mortgage. If the Mortgagee pays any lien or claim, this shall be an Event of Default by Owner, and Mortgagee may immediately enter on and use the Vessel as it sees fit and this shall be regarded as a lawful repossession.

3.4.     Each and every power or remedy given to Mortgagee shall be cumulative, and in addition to all powers or remedies now or hereafter existing in admiralty, in equity, at law or by statute, and may be exercised as often as deemed necessary by Mortgagee. No delay or omission by Mortgagee shall impair any right, power or remedy, and no waiver of any default shall waive any other default.

3.5.     Mortgagee may apply the net proceeds of any judicial or other sale, and any charter, management, operation or other use of the Vessel by Mortgagee, of any claim for damages, of any judgment, and of any insurance proceeds received by Mortgagee (except to the extent paid to Owner or applied in payment or repairs or otherwise for Owner's benefit) (hereinafter "Proceeds") as follows:

FIRST: to the payment of all reasonable attorneys' fees, court costs, and any other expenses, losses, charges or damages incurred or advances made by Mortgagee in the protection of its rights or caused by Owner's default with interest at the default rate of interest in effect hereunder, and to provide adequate indemnity against any liens claiming priority over this Mortgage.

Page 8

SECOND: to the payment of all interest (including any interest accruing at the default rate of interest), to date of payment, on the Note and any or all sums secured by this Mortgage, and to any balances of such proceeds to the payment next of all matured installments of principal and then of all unmatured installments or principal in the inverse order of their maturity.

If, after deducting from the Proceeds the amounts above, there is a deficiency, Mortgagee may collect the deficiency from the Owner and, in doing so, may apply, without prior notice, any deposits or other assets of the Owner to payment of the deficiency.

3.6.    All advances and expenditures which Mortgagee in its reasonable discretion may make for repairs, insurance, payment of liens or other claims, defense of suits, or for any other purpose related to this Mortgage, the Note or under the Loan Documents, and all damages sustained by Mortgagee because of a default, shall be paid by Owner on demand or, at Mortgagee's option, shall be added to the unpaid balance of the Note and paid by Owner.  Mortgagee shall not be obligated to make any such advances or expenditures, nor shall their making relieve Owner of any obligation or default related to the advances or expenditure.

## IV.    POSSESSION UNTIL DEFAULT

Until an Event of Default occurs, Owner shall be permitted to retain actual possession and use of the Vessel.

## V.    MISCELLANEOUS PROVISIONS

5.1.    Time is material and of the essence in this Agreement.  Mortgagee waives no rights by accepting late or partial payments, or by delaying enforcing any of its rights hereunder.  No changes, additions, or deletions in any terms shall be valid unless signed by an authorized officer of Mortgagee.

5.2.    Any provisions deemed invalid under any law, rule or regulation of any governmental agency shall not affect any other provision hereof.

5.3.    This Mortgage is additional security given to Mortgagee as incentive to advance funds under the Note and pursuant to the terms of the other Loan Documents.

5.4.    This Mortgage shall be governed according to the laws of the United States and the Commonwealth of Virginia, without reference to any law regarding choice of law.

5.5.    Nothing shall be construed to impose any obligation on Mortgagee to extend, or continue to extend, any credit at any future time.

[Signatures appear on the following page]

Page 9

As of this date first written above, Owner has caused this Mortgage to be executed in its name by a person authorized to do so.

OWNER:

**BELLA SKY, LLC**

By: _____
        C. Meade Amory, Manager


COMMONWEALTH OF VIRGINIA
CITY/COUNTY OF City of Newport News

On this 27th day of September, 2019, before me, a notary in and for the State and City or County aforesaid, personally appeared C. Meade Amory, Manager of Bella Sky, LLC, who is personally known to me or who has produced _____
as identification, and executed foregoing instrument, on behalf of said corporation.

_____
Notary Public

Notary Registration Number: 7175047

My Commission Expires: April 30, 2020

STAMP

ARETHEA V. WALKER
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES APR. 30, 2020
COMMISSION # 7175047

4832-0296-8232, v. 1

JS 44 (Rev. 10/20)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

Truist Bank

### DEFENDANTS

F/V BELLA SKY (O.N. 580932), its engines, tackle, gear, and appurtenances, In Rem

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Thomas J. Muzyka, Clinton & Muzyka, P.C., 1 India Street, Suite 200, Boston, MA 02109  (617) 723-9165

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

### V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
46 U.S.C. §31321

Brief description of cause:
In Rem action for the arrest of the F/V QUINBY ALLIE concerning forclosure of preferred ships mortgage,

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 1,214,467.73 CHECK YES only if demanded in complaint:
plus accumulated interest   JURY DEMAND:   ☐ Yes   ☒ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*   and costs
JUDGE   Allison D. Burroughs   DOCKET NUMBER   21-10835

DATE   5/21/21

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. **Title of case (name of first party on each side only)** Truist Bank vs. F/V BELLA SKY (O.N. 580932) its engines, gear and appurtenances, In Rem

2. **Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).**

   | | | |
   |---|---|---|
   | ☐ | I. | 160, 400, 410, 441, 535, 830*, 835*, 850, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT. |
   | ☐ | II. | 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899. |
   | ☑ | III. | 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950. |

   *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. **Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.**

   Truist Bank vs. F/V QUINBY ALLIE (O.N. 507438), her engines, tackle, furnishings, equipment, etc. C.A. No. 21-10835-ADB

4. **Has a prior action between the same parties and based on the same claim ever been filed in this court?**
   YES ☐   NO ☑

5. **Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)**
   YES ☐   NO ☑

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐   NO ☑

6. **Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?**
   YES ☐   NO ☑

7. **Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).**
   YES ☐   NO ☑

   A. If yes, in which division do all of the non-governmental parties reside?
   Eastern Division ☐     Central Division ☐     Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
   Eastern Division ☑     Central Division ☐     Western Division ☐

8. **If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)**
   YES ☐   NO ☑

(PLEASE TYPE OR PRINT)
**ATTORNEY'S NAME** Thomas J. Muzyka and John J. Bromley, Clinton & Muzyka, P.C.
**ADDRESS** Board of Trade Building, One India Street, Suite 200, Boston, MA 02109
**TELEPHONE NO.** (617) 723-9165

(CategoryForm1-2019.wpd )

# Exhibit X



REEVES McEWING
-LLP-

**Mary E. Reeves, Esquire**
**reeves@lawofsea.com**
**Brian McEwing, Esquire**
**McEwing@lawofsea.com**
**Reply To Dorchester**

**10 Andrews La., PO BOX 599**
**Dorchester, NJ 08316**
**Tele: 609-846-4717**
**Fax: 609-884-4378**

November 15, 2021

***Via Email Only***
NVDC.PDF.FILING@uscg.mil

USCG – NVDC
792 T J Jackson Dr.
Falling Waters, WV 25419

   **Re: BELLA SKY, O.N. 580932**

Dear Sir or Madam,

   Attached hereto please find an Amended Notice of Claim of Lien submitted for filing for the above named vessel.  Also attached is a credit card authorization form authorizing payment in the amount of $8.00 for the single page filing.

   The lien arose, per the original filing, on multiple dates, the last date being January 31, 2021. Kindly place the Notice of record and return a filed copy to this office.

       Respectfully submitted,

       Reeves McEwing LLP

       Brian McEwing

Enclosures

---

## AMENDED NOTICE OF CLAIM OF LIEN

The following instrument is an amendment to the Notice of Claim of Lien filed on February 24, 2021 at Batch #:87262600/Doc #: 6, against the vessel **BELLA SKY** Official Number **580932**.

The vessel is owned by **BELLA SKY, LLC**, whose address is 101 S. King St., Hampton, VA 23669.

The Claim of Lien is made by **L.D. AMORY & COMPANY, INC.**, whose address is 101 S. King St., Hampton, VA 23669.

The lien is claimed to secure payment for necessaries provided to **BELLA SKY**. The lien arose on multiple dates, beginning in 2018 through January 11, 2021.

The amount claimed under this lien is **$202,101.407** with interest accruing and costs sustained.

There is one preferred mortgage on the **BELLA SKY**, granted by **BRANCH BANKING AND TRUST COMPANY** whose address is 737 J Clyde Morris Blvd., Newport News, VA 23601-1538 in the amount of **$499,175.00** filed on April 6, 2017 at 4:05:00 p.m. at Batch No.: 43210500, with Doc ID No.: 6 filed with The Department of Homeland Security - U.S. Coast Guard National Documentation Center.

Copies of this Notice have been sent to **BELLA SKY, LLC** and **BRANCH BANKING AND TRUST COMPANY** by Certified Mail Return Receipt to both addresses noted above.

This Amended Notice of Claim of Lien was executed on the 14 day of November 2021.

I CERTIFY that the information contained in this Amended Notice of Claim of Lien is true and correct to the best knowledge, information and belief.

Quinby J. Amory, President
L. D. Amory & Company, Inc.

STATE OF VIRGINIA:

ss

CITY OF HAMPTON:

On the 14 day of Nov_____ 2021, before me the subscriber, a notary public of the State of Virginia, personally appeared Quinby J. Amory, known to me to be the person mentioned in this Notice of Claim of Lien, who stated that he/she fully understands the meaning and effect of this Amended Notice of Claim of Lien, that he/she is authorized to execute this document on behalf of L. D. Amory & Company, Inc.; that all averments made in this Amended Notice of Claim of Lien are true and correct to the best of her knowledge and belief; and who voluntarily executed this document in my presence, acknowledging it as his/her act and deed, and expressed his/her desire that it be recorded as such.

WITNESS MY HAND AND SEAL THE DAY AND YEAR AFORESAID

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard
**AUTHORIZATION FOR CREDIT CARD TRANSACTIONS**

OMB No: 1625-0027
Expires: 07/31/2019

**A. DATE**
11-15-2021

**B. FROM**
REEVES MCEWING LLP

**C. TELEPHONE NUMBER**
609-846-4717

**D. VESSEL NAME**
BELLA SKY

**E. HULL IDENTIFICATION # OR OTHER UNIQUE IDENTIFIER** *(IF ANY)*
580932

**F. CREDIT CARD HOLDER'S NAME**
BRIAN MCEWING

**G. CREDIT CARD NUMBER** *(WE ACCEPT VISA, MASTERCARD, AMERICAN EXPRESS OR DISCOVER)*

| 4 | 4 | 3 | 6 | 0 | 3 | 3 | 1 | 1 | 9 | 3 | 2 | 9 | 0 | 9 | 9 |

**H. EXPIRATION DATE**
04/22

**I. AMOUNT OF CHARGE**
$8.00

**J. VESSEL USE/ENDORSEMENT** *(CHECK ONE)*
☐ REC  ☑ COM

**K. OFFICIAL # OR HIN**
580932

**L. INDICATE SERVICE REQUIRED**
Visit our website at http://www.uscg.mil/nvdc for complete Fee Schedule

☐ Application Fees *(Initial, Exchange, Return, and Replacement)*   Amount $ _____
☐ Certificate of Ownership (CG-1330) Fee $125.00
☐ Copy of General Index or Abstract of Title  Fee $25.00
☐ Certified Copy of Certificate of Documentation w/Seal  Fee $4.00
☐ Deletion Letter $15.00
☐ Bill of Sale $8.00/page
☐ Application for Renewal $26.00
☐ Application for Late Renewal $5.00 *(include $26.00 Renewal fee for a total of $31.00)*
☑ Other LIEN FILING   Amount $ 8.00

## *APPLICATION FEES ARE NOT REFUNDABLE (46 CFR 67.500 (E)).*

**M. REQUESTOR NAME & ADDRESS**
REEVES MCEWING LLP
10 ANDREWS LANE, PO BOX 599
DORCHESTER, NJ 08316

ATTN: BRIAN MCEWING

**N. TELEPHONE NUMBER**
6098464717

**O. FAX NUMBER**
6098844378

**P. E-MAIL ADDRESS**
MCEWING@LAWOFSEA.COM

### FOR COAST GUARD USE ONLY
**Q. NAME OF PERSON TAKING REQUEST**

**R. DATE PROCESSED**

### PRIVACY ACT STATEMENT
1. **AUTHORITY:** 5 U.S.C. 301, DEPARTMENTAL REGULATIONS; 46 U.S.C. CHAPTER 121, DOCUMENTATION OF VESSELS.
2. **PURPOSE:** COLLECT USER FEES FOR SERVICES (E.G. VESSEL DOCUMENTATION, BILL OF SALE, CERTIFICATE OF OWNERSHIP, ETC.) PROVIDED BY THE USCG NATIONAL VESSEL DOCUMENTATION CENTER (NVDC).
3. **ROUTINE USES:** AUTHORIZED USCG PERSONNEL WILL USE THIS DATA TO ASSESS AND ACCOUNT FOR VARIOUS USER FEES CHARGED BY THE NVDC. ANY DISCLOSURES OF DATA WITHIN THIS RECORD WILL BE MADE IN ACCORDANCE WITH DHS/USCG-013, MARINE INFORMATION FOR SAFETY AND LAW ENFORCEMENT (MISLE), 74 FEDERAL REGISTER (FR) 30305, JUNE 25, 2009, AND DHS/ALL-007 ACCOUNTS PAYABLE SYSTEM OF RECORDS, 80 FEDERAL REGISTER (FR) 58286, SEPTEMBER 28, 2015.
4. **CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** VOLUNTARY. HOWEVER, NO DOCUMENTATION SERVICE FOR WHICH A FEE IS APPLICABLE WILL BE PERFORMED UNTIL THE APPROPRIATE FEE HAS BEEN PAID, AS PER 46 CFR PART 67.500.

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 5 MINUTES.  YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO: U.S. COAST GUARD, NATIONAL VESSEL DOCUMENTATION CENTER, 792 T J JACKSON DRIVE, FALLING WATERS, WEST VIRGINIA 25419, OR OFFICE OF MANAGEMENT AND BUDGET, PAPERWORK REDUCTION PROJECT (1625-0027), WASHINGTON, DC 20503.

CG-7042 (08/16)       Previous Edition Obsolete       Page 1 of 1



**Mary E. Reeves, Esquire**
**reeves@lawofsea.com**
**Brian McEwing, Esquire**
**McEwing@lawofsea.com**
**Reply To Dorchester**

**10 Andrews La., PO BOX 599**
**Dorchester, NJ 08316**
**Tele: 609-846-4717**
**Fax: 609-884-4378**

November 15, 2021

**_Via Email Only_**
NVDC.PDF.FILING@uscg.mil

USCG – NVDC
792 T J Jackson Dr.
Falling Waters, WV 25419

    **Re: QUINBY ALLIE, O.N. 507438**

Dear Sir or Madam,

    Attached hereto please find an amended Notice of Claim of Lien submitted for filing for the above named vessel.  Also attached is a credit card authorization form authorizing payment in the amount of $8.00 for the single page filing.

    The lien arose, per the original filing, on multiple dates, the last date being January 31, 2021. Kindly place the Notice of record and return a filed copy to this office.

                    Respectfully submitted,

                    Reeves McEwing LLP

                    Brian McEwing

Enclosures

---

## AMENDED NOTICE OF CLAIM OF LIEN

The following instrument is an amendment to a Notice of Claim filed on February 24, 2021 at Batch #: 87262600/Doc #: 2 against the vessel **QUINBY ALLIE** Official Number <u>507438</u>.

The vessel is owned by **QUINBY ALIE, LLC,** whose address is 101 S. King St., Hampton, VA 23669.

The Claim of Lien is made by **L.D. AMORY & COMPANY, INC.,** whose address is 101 S. King St., Hampton, VA 23669.

The lien is claimed to secure payment for <u>necessaries</u> provided to **QUINBY ALLIE**. The lien arose on multiple dates, beginning on <u>**October 31, 2019 through January 12, 2021.**</u>

The amount claimed under this lien is <u>**$261,685.57**</u> with interest accruing and costs sustained.

There is one preferred mortgage on the **QUINBY ALLIE**, granted by **BRANCH BANKING AND TRUST COMPANY (Now TRUIST Bank)** whose address is 737 J Clyde Morris Blvd., Newport News, VA 23601-1538 in the amount of **$998,212.90** filed on October 1, 2019 at 1:49 p.m., in Batch No.: 68025100, with Doc ID No.: 2 filed with The Department of Homeland Security - U.S. Coast Guard National Documentation Center.

Copies of this Amended Notice have been sent to **QUINBY ALLIE, LLC** and **TRUIST Bank**, successor in interest to **BRANCH BANKING AND TRUST COMPANY** by Certified Mail Return Receipt to both addresses noted above.

This Amended Notice of Claim of Lien was executed on the _14_ day of November 2021.

I CERTIFY that the information contained in this amended Notice of Claim of Lien is true and correct to the best knowledge, information and belief.

Quinby J. Amory, President
L. D. Amory & Company, Inc.

STATE OF VIRGINIA:

          ss

CITY OF HAMPTON:

On the _14_ day of November, 2021, before me the subscriber, a notary public of the State of Virginia, personally appeared, Quinby J. Amory, known to me to be the person mentioned in this Notice of Claim of Lien, who stated that he/she fully understands the meaning and effect of this Amended Notice of Claim of Lien, that he/she is authorized to execute this document on behalf of L. D. Amory & Company, Inc.; that all averments made in this Amended Notice of Claim of Lien are true and correct to the best of her knowledge and information; and who voluntarily executed this document in my presence, acknowledging it as his/her act and deed, and expressed his/her desire that it be recorded as such.

WITNESS MY HAND AND SEAL THE DAY AND YEAR AFORESAID

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard
**AUTHORIZATION FOR CREDIT CARD TRANSACTIONS**

OMB No: 1625-0027
Expires: 07/31/2019

**A. DATE**
11-15-2021

**B. FROM**
REEVES MCEWING LLP

**C. TELEPHONE NUMBER**
609-846-4717

**D. VESSEL NAME**
QUINBY ALLIE

**E. HULL IDENTIFICATION # OR OTHER UNIQUE IDENTIFIER** *(IF ANY)*
507438

**F. CREDIT CARD HOLDER'S NAME**
BRIAN MCEWING

**G. CREDIT CARD NUMBER** *(WE ACCEPT VISA, MASTERCARD, AMERICAN EXPRESS OR DISCOVER)*

| 4 | 4 | 3 | 6 | 0 | 3 | 3 | 1 | 1 | 9 | 3 | 2 | 9 | 0 | 9 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**H. EXPIRATION DATE**
04/22

**I. AMOUNT OF CHARGE**
$8.00

**J. VESSEL USE/ENDORSEMENT** *(CHECK ONE)*
☐ REC   ☑ COM

**K. OFFICIAL # OR HIN**
507438

**L. INDICATE SERVICE REQUIRED**

Visit our website at http://www.uscg.mil/nvdc for complete Fee Schedule

☐ Application Fees *(Initial, Exchange, Return, and Replacement)*   Amount $ _____
☐ Certificate of Ownership (CG-1330) Fee $125.00
☐ Copy of General Index or Abstract of Title  Fee $25.00
☐ Certified Copy of Certificate of Documentation w/Seal  Fee $4.00
☐ Deletion Letter $15.00
☐ Bill of Sale $8.00/page
☐ Application for Renewal $26.00
☐ Application for Late Renewal $5.00 *(include $26.00 Renewal fee for a total of $31.00)*
☑ Other LIEN FILING            Amount $ 8.00

## *APPLICATION FEES ARE NOT REFUNDABLE (46 CFR 67.500 (E)).*

**M. REQUESTOR NAME & ADDRESS**

REEVES MCEWING LLP
10 ANDREWS LANE, PO BOX 599
DORCHESTER, NJ 08316

ATTN: BRIAN MCEWING

**N. TELEPHONE NUMBER**
6098464717

**O. FAX NUMBER**
6098844378

**P. E-MAIL ADDRESS**
MCEWING@LAWOFSEA.COM

### FOR COAST GUARD USE ONLY

**Q. NAME OF PERSON TAKING REQUEST**

**R. DATE PROCESSED**

### PRIVACY ACT STATEMENT

1. **AUTHORITY:** 5 U.S.C. 301, DEPARTMENTAL REGULATIONS; 46 U.S.C. CHAPTER 121, DOCUMENTATION OF VESSELS.
2. **PURPOSE:** COLLECT USER FEES FOR SERVICES (E.G. VESSEL DOCUMENTATION, BILL OF SALE, CERTIFICATE OF OWNERSHIP, ETC.) PROVIDED BY THE USCG NATIONAL VESSEL DOCUMENTATION CENTER (NVDC).
3. **ROUTINE USES:** AUTHORIZED USCG PERSONNEL WILL USE THIS DATA TO ASSESS AND ACCOUNT FOR VARIOUS USER FEES CHARGED BY THE NVDC. ANY DISCLOSURES OF DATA WITHIN THIS RECORD WILL BE MADE IN ACCORDANCE WITH DHS/USCG-013, MARINE INFORMATION FOR SAFETY AND LAW ENFORCEMENT (MISLE), 74 FEDERAL REGISTER (FR) 30305, JUNE 25, 2009, AND DHS/ALL-007 ACCOUNTS PAYABLE SYSTEM OF RECORDS, 80 FEDERAL REGISTER (FR) 58286, SEPTEMBER 28, 2015.
4. **CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** VOLUNTARY. HOWEVER, NO DOCUMENTATION SERVICE FOR WHICH A FEE IS APPLICABLE WILL BE PERFORMED UNTIL THE APPROPRIATE FEE HAS BEEN PAID, AS PER 46 CFR PART 67.500.

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 5 MINUTES.  YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO:  U.S. COAST GUARD, NATIONAL VESSEL DOCUMENTATION CENTER, 792 T J JACKSON DRIVE, FALLING WATERS, WEST VIRGINIA 25419, OR OFFICE OF MANAGEMENT AND BUDGET, PAPERWORK REDUCTION PROJECT (1625-0027), WASHINGTON, DC 20503.

CG-7042 (08/16)              Previous Edition Obsolete                              Page 1 of 1

# Exhibit Y

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION**
**NO.  21-CV-10835-ADB**

**TRUIST BANK,**
         **Plaintiff,**                                      **IN ADMIRALTY**

**v.**

**F/V QUINBY ALLIE, OFFICIAL**
**NUMBER 507438, HER ENGINES,**
**TACKLE, FURNISHINGS, EQUIPMENT,**
**SUPPLIES, FISHING PERMITS, AND**
**OTHER APPURTENANCES,** *in rem*,
         **Defendant.**

**PLAINTIFF'S UNOPPOSED *EMERGENCY* MOTION TO AMEND THE**
**ORDER OF SALE (ECF No. 50) TO INCREASE CREDIT BID**

Now comes the Plaintiff, Truist Bank, in the above-entitled action, by and through its undersigned counsel, Clinton & Muzyka, P.C. and Troutman Pepper Hamilton Sanders LLP, and, for the reasons set forth below, respectfully requests that this Honorable Court permit it to increase its credit bid to the amount of ***$1,088,560.20*** and that the Court amend its Order of Sale (ECF No. 50) to reflect this current amount.

The Plaintiff states as follows in support of this Motion:

**I.    PROCEDURAL BACKGROUND**

The original Order of Sale was issued on November 8, 2021 in response to a Motion requesting the Order filed on October 15, 2021 (ECF No. 39).  A date for the Vessel's auction by U.S. Marshal was then scheduled for March 22, 2022.  The parties attempted resolution of this civil action by Mediation with Magistrate Judge Bowler on March 10, 2022 without success. Plaintiff, in preparation for the March 22, 2022 U.S. Marshal auction of the Vessel now submits this motion to update the amounts owed to Plaintiff from the sale of the *res*.

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 113 of 127 PageID# 995
Case 1:21-cv-10835-ADB   Document 62   Filed 03/16/22   Page 2 of 4

2

## II.    ARGUMENT

Because Mediation was not successful, Plaintiff must now go forward with the U.S. Marshal auction on March 22, 2022.  In preparation for the auction, Plaintiff must seek an increase in the credit bid that was allowed by this Court to properly reflect the increased amount owed on the Promissory Note(s), increased *custodia legis*, and the attorneys fees and costs expended to-date.

### A.  The Promissory Notes

The amount owed on the Promissory Notes, as of March 9, 2022, is at the level of ***$927,137.96***.  See Affidavit of Daniel T. Stillman, Esq., Exhibit "A" and its attendant spreadsheet of costs.  As illustrated in Exhibit A, this amount is comprised of Principal in the amount of $853,657.85, Interest in the amount of $68,587.35, and Late Charges in the amount of $4,892.76.

### B.  *Custodia Legis*

As of February 28, 2022, *custodia legis* is at the level of ***$89,501.11***.  Exhibit "A."

### C.  Attorneys Fees and Costs

As of March 9, 2022, attorneys fees and costs are now at the level of ***$71,921.13***.  This number is comprised of $71,827.68 in attorneys fees and $93.45 in Court and Administrative costs. Exhibit "A."

***The above figures create a total of $1,088,560.20.***

## III.    CONCLUSION

For the reasons set forth above, and those set forth in Plaintiff's Memorandum in support of its unopposed Motion for the Sale of the Vessel (ECF No. 40), which is incorporated herein by reference, Truist Bank prays that it be permitted to increase its credit bid to the level of

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 114 of 127 PageID# 996
Case 1:21-cv-10835-ADB   Document 62   Filed 03/16/22   Page 3 of 4

3

*$1,088,560.20* and that the Court properly amend its Order of Sale (ECF No. 50) in accordance with such allowance.

 **WHEREFORE**, the Plaintiff, Truist Bank, prays that this Honorable Court allow it to increase its credit bid to the level of *$1,088,560.20* and that the Court properly amend its Order of Sale (ECF No. 50) in accordance with such allowance.

### Local Rule 7.1 Certification

 I certify that all counsel of record were made aware of this Motion on March 15, 2022 by email forwarding this Motion and Plaintiff's intent to file it and there were no objections.

        */s/ John J. Bromley*
        John J. Bromley

    **Truist Bank,**

    By its attorneys,
    **CLINTON & MUZYKA, P.C.**

    *"/s/Thomas J. Muzyka"*
    **Thomas J. Muzyka**
    **BBO No. 365540**
    **John J. Bromley**
    **BBO No. 672134**
    Board of Trade Building
    One India Street, Suite 200
    Boston, MA 02109
    Tel#: (617) 723-9165
    Fax#: (617) 720-3489
    Email:  tmuzyka@clinmuzyka.com
    Email:   jbromley@clinmuzyka.com

4

**TROUTMAN PEPPER HAMILTON
SANDERS, LLP**

*"/s/Daniel T. Stillman"*
**Daniel T. Stillman**
***Pro Hac Vice***
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Tel#: (757) 687-7710
Email:  dan.stillman@troutman.com

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5.2, I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 16, 2022.

*"/s/ Thomas J. Muzyka"*
Thomas J. Muzyka



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.  21-CV-10835-ADB

**TRUIST BANK,**
      **Plaintiff,**

**IN ADMIRALTY**

v.

**F/V QUINBY ALLIE, OFFICIAL
NUMBER 507438, HER ENGINES,
TACKLE, FURNISHINGS, EQUIPMENT,
SUPPLIES, FISHING PERMITS, AND
OTHER APPURTENANCES,** *in rem*,
      **Defendant.**

## AFFIDAVIT OF DANIEL T. STILLMAN, ESQ.

I am a member of the firm of Troutman Pepper Hamilton Sanders, LLP, attorneys for the Plaintiff, Truist Bank.  I submit this Affidavit in support of Plaintiff's Unopposed Emergency Motion to Amend the Order of Sale to reflect an increase in the credit bid.

1.  The following is based upon personal knowledge.

2.  The Vessel presently remains under arrest in the Port of New Bedford, Massachusetts and in the custody of the Court-appointed substitute custodian, Michael Collyer of Marine Safety Consultants, Inc.

3.  I attest to the accuracy of the attached spreadsheet that reflects the amounts owed to the Plaintiff on the Promissory Notes, as of March 9, 2022, in the total amount of $927,137.96.

4.  I attest to the accuracy of the attached spreadsheet that reflects the amounts owed to the Plaintiff for *custodia legis*, as of March 9, 2022, in the total amount of $89,501.11.

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 118 of 127 PageID# 1000
Case 1:21-cv-10835-ADB   Document 62-1   Filed 03/16/22   Page 3 of 4

2

5.  I attest to the accuracy of the attached spreadsheet that reflects the amounts owed to
    the Plaintiff for attorneys fees and costs, as of February 28, 2022, in the total amount
    of $71,921.13.


**SIGNED UNDER THE PENALTIES OF PERJURY THIS 11th DAY OF**

**MARCH, 2022.**

_"/s/ Daniel T. Stillman"_
Daniel T. Stillman

# F/V QUINBY ALLIE

| PAYOFF DETAILS (03-09-22) | |
|---|---|
| **Principal** | $853,657.85 |
| **Total Interest** | $68,587.35 |
| **Late Charges** | $4,892.76 |
| **FEES / COSTS (03-09-22)** | |
| **Legal / Attorneys' Fees** | $71,827.68 (Feb. 28, 2022) |
| **Court / Admin Costs** | $93.45 |
| **Custodia Legis** | $89,501.11 |
| **PAYOFF + FEES / COSTS (03-09-22)** | |
| **TOTAL** | **$1,088,560.20** |

## BREAKDOWN OF CUSTODIA LEGIS EXPENSES

| MARINE SAFETY CONSULTANTS, INC. | | |
|---|---|---|
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Monthly Custodial Fees: $1,500 x10 Months* | $15,000.00 | Jun. 2021- Mar. 2022 |
| • *Towing Preparation* | $2,802.50 | May 2021 |
| • *Condition and Value Survey* | $800.00 | Jul. 2021 |
| **ATLANTIC BROKERAGE HOUSE** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Permit Appraisal Fee* | $500.00 | Jun. 2021 |
| **TUCKER-ROY TOW & SALVAGE, INC.** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Towing services* | $10,306.25 | May 2021 |
| **INTERNATIONAL SPECIAL RISKS** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Initial Coverage* | $22,500.00 | May 2021 |
| **COMPASS INSURANCE** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Coverage Payment [Q3: $5,826.96 // Q4: $5,826.96]* | $11,653.92 | Oct. 2021 (Q3) // Jan. 2022 (Q4) |
| **C.P. BRODEUR, INC.** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Shift Vessel to new berth at request of Custodian* | $85.00 | Jun. 2021 |
| **SHORELINE RESOURCES, LLC** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Monthly Fees: $2,000 x10 Months* | $20,000.00 | Jun. 2021-Mar. 2022 |
| **EAST COAST FABRICATION** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Vessel Winterization* | $2,500.00 | Dec. 2021 |
| **STANDARD MARINE OUTFITTERS** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Antifreeze/Coolant for Vessel Winterization* | $332.63 | Nov. 2021 |
| **FUEL MAN LLC** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Additional Antifreeze for QUINBY ALLIE* | $20.81 | Dec. 2021 |
| **U.S. MARSHALS SERVICE** | | |
| **Vessel Custodial Costs/Fees Incurred** | Amount | Date(s) |
| • *Additional Advertising Expenses* | $3,000.00 | Feb. 2022 |
| **CUSTODIAL LEGIS EXPENSES TO-DATE** | **$89,501.11** | **Mar. 9, 2022** |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

$\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ **CIVIL ACTION**
$\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}$ **NO.  21-CV-10841-ADB**

**TRUIST BANK,**
$\phantom{xxx}$ **Plaintiff,** $\phantom{xxxxxxxxxxxxxxxxxxxxxxx}$ **IN ADMIRALTY**

**v.**

**F/V BELLA SKY, OFFICIAL**
**NUMBER 580932, HER ENGINES,**
**TACKLE, FURNISHINGS, EQUIPMENT,**
**SUPPLIES, FISHING PERMITS, AND**
**OTHER APPURTENANCES,** *in rem*,
$\phantom{xxx}$ **Defendant.**

**PLAINTIFF'S UNOPPOSED *EMERGENCY* MOTION TO AMEND THE**
**ORDER OF SALE (ECF No. 52) TO INCREASE CREDIT BID**

Now comes the Plaintiff, Truist Bank, in the above-entitled action, by and through its undersigned counsel, Clinton & Muzyka, P.C. and Troutman Pepper Hamilton Sanders LLP, and, for the reasons set forth below, respectfully requests that this Honorable Court permit it to increase its credit bid to the amount of ***$471,343.52*** and that the Court amend its Order of Sale (ECF No. 52) to reflect this current amount.

The Plaintiff states as follows in support of this Motion:

**I.** $\phantom{xx}$ **PROCEDURAL BACKGROUND**

The original Order of Sale was issued on November 8, 2021 in response to a Motion requesting the Order filed on October 15, 2021 (ECF No. 41).  A date for the Vessel's auction by U.S. Marshal was then scheduled for March 22, 2022.  The parties attempted resolution of this civil action by Mediation with Magistrate Judge Bowler on March 10, 2022 without success.  Plaintiff, in preparation for the March 22, 2022 U.S. Marshal auction of the Vessel now submits this motion to update the amounts owed to Plaintiff from the sale of the *res*.

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 121 of 127 PageID# 1003
Case 1:21-cv-10841-ADB   Document 65   Filed 03/16/22   Page 2 of 4

2

## II.   ARGUMENT

Because Mediation was not successful, Plaintiff must now go forward with the U.S. Marshal auction on March 22, 2022.  In preparation for the auction, Plaintiff must seek an increase in the credit bid that was allowed by this Court to properly reflect the increased amount owed on the Promissory Note(s), increased *custodia legis*, and the attorneys fees and costs expended to-date.

### A.  The Promissory Notes

The amount owed on the Promissory Notes, as of March 9, 2022, is at the level of ***$352,919.76***.  *See* Affidavit of Daniel T. Stillman, Esq., Exhibit "A" and its attendant spreadsheet of costs.  As illustrated in Exhibit A, this amount is comprised of Principal in the amount of $325,732.78, Interest in the amount of $24,378.00, and Late Charges in the amount of $2,808.98.

### B.  *Custodia Legis*

As of February 28, 2022, *custodia legis* is at the level of ***$46,502.63***.  Exhibit "A."

### C.  Attorneys Fees and Costs

As of March 9, 2022, attorneys fees and costs are now at the level of ***$71,921.13***.  This number is comprised of $71,827.68 in attorneys fees and $93.45 in Court and Administrative costs. Exhibit "A."

***The above figures create a total of $471,343.52.***

## III.   CONCLUSION

For the reasons set forth above, and those set forth in Plaintiff's Memorandum in support of its unopposed Motion for the Sale of the Vessel (ECF No. 42), which is incorporated herein by reference, Truist Bank prays that it be permitted to increase its credit bid to the level of ***$471,343.52***

Case 4:21-cv-00037-AWA-RJK   Document 63-2   Filed 08/26/22   Page 122 of 127 PageID# 1004
Case 1:21-cv-10841-ADB   Document 65   Filed 03/16/22   Page 3 of 4

3

and that the Court properly amend its Order of Sale (ECF No. 52) in accordance with such allowance.

  **WHEREFORE**, the Plaintiff, Truist Bank, prays that this Honorable Court allow it to increase its credit bid to the level of ***$471,343.52*** and that the Court properly amend its Order of Sale (ECF No. 52) in accordance with such allowance.

**Local Rule 7.1 Certification**

  I certify that all counsel of record were made aware of this Motion on March 15, 2022 by email forwarding this Motion and Plaintiff's intent to file it and there were no objections.

          */s/ John J. Bromley*
          John J. Bromley


        **Truist Bank,**

        By its attorneys,
        **CLINTON & MUZYKA, P.C.**

        *"/s/Thomas J. Muzyka"*
        **Thomas J. Muzyka**
        **BBO No. 365540**
        **John J. Bromley**
        **BBO No. 672134**
        Board of Trade Building
        One India Street, Suite 200
        Boston, MA 02109
        Tel#: (617) 723-9165
        Fax#: (617) 720-3489
        Email:  tmuzyka@clinmuzyka.com
        Email:  jbromley@clinmuzyka.com

4

**TROUTMAN PEPPER HAMILTON
SANDERS, LLP**

*"/s/Daniel T. Stillman"*
**Daniel T. Stillman**
***Pro Hac Vice***
222 Central Park Avenue, Suite 2000
Virginia Beach, VA 23462
Tel#: (757) 687-7710
Email:  dan.stillman@troutman.com

<u>**CERTIFICATE OF SERVICE**</u>

Pursuant to Local Rule 5.2, I hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 16, 2022.

*"/s/ Thomas J. Muzyka"*
Thomas J. Muzyka



**EXHIBIT "A"**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

                                    **CIVIL ACTION**
                                    **NO. 21-CV-10841-ADB**

**TRUIST BANK,**
        **Plaintiff,**                    **IN ADMIRALTY**

**v.**

**F/V BELLA SKY, OFFICIAL**
**NUMBER 580932, HER ENGINES,**
**TACKLE, FURNISHINGS, EQUIPMENT,**
**SUPPLIES, FISHING PERMITS, AND**
**OTHER APPURTENANCES,** *in rem*,
        **Defendant.**

<u>**AFFIDAVIT OF DANIEL T. STILLMAN, ESQ.**</u>

I am a member of the firm of Troutman Pepper Hamilton Sanders, LLP, attorneys for the

Plaintiff, Truist Bank.  I submit this Affidavit in support of Plaintiff's Unopposed Emergency

Motion to Amend the Order of Sale to reflect an increase in the credit bid.

1.   The following is based upon personal knowledge.

2.   The Vessel presently remains under arrest in the Port of New Bedford, Massachusetts

     and in the custody of the Court-appointed substitute custodian, Michael Collyer of

     Marine Safety Consultants, Inc.

3.   I attest to the accuracy of the attached spreadsheet that reflects the amounts owed to

     the Plaintiff on the Promissory Notes, as of March 9, 2022, in the total amount of

     $352,919.76.

4.   I attest to the accuracy of the attached spreadsheet that reflects the amounts owed to

     the Plaintiff for *custodia legis*, as of March 9, 2022, in the total amount of

     $46,502.63.

5.  I attest to the accuracy of the attached spreadsheet that reflects the amounts owed to

the Plaintiff for attorneys fees and costs, as of February 28, 2022, in the total amount

of $71,921.13.


**SIGNED UNDER THE PENALTIES OF PERJURY THIS 11th DAY OF**

**MARCH, 2022.**

"*/s/ Daniel T. Stillman*"
Daniel T. Stillman

# F/V BELLA SKY

| PAYOFF DETAILS (03-09-22) | |
|---|---|
| **Principal** | $325,732.78 |
| **Total Interest** | $24,378.00 |
| **Late Charges** | $2,808.98 |
| FEES / COSTS (03-09-22) | |
| **Attorneys' Fees** | $71,827.68 (Feb. 28, 2022) |
| **Court / Admin Costs** | $93.45 |
| **Custodia Legis** | $46,502.63 |
| PAYOFF + FEES / COSTS (03-09-22) | |
| **TOTAL** | **$471,343.52** |

## BREAKDOWN OF CUSTODIA LEGIS EXPENSES

| MARINE SAFETY CONSULTANTS, INC. | | |
|---|---|---|
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Monthly Custodial Fees: $1,500 x10 Months | $15,000.00 | Jun. 2021- Mar. 2022 |
| • Condition and Value Survey | $500.00 | Jul. 2021 |
| ATLANTIC BROKERAGE HOUSE | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Permit Appraisal Fee | $500.00 | Jun. 2021 |
| COMPASS INSURANCE | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Coverage Payment [Q3: $2,292.50 // Q4: $2,292.50] | $4,585.00 | Oct. 2021 (Q3) // Jan. 2022 (Q4) |
| C.P. BRODEUR, INC. | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Shift Vessel to new berth at request of Custodian | $85.00 | Jun. 2021 |
| SHORELINE RESOURCES, LLC | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Monthly Fees: $2,000 x 10 Months | $20,000.00 | Jun. 2021- Mar. 2022 |
| EAST COAST FABRICATION | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Vessel Winterization | $2,500.00 | Dec. 2021 |
| STANDARD MARINE OUTFITTERS | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Antifreeze/Coolant for Vessel Winterization | $332.63 | Nov. 2021 |
| U.S. MARSHALS SERVICE | | |
| Vessel Custodial Costs/Fees Incurred | Amount | Date(s) |
| • Additional Advertising Expenses | $3,000.00 | Feb. 2022 |
| **CUSTODIAL LEGIS EXPENSES TO-DATE** | **$46,502.63** | **Mar. 9, 2022** |