UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION
In Admiralty

**TROY D. DWYER, derivatively on
Behalf of Quinby Allie, LLC and
Bella Sky, LLC,**

**and**                                                          Civil No: 4:21-cv-37

**TROY D. DWYER, individually,**

      **Plaintiffs,**
**v.**

**L.D. AMORY AND COMPANY, INCORPORATED,**
**a Virginia corporation,**

**QUINBY J. AMORY,**

**and**

**C. MEADE AMORY,**

      **Defendants, and**

**QUINBY ALLIE, LLC**,
**a Virginia limited liability company**,

**and**

**BELLA SKY, LLC**,
**a Virginia limited liability company,**

      **Nominal Defendants**.

## AMENDED VERIFIED COMPLAINT

Plaintiff, Troy D. Dwyer, by undersigned counsel, files the following Amended Verified

Complaint, derivatively on behalf of Quinby Allie, LLC and Bella Sky, LLC ("the LLCs"), and

individually, against the Defendants, L.D. Amory and Company, Incorporated, C. Meade

Amory, and Quinby J. Amory, and in support thereof states as follows:

1

## PARTIES AND JURISDICTION

1.       Quinby Allie, LLC and Bella Sky, LLC are each Virginia limited liability companies with their registered offices located in the City of Hampton, Virginia.

2.       Troy D. Dwyer ("Dwyer") is an individual currently residing in the Commonwealth of Massachusetts and is both a member and manager of the LLCs. He owns 50% of the membership interest in the LLCs. Dwyer was a member of the LLCs at the time of all transactions complained of herein, he has continuously been a member of the LLCs to the present.

3.       L. D. Amory and Company, Incorporated ("LDA") is a Virginia corporation with its registered office located in the City of Hampton, Virginia, and regularly conducts business in Virginia.

4.       LDA operates a fish house at 101 S. King Street, Hampton, Virginia 23669, where it unpacks and buys seafood from commercial fishing vessels that land their catch at its fish house. LDA then sells such seafood to third parties either directly or indirectly through various channels.

5.       C. Meade Amory ("Amory") is an individual currently residing in the Commonwealth of Virginia, and is both a member and manager of each of the LLCs. He also serves as the Secretary/Treasurer of LDA, according to the records of the State Corporation Commission of the Commonwealth of Virginia. He further at various times has held himself out as the owner and president of LDA. *See* various articles and websites, attached as **Exhibit A**. Amory also owns 50% of the membership interests in the LLCs.

6.     Quinby J. Amory ("Mrs. Amory") is an individual currently residing in the Commonwealth of Virginia. She is the President of LDA and its sole shareholder.  *See* Va. SCC record for LDA, attached as **Exhibit B**.

7.     This case falls under this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333, 46 U.S.C. § 31343(c)(2), and Rule 9(h) of the Federal Rules of Civil Procedure for the admiralty and maritime claims stated herein. The Court has supplemental and pendant jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. As such, this action is not a collusive one to confer jurisdiction that the court would otherwise lack.

8.     Additionally, the Court has jurisdiction over this action for declaratory relief pursuant to Title 28 of the United States Code, §§ 2201 *et seq*, in that a present controversy exists between plaintiff Dwyer, derivatively on behalf of the LLCs, Amory, and LDA as to certain debts purportedly owed by the LLC's to LDA, and Dwyer asks the Court to adjudicate and determine the validity of such debts. The Court has supplemental and pendant jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## DUTIES OF C. MEADE AMORY

9.     Amory, as manager of the LLCs and owner of a 50% interest in the LLCs, has the ability to control and does control the business and corporate affairs of all of the LLCs. Correspondingly, Amory owed and owes the LLCs fiduciary obligations of good faith, loyalty, and candor, and was and is required to use his utmost ability to control and manage the LLCs in a fair, just, honest, and equitable manner. Amory was and is required to act in accordance with the LLCs' respective operating agreements and in furtherance of the best interests of the LLCs, not in furtherance of his personal interest or benefit and/or not in furtherance of any other entity with which he is associated, including LDA.

10.     Amory, as manager and co-owner of the LLCs, is able to and has, directly and/or indirectly exercised control over the wrongful acts complained of herein.

11.      To discharge his duties, Amory, as manager and co-owner of the LLCs, is required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the LLCs. By virtue of such duties, Amory as manager of the LLCs, was and is required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the LLCs were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of LLCs' business;

    b.  Exercise good faith to ensure that the LLCs were operated in a diligent, honest, and prudent manner in compliance with all applicable federal and state laws, rules, regulations, requirements, and all contractual obligations, including acting only within the scope of their legal authority; and

    c.  Refrain from wasting the LLCs assets or otherwise unduly benefitting himself and/or other entities associated with him at the expense of the LLCs.

12.     Va. Code Ann. § 13.1-1024.1(A) provides that "[a] manager shall discharge his or its duties as a manager in accordance with the manager's good faith business judgment of the best interests of the limited liability company."

## FACTS

13.     On or about July 31, 2014, Dwyer and Amory established Bella Sky, LLC, each as a member with a 50% interest and each designated as a manager. *See* Bella Sky Operating Agreement, attached as **Exhibit C**. The purpose of Bella Sky, LLC was "to buy, sell, hold, manage and operate fishing vessels, together with all equipment and permits and to engage in

any other activities as members shall determine and not prohibited by law, for the purpose of making a profit[.]" **Exhibit C**, p.11. Bella Sky, LLC currently owns the F/V BELLA SKY (Official No. 580932).

14.    On or about May 23, 2019, Dwyer and Amory established Quinby Allie, LLC, each of them as a member with a 50% interest and each designated as a manager, the purpose of which was to acquire and operate a second commercial fishing vessel. *See* Quinby Allie Operating Agreement., attached as **Exhibit D**. Quinby Allie, LLC currently owns the F/V QUINBY ALLIE (Official No. 507438).

15.    Amory manages the LLCs, maintains their principal offices, and keeps their books and records at the location of LDA's fish house facility at 101 S. King Street, Hampton, Virginia 23669.

16.    Dwyer is responsible for maintenance and operation of the vessels owned by the LLCs.

17.    With each of the LLCs, Amory opened bank accounts in the name of each LLC at Truist Bank (f/k/a Branch Banking and Trust Company or "BB&T") (hereinafter referred to as "BB&T" or "Truist"), the same bank where LDA had its accounts. Amory undertook as manager to maintain the books, records, and accounts of the LLCs, with the assistance of employees of LDA that he would designate and who worked for the LLCs under his direction, including Cynthia Triplett ("Triplett").

18.    Triplett is currently employed with LDA as the Controller and/or the person in charge of Accounts Payable. She also handles the financial books and records of the LLCs.

19.    Pursuant to each of the LLCs' Operating Agreements, the managers and members of the LLC were not to contract any loans or indebtedness on behalf of either company, nor any

evidence of indebtedness issued in each company's name, "unless authorized by resolution of the Members." *See* **Exhibits C & D,** at p.5.

20.     Pursuant to each respective LLCs' Operating Agreement, members were to receive reimbursement for expenses reasonably incurred in the performance of their duties.

21.     Amory, by and with the assistance of Triplett, who was an LDA employee under Amory's direction and supervision, exercised complete control and domination over corporate affairs and financial and bookkeeping affairs of the LLCs to the exclusion of Dwyer.

22.     Amory controlled the bank accounts and credit card accounts for each LLC, and maintained the general ledger and other books and records of the LLCs, by and through and with the assistance of LDA employees of his choosing and at his direction.  Triplett also kept the books and records of LDA under Amory's direction.

23.     For each of the LLCs' accounts at BB&T, per Amory's direction, Dwyer had no check-writing, check-signing, wiring, ACH, or other authority to move funds into or out of the accounts, and he rarely received copies of statements of accounts. Amory, however, authorized and directed a designated LDA employee at all pertinent times to have check-writing, check-signing, wiring, ACH, and other authority to transfer funds into and out of the LLCs' bank accounts.

24.     The sole means of the LLCs to earn revenue was and is for each of the vessels to engage in commercial fishing and sell fishing stock to a fish house for the market price of such stock.

25.     Typically a commercial fishing boat will outfit and provision a vessel for each voyage, set sail and fish until the hold is full and/or available species quota is caught, then return to shore to unpack the catch at a commercial fish house. The fish house typically "settles" the

voyage by preparing a settlement sheet showing the price paid for the catch and deductions for expenses of the voyage and vessel (such as fuel, oil, ice, and groceries), and, after expenses, divides the balance between the crew, with the respective shares of each crewmember (agreed to in advance), and the boat (the "boat share").

26.     One of the key tasks of the LLCs' bookkeeper was to calculate and prepare the settlements for each fishing trip voyage, receive the funds of each voyage from the fish house where the voyage landed into the accounts of the LLCs, and then write and send checks to pay for all the items on the settlement sheet: crew shares, fuel and oil expenses, food, ice, and finally to leave the balance of the funds (55% of net revenue from fishing stock) in the LLCs' accounts as the boat share.

27.     The boat share funds from voyages were to be kept in reserve and used to pay for the expenses of the vessels, including mortgage and insurance obligations.

28.     The LLCs' vessels thus paid for the expenses of each fishing voyage out of the stock sale of each trip. Other expenses such as mortgage payments, insurance, and repair and maintenance were to be paid out of the boat share earnings for each vessel.

## BELLA SKY, LLC AND F/V BELLA SKY

29.     In June through July of 2014, Amory and Dwyer sought to purchase another vessel. They already owned the F/V LANGLEY DOUGLAS under another LLC, A & D Fisheries, LLC. They ultimately decided to purchase two vessels and group both vessel permits under one vessel.  They agreed to purchase the F/V BAILEY BOY, understanding the vessel itself was at or near the end of its useful life but believing its fishing permits had value. They also agreed to buy the F/V CATERINA G to replace the F/V BAILEY BOY, though both Amory

and Dwyer understood this vessel was smaller than they would have liked and would require significant alterations.

30.     On July 31, 2014, Dwyer and Amory formed Bella Sky, LLC. On or about August 2014, Bella Sky, LLC bought the F/V BAILEY BOY and F/V CATERINA G, renaming the latter vessel as the F/V BELLA SKY and transferring the permits from the F/V BAILEY BOY to the newly renamed F/V BELLA SKY.  After transferring its permits to the F/ V BELLA SKY, A & D Fisheries, LLC sold the F/V BAILEY BOY to a third party for approximately $25,000.

31.     Thereafter, Dwyer and Amory, by and through Bella Sky, LLC, employed the F/V BELLA SKY (Official No. 615635) in commercial fishing.

32.     In 2017, after the F/V BELLA SKY lost fishing time due to weather and its small size, Dwyer, with the agreement of Amory, began to look for a larger vessel to replace the F/V BELLA SKY. Dwyer found the F/V HUMPBAK (Official No. 580932).

33.     On or about April 2017, Dwyer and Amory, by and through Bella Sky, LLC, sold the smaller F/V BELLA SKY (Official No. 615635) and purchased the F/V HUMPBAK. They also caused the fishing permits from the former F/V BELLA SKY to be transferred to the F/V HUMPBAK, and renamed the F/V HUMPBAK the F/V BELLA SKY. The Official Number of what is the current F/V BELLA SKY remained 580932, which was the F/V HUMPBAK's official number.

34.     Dwyer and Amory obtained a mortgage with BB&T in the original amount of $499,175.00 to purchase the newest F/V BELLA SKY (Official No. 580932), in 2017. Each member personally guaranteed the mortgage, and LDA also guaranteed the mortgage.

35.     After purchasing the larger F/V BELLA SKY, and over the course of approximately two months, Dwyer, for the benefit of Bella Sky, LLC, cleaned, repaired, painted, and otherwise outfitted the vessel, all while located in Scituate, Massachusetts.

36.     F/V BELLA SKY began fishing for ilex squid and other species on June 12, 2017. Dwyer and Amory agreed to change the fish hold arrangement on the Vessel to pump squid out of the hold. Dwyer oversaw those changes to the vessel, which took about a month.

37.     The F/V BELLA SKY (Official No. 580932) was and is Bella Sky, LLC's sole asset.

## QUINBY ALLIE, LLC AND F/V QUINBY ALLIE

38.     On September 11, 2017, the F/V LANGLEY DOUGLAS, owned by A & D Fisheries, LLC, sank and was a total loss.

39.     In November of 2017, Amory and Dwyer agreed to seek another vessel to replace the F/V LANGLEY DOUGLAS. Dwyer, with Amory's agreement, traveled to Seattle, Washington, to inspect various vessels that were built with various holding tank configurations and therefore more stable, safe, and suitable for ilex squid fishing. However, they encountered legal hurdles in bringing West Coast vessels to the East Coast and were unable to do so.

40.     In November 2017, while the F/V BELLA SKY continued to fish, Amory suggested, and Dwyer agreed, that Dwyer would captain a fishing vessel of an acquaintance, the F/V Nadia Lee, and by doing so Dwyer was able to keep other crewmembers from the F/V LANGLEY DOUGLAS working through 2018 and not lose them to other vessels and companies.

41.     In the summer of 2018 through November 2018, Dwyer served as captain of the F/V BELLA SKY.

42.     Dwyer again worked on F/V NADIA LEE from November 2018 through the end of April, 2019. By doing this, Dwyer was able to keep all the crew from the F/V LANGLEY DOUGLAS working and not lose them to other vessels and companies.

43.     In January of 2019, Dwyer found a suitable vessel to replace the F/V LANGLEY DOUGLAS, the F/V GULF SPIRIT(Official Number 507438), located in Vancouver, Canada.

44.     Amory and Dwyer agreed Dwyer would inspect the vessel, and in February 2019, Dwyer flew to the West Coast and from there drove to Vancouver to examine the vessel.

45.     Amory and Dwyer agreed to purchase the F/V GULF SPIRIT. However, rather than use A & D Fisheries, LLC to purchase the new vessel, Amory recommended that a new company, Quinby Allie, LLC, be formed to purchase the new vessel.

46.     Quinby Allie, LLC was formed on May 23, 2019.

47.     Quinby Allie, LLC purchased the F/V GULF SPIRIT in June of 2019, renaming it the F/V QUINBY ALLIE, although Amory and Dwyer knew it would need to be redocumented in the U.S. and undergo substantial work before engaging in fishing for their purposes.

48.     After the purchase of the F/V QUINBY ALLIE, in June 2019, Dwyer and other crewmembers travelled to the vessel in Seattle to oversee the vessel's remeasuring and redocumentation.

49.     Dwyer and three crew members worked long days and weeks on the F/V QUINBY ALLIE in Seattle through September 2019, flying home for a four-day break in August.

50.     The F/V QUINBY ALLIE sailed for the East Coast on September 17, 2019, arriving in Hampton, Virginia at the LDA fish house, on October 22, 2019. However fiberglass

work in the fish tanks remained to be done. The workers were not able to complete the work until the end of December 2019.

51.     The F/V QUINBY ALLIE (Official No. 507438) was and is Quinby Allie, LLC's sole asset.

52.     While Dwyer and crewmembers were working on getting the F/V QUINBY ALLIE ready in Seattle, in mid-to-late 2019, the F/V BELLA SKY was tied up at the dock at LDA. Although Amory worked at the LDA fish house facility every day, when Dwyer returned, he found the F/V BELLA SKY had dead batteries, debris on the deck, and mice living inside the vessel, as if no one had checked on the welfare of the vessel the entire time Dwyer was in Seattle.

53.     To get the crews working, Capt. Brad Horrell fished the F/V BELLA SKY in November 2019, and Dwyer took the aforementioned acquaintance's vessel, the F/V NADIA LEE, fishing, until the fiberglass work was complete on the F/V QUINBY ALLIE.

54.     On January 12, 2020, Capt. Brad Horrell sailed the F/V QUINBY ALLIE to Scituate, Massachusetts to be outfitted with new trawl gear.

55.     The F/V QUINBY ALLIE and F/V BELLA SKY (the "Vessel" or "Vessels") fished for fluke in North Carolina from the end of January through the end of March, 2020. When the COVID-19 pandemic began in the U.S., fishing prices bottomed out, and Amory and Dwyer agreed to stop fishing, and tie up both vessels, while prices were so low.

56.     The Vessels returned to fishing in May 2020 and fished until August 2020.

57.     In early 2020, Amory changed the long-term bookkeeper of the LLCs to Cynthia Triplett. Dwyer found it difficult to get the necessary and customary assistance from Triplett as he had in the past with prior LDA employees Amory had assigned to keep the LLCs' books.

11

Triplett refused to prepare the settlement sheets for F/V BELLA SKY and F/V QUINBY ALLIE in 2020. Dwyer resorted to calculating the voyage settlements himself, by hand, and sending them to Triplett to disburse each voyage's revenue appropriately from the LLCs' accounts which she and Amory controlled.

58.    Amory gave Triplett carte blanche authority over the LLCs' books and records, and refused to require her to provide the assistance Dwyer required to operate the vessels. When Dwyer requested Amory designate another LDA employee to keep the LLCs' books, Amory refused.

### COMPANY SALE NEGOTIATIONS AND AMORY TYING UP THE VESSELS

59.    Without informing Dwyer, on or about June 26, 2020, Amory unilaterally approached a bank in Virginia to refinance the F/V QUINBY ALLIE, incurring substantial expenses to Quinby Allie, LLC related to the attempted refinance.

60.    During the summer of 2020, Amory suggested Dwyer buy out his interest in the Vessels with Dwyer taking over the vessel mortgages and also the "liabilities" of the LLCs. Amory and Dwyer met with the registered agent for all the LLCs (and LDA), Thomas Burcher, Esq., at his office in Hampton, Virginia on June 15, 2020.

61.    At that meeting, Amory stated he would like to net approximately $200,000 from the sale of his interests in the LLCs to Dwyer, after Dwyer took on the mortgages and "liabilities" of the LLCs. In July 2020, the National Marine Fisheries Mid-Atlantic Council met and discussed changes to the ilex fishery, possibly instituting a tier system, which Amory speculated would make the Vessels' fishing permits more valuable.

62.    Amory, without consulting with Dwyer, approached a commercial fishing and packing house venture, Town Dock in Point Judith, Rhode Island, to buy Amory's interests in

the LLCs and Vessels, pay off the mortgages and "liabilities", and to net him much more than $200,000, as much as $500,000.

63.     In or about August, 2020, Amory informed the aforesaid bank in Virginia that he was going to sell the F/V QUINBY ALLIE rather than refinance the mortgage.

64.     On August 14, 2020, Dwyer and Amory again met in Hampton, Virginia, while the F/V BELLA SKY was packing out at LDA's fish house, and Amory informed Dwyer of the Town Dock deal.  Dwyer was not interested in a partnership with Town Dock and informed Amory he had spoken with another potential partner to buy out Amory's interest in the LLCs and Vessels.

65.     During this meeting, no agreement was reached.

66.     On August 17, 2020, Amory unilaterally halted the LLC salary payments going to Dwyer, and instructed Dwyer to have no further direct communications and to only communicate with Amory via his lawyer.

67.     On August 25, 2020, Amory, without any notice or explanation to Dwyer, paid $100,000 from Quinby Allie LLC's account to LDA via a check signed by Triplett. *See* Check No. 010170 dated August 25, 2020 from Quinby Allie, LLC's BB&T Account to LDA, **Exhibit E**.

68.     By letter dated September 10, 2020 and emailed to Dwyer on that date, Triplett as controller of LDA and at Amory's direction, informed the LLCs that their debts to LDA were in default to LDA in the amount of $159,868.24 (Quinby Allie, LLC), $423,918.50 (Bella Sky, LLC), and $344,624.84 (A&D Fisheries, LLC). *See* LDA Default Letter, **Exhibit F**.

69.     Dwyer has no knowledge of the basis for the claimed indebtedness and never agreed or consented to the LLCs incurring such debt, much of which goes back to 2012.

70.     The next day, on September 11, 2020, Amory emailed Dwyer, stating, "The settlement checks for the crew were written and mailed. There will be no more checks sent and all accounts will be temporarily frozen. You will have no more direct communication – all communication will need to go through my lawyer – Mike Ware who is copied on this email." See Amory Email, attached as **Exhibit G**. Amory also cancelled and/or froze the company credit cards on or about that same date.

71.     Without any access to the operating funds or credit cards of the LLCs, the Vessels were effectively tied up. Prior to these actions by Amory, the Vessels had been fishing and earning revenue, and would have continued to fish to through the fall and winter of 2020.

72.     Dwyer retained counsel and sought to negotiate a buy-out of Amory's interests. However, in the course of negotiations, it became apparent that the accounts of the LLCs were inscrutable, and Amory claimed large "liabilities" were owed by the LLCs to LDA without any documentation showing how and when these liabilities were incurred. Further, Amory insisted repeatedly that any buyer would have to pay in full all the purported debts to LDA, which requirement would benefit LDA and prejudice the LLCs.

73.     Dwyer is not aware of any resolutions of the members of the LLCs approving incurring debts to LDA, and it is his belief there are no such resolutions.

74.     Dwyer is not aware of any written notes payable, acknowledgment of receipt of funds, request for funds, interest terms, loan payment terms, or any other written indicia of any loans from LDA to the LLCs. On his information and belief, there is no written documentation evidencing any loan terms, loans extended, requests to borrow, requests to disburse funds, receipt of payment of funds, notes payable, promises to pay, payment terms, interest terms or calculations, or any other written indication of  the existence of loans by and between LDA and

14

the LLCs. There are further no resolutions whereby Dwyer authorized or agreed to any such debts or liabilities.

75.     When the Vessels are fishing, their expenses from each trip are paid out of the total earnings from the fish stock that is sold to the packing house, or fish house.  After expenses, the remainder is split with the crew (45%) and the Vessels (55% - the "boat share"). As is indicated by the settlement sheets for the Vessels, the Vessels have always had profitable fishing voyages, with substantial earnings.

76.     Upon information and belief, the Vessels' earnings from fishing, including earnings from the former vessel owned by Bella Sky, LLC (and also named F/V BELLA SKY), were sufficient generally to cover the costs and expenses of the LLCs' operations. Dwyer is further not aware of and did not consent to any capital or profit distributions made to the members, he and Amory, and as such it is and was his belief that the LLCs were sufficiently funded and capitalized.

77.     On January 5, 2021, Dwyer, by counsel, sought an accounting of the books of the LLCs and A & D Fisheries, LLC. Dwyer obtained various financial statements that continued to show large liabilities to LDA without documentation of how they were incurred.  See Aarsheim Email to Ware, attached as **Exhibit H**. The initial financial statements and bank account statements raised significant questions regarding the books and records of the LLCs and the purported debt to LDA.

78.     In particular, the financial statements of the LLCs and A & D Fisheries, LLC showed debts increasing significantly to LDA in the latter part of 2020, from September to December, even though the Vessels were tied up and not incurring costs other than mortgage and insurance.

79.     Thereafter, and until approximately March 2021, Dwyer, by counsel, sought additional financial records and accountings for the LLCs, obtaining as stated above incomplete financial statements, bank statements and also account reconciliations and similar items. However, to this date, Dwyer has been unable to obtain the general ledger for each of the LLCs, checking account registers, nor any written documentation of loans made by LDA to the LLCs.

80.     On March 11, 2021, counsel for Dwyer, on behalf of the LLCs, wrote to Amory's counsel, requesting an accounting and specific information about the business affairs of the LLCs, particularly debt to LDA. *See* Letter to Ware, **Exhibit I**. Amory's counsel never responded, though LDA did file the wrongful arrest action discussed below the next day.

81.     In January 2021, Dwyer used his own funds for the working capital to get both Vessels operating and fishing again, and, with the exception of the wrongful vessel arrests contrived and caused by Amory in the name of LDA, he is ensuring the boats fish as much as reasonably possible in order to pay vessel expenses and earn revenue for the LLCs.

**THE VESSEL ARREST, LIENS AND FORECLOSURE EFFORTS IN VIRGINIA**

82.     On February 24, 2021, unbeknownst to Dwyer, Amory caused LDA, by and through Triplett and Mrs. Amory, to give notice of and record with the United States Coast Guard's Vessel Documentation Center false, fraudulent, and unlawful maritime liens for claimed necessaries against the Vessels, though Amory and Mrs. Amory knew or should have known the claimed lien amounts did not arise from providing the Vessels necessaries and as such the purported debt of LDA did not create a maritime lien on the Vessels. *See* Triplett Email (Mar, 25, 2021) with attached Lien Correspondence and Filings, **Exhibit J** hereto.

83.     Mrs. Amory signed the Notices of Claim of Lien that were filed with the Coast Guard. *See* **Exhibit J.**

84.     On March 12, 2021, Amory caused LDA, a company of which he is an officer and employee, to file an *in rem* action against the Vessels and *in personam* actions against the LLCs and himself and Dwyer. Verified Complaint in *L.D. Amory and Company Incorporated v. F/V BELLA SKY et al.*, No. 4:21-cv-24 (E.D. Va. 2021), attached as **Exhibit K**. Though the Verified Complaint falsely alleges some negative actions by Dwyer (in an apparent attempt to pierce the corporate veil), it makes no allegations of wrongdoing or malfeasance against Amory even though he is a named defendant.

85.     On Saturday, March 13, 2021, Amory through LDA caused the U.S. Marshal to seize and arrest the F/V QUINBY ALLIE and F/V BELLA SKY, with LDA as the designated substitute custodian. *See* Warrant of Arrest, attached as **Exhibit L**. At that time, F/V QUINBY ALLIE and F/V BELLA SKY had just landed from their respective fishing trips and therefore the arrest interrupted and frustrated the crews' actions in unloading stock and preparing for their next trips.

86.     Amory controlled the actions which lead to the arrest of the Vessels by directing an LDA employee under his authority, Triplett, to locate and retain maritime attorneys who would file the necessary pleadings to arrest the Vessels.

87.     Amory further effected the vessel arrest by directing Triplett to gather records of purported loans of the LLCs to LDA, to include amounts of purported loans to A & D Fisheries, LLC, a company that does not own the Vessels arrested, to use in support of the Verified Complaint. See Exhibit A to Verified Complaint, **Exhibit M** hereto.

88.     Amory, by causing and effecting the arrest of the Vessels, sought to have the Vessels sold at a judicial sale to satisfy the purported loans of LDA. *See* Verified Complaint, Prayer for Relief.

89.     Amory knew or should have known that the purported debt of LDA did not create maritime liens on the Vessels, yet he willfully, in bad faith and with malice caused LDA to assert maritime liens and have the Vessels arrested on the false authority of such liens.

90.     The Vessel arrests, based on purported maritime liens arising from the LDA loans, were wrongful, in direct violation of established law, and wholly unsupported by evidence of actual indebtedness, notes payable, receipt of loan funds by the LLCs, and were not for any necessaries supplied to the Vessels by LDA.

91.     Defendant Quinby J. Amory ("Mrs. Amory") verified the complaint under penalty of perjury under U.S. law on March 10, 2021, identifying herself as president of LDA. See Verification, **Exhibit N**. Her Verification attests the matters set forth in the Complaint "are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters, I believe them to be true." *Id.*

92.     Upon information and belief, Mrs. Amory is not familiar with the business affairs and records of LDA, she has little to no knowledge of the purported loans LDA made over the years to the LLCs upon which the Verified Complaint and vessel arrest was premised, and she has no knowledge of any necessaries provided to the Vessels by LDA.  As such, her Verification was made in violation of 28 U.S.C. § 1746.

93.     Amory is familiar with the business affairs and records of LDA, and he is the only officer of LDA with sufficient knowledge of LDA's transactions with the LLCs to provide the information used to draft the Verified Complaint.

94.     On Saturday, March 13, 2021, Dwyer, on behalf of the LLCs, retained undersigned counsel to move to quash the arrest as unlawful.  Said undersigned counsel filed a Motion to Vacate Order of Warrant of Arrest, Quash the Arrest of the F/V QUINBY ALLIE and

F/V BELLA SKY, for Attorneys' Fees and Costs, and Request for Emergency Hearing and Expedited Relief in the evening of Sunday, March 14, 2021. Thereafter, on Monday, March 15, 2021, LDA caused the Vessels to be released from arrest and dismissed the entire action.

95.     On March 23, 2021, Amory, still seeking to force a sale to the benefit of LDA and detriment of the LLCs, caused LDA, by and through Triplett, to notify the Vessels' mortgage holder, Branch Banking and Trust ("BB&T" or "Truist"), of LDA's recorded maritime liens against the Vessel with the intent to have the mortgage holder declare an event of default and foreclose on the Vessels. *See* **Exhibit J**. Specifically, Ms. Triplett stated: "This action creates a default on the ship mortgages and you are now subject to foreclosure. I would suggest that you immediately come forth with a solution on selling the boats." *Id.*

96.     Dwyer, on behalf of the LLCs, communicated with BB&T thereafter, to assure the bank that he, as member of the LLCs, would endeavor to keep payments current on the mortgages using funds earned by each Vessel from fishing.

## AMORY'S ADDITIONAL BREACHES OF FIDUCIARY DUTY AND PERSONAL MOTIVES

97.     As a result of the sales negotiations and Vessel Arrest, Dwyer has learned numerous facts of Amory's poor management, malfeasance, and or other breaches of Amory's fiduciary duties owed to the LLCs, as follows:

a.   Failing to properly segregate the funds of the LLCs and co-mingling them along with the accounts of A & D Fisheries, LLC;

b.   Failing to properly document all transactions by and between the LLCs and LDA, making it impossible for the LLCs to understand how much, if anything, is owed to LDA, to the benefit of LDA and Amory;

c. On information and belief, causing or allowing the LLCs to pay for, or LDA to pay for and charge the amount against the LLCs as "loans," good, services, and other items that provided no benefit to the LLCs but provided a direct benefit to LDA and Amory, including but not limited to legal services, such as an almost $63,000 payment in 2014 to the law firm Hawkins, Burcher & Boaster for unknown purposes;

d. On at lease two occasions, failing to deposit the gross vessel earnings for the fishing voyages into the accounts for the LLCs. For a voyage of the F/V BELLA SKY landing on July 17, 2020, LDA failed to deposit the total fishing stock of $40,981.25 into Bella Sky, LLC's BB&T account. On July 24, 2020, F/V QUINBY ALLIE sold $4,652.30 of its fishing stock to LDA yet those funds were never deposited by LDA into Quinby Allie, LLC's BB&T account. Rather, on July 27, 2020, Quinby Allie, LLC received funds in the amount of $78,335.19 for its fish stock sold to Town Dock (and appearing on the July 24, 2020 settlement sheet), but no payment from LDA for the portion of stock sold to LDA (and also appearing on the July 24, 2020 settlement sheet) was received. *See* F/V BELLA SKY's July 17, 2020 Settlement Sheet and corresponding July 2020 B&BT Statement, as well as F/V QUINBY ALLIE's July 24, 2020 Settlement Sheet and corresponding July 2020 BB&T Statement, **Exhibit O**.

e. Failing to properly administer and distribute fishing trip funds by, on some occasions, failing to duly pay the expenses of a fishing voyage out of the stock earnings from that voyage, including Warrior Fuel Corporation expenses from the summer of 2020 fishing voyages;

f. Causing or allowing, or failing to properly supervise Triplett who wrote and signed a check for $1,000 out of the Quinby Allie LLC bank account to her boyfriend, Chris

Strickland, on November 19, 2020, for unknown purposes. *See* Check No. 010182 dated November 19, 2020 from Quinby Allie, LLC's BB&T Account to Strickland, **Exhibit P**.

g.  In May and June of 2020, causing LDA, by and through Triplett or by his own actions, to falsify the records of the debt LDA claims the LLCs owe it by entering large amounts of notes payable, or "N/P," by the LLCs on LDA's books, in the total amount of $537,380.79, *see* **Exhibit M**  (three entries on 5/11/20, 5/14/20, and 6/30/20), thereby inflating the LLCs' purported debt to LDA in preparation for LDA to file suit and claim a lien on the debt;

h.  On December 31, 2020, causing LDA by and through Triplett, to further increase the LLCs purported debt to LDA by noting a debit charge to the LLCs of $11,000 for accounting services by LDA, an amount that is arbitrary, and was never invoiced or agreed to by the LLCs, *see* **Exhibit M;**

i.  Causing LDA by and through Triplett or on his own to charge the LLCs interest on undisclosed and apparently arbitrary terms on purported debt amounting to approximately $83,133.10, and accruing. *See* **Exhibit Q** (Annotated Ledger for LDA claimed debt of LLCs filed with Arrest Action) (blue highlighted entries);

j.  Causing LDA, by and through Triplett or on his own, to falsify records of the LDA by moving or reclassifying $356,495.93 of purported debt of A & D Fisheries, LLC to the "loan" accounts of the LLCs, in an attempt to increase the amount LDA purports the LLCs owe and in preparation to assert invalid and inflated liens for necessaries on the Vessels, *see* **Exhibit Q** (yellow marked entries);

k.  Failing to renew the Vessels' fishing permits with the State of Virginia for 2021 as was Amory's responsibility in prior years and failing to inform Dwyer of same;

l.  Causing the LLCs, by and through Triplett whom he supervises as an officer and employee of LDA, to pay $100,000 to LDA in August 25, 2020 (**Exhibit E**), and just two weeks later causing LDA by and through Triplett to put the LLCs on notice of a default to LDA in the total amount of $928,411.58;

m.  Causing LDA, by and through Triplett or on his own, to falsely notify BB&T that the LLCs owed LDA combined debts of $1,092,699.23 with the intent for BB&T to declare an event of default and foreclose on the Vessels, which eventually caused the LLCs to lose a significant amount of income and the judicial sale of their sole assets. *See* **Exhibit J**; and

n.  Such further and other acts as may be proven at trial.

98.     Other acts of Amory leading up to the present constitute acts in which Amory has acted for his own benefit or motivation to the detriment of the LLCs. Although many of the aforesaid acts of misconduct by Amory predate the events that gave rise to this action, the most egregious, secretive, and detrimental acts, including inflating loan amounts of the LLCs and attributing them to the two Vessels while negotiating a sale of the LLCs, and then using such "debt" amounts to arrest the Vessels and force them into foreclosure, occurred when Amory was influenced by his own personal motives which were to the detriment of the LLCs, as follows:

a.  On information and belief, LDA suffered significant cash flow difficulties in 2020 as a result of the COVID-19 pandemic;

b.  Amory sought to falsely increase the loans payable to LDA to improve the financial condition of LDA;

c. Amory hoped to sell the Vessels and LLCs quickly to obtain significant cash flow for LDA, thereby having the LLCs "bail out" LDA; and

d. Amory sought to cover a history of malfeasance and poor management of LDA and the LLCs by selling the LLCs and Vessels, instantly recouping the inflated and purported "debt" the LLCs "owed" to LDA.

99.    Dwyer frustrated Amory's personal motives when, in late 2020, Dwyer would not agree to sales terms that allowed LDA's inflated debt claims to be paid by the buyer and instead Dwyer sought further information about the debt.

100.    Amory's aforesaid actions were done with actual malice to the LLCs, knowledge the LLCs would be injured, and were so willful or wanton as to evince a conscious disregard for the rights of the LLCs and Dwyer.

## THE VESSEL ARREST, LIENS AND FORECLOSURE EFFORTS IN MASSACHUSETTS

101.    Upon information and belief, LDA's letter to BB&T ("Truist") dated March 23, 2021 falsely claiming that the LLCs owed LDA combined debts of $1,092,699.23 set the arrest proceedings in motion. *See* **Exhibit J.**

102.    LDA's March 23, 2021 letter claimed that the LLCs owed combined debts that nearly exceeded Truist's outstanding mortgages on those Vessels, believed to be in the range of $1,179,389 at that time.

103.    Upon information and belief, Truist relied on LDA's March 23, 2021 letter in its determination that the Vessels were reportedly in default of their mortgages and to ultimately arrest the Vessels in Massachusetts.

104.    Upon information and belief, Truist would not have arrested the vessels but for the false representations in LDA's March 23, 2021 letter."

105.    In causing LDA to send the March 23, 2021 letter to Truist, Amory breached his fiduciary duty to the LLCs and LDA mispresented the amounts allegedly owed on its falsely claimed loans.

106.    The Defendants used improper methods to cause Truist to arrest and ultimately sell the Vessels in Massachusetts by significantly over inflating LDA's alleged liens and reporting that its lien created a default on the ship mortgages.

107.    On May 20, 2021, Truist filed its Verified Complaint for the *in rem* arrest of F/V QUINBY ALLIE in the United States District Court for the District of Massachusetts. *See* Truist Verified Complaint, F/V QUINBY ALLIE Arrest Action, attached as **Exhibit V.**

108.    On May 21, 2021, Truist filed its Verified Complaint for the *in rem* arrest of F/V BELLA SKY in the United States District Court for the District of Massachusetts. *See* Truist Verified Complaint, F/V BELLA SKY Arrest Action, attached as **Exhibit W**.

109.    On May 25, 2021 in Massachusetts, F/V QUINBY ALLIE was arrested and on June 1, 2021, the F/V BELLA SKY was arrested (hereinafter referred to the "MA Vessel Arrest Actions").

110.    Upon information and belief, LDA's notice of recorded liens set Truist's arrest proceedings in motion.

111.    Due to the Massachusetts arrest actions, F/V QUINBY ALLIE and F/V BELLA SKY have been tied to the dock and unable to earn any fishing income since May and June 2021.

112.    On June 8, 2021, LDA submitted notice that it had revised its liens against both Vessels, in which LDA reduced its lien against F/V BELLA SKY from $501,567.43 to $99,880.59 and its lien against F/V QUINBY ALLIE from $591,131.80 to $198,607.15. *See* ECF No. 27.

24

113.   On November 15, 2021, LDA submitted its Amended Notices of Claim of Liens against F/V QUINBY ALLIE and F/V BELLA SKY. LDA then alleged liens in the amount of $261,685.57 against F/V QUINBY ALLIE and $202,101.40 against F/V BELLA SKY for a total claim of $463,786.97. *See* LDA's Amended Liens dated November 2021, attached as **Exhibit X.**

114.   Upon information and belief, LDA can now only attempt to substantiate less than half of the amount originally claimed, originally recorded with the Coast Guard, alleged in multiple federal courts, and represented to Truist.

115.   On March 16, 2022, Truist moved to amend the Order of Sale in the Massachusetts Vessel arrest actions and reported the figures owed by the LLCS for the outstanding mortgages and costs related to the arrests at that time were as follows:

- F/V QUINBY ALLIE:        $1,088,560.20
- F/V BELLA SKY:            $  471,343.52

*See* Truist's Motions and Affidavits in both Arrest Actions, attached hereto as **Exhibit Y.**

116.   Truist's outstanding figures include the following for F/V QUINBY ALLIE – principal of $853,657.85, plus interest, *custodia legis*, attorneys' fees, and other costs in the amount of $234,902.24, and for F/V BELLA SKY – outstanding principal of $325,732.78, plus interest, *custodia legis*, attorneys' fees, and other costs in the amount of $145,704.19. *Id.*

117.   On March 22, 2022, the judicial auction took place with the U.S. Marshal.

118.   Tremont Fisheries, LLC submitted the highest bid in the amount of $325,733 for F/V BELLA SKY, which was significantly below F/V BELLA SKY's hull and permit valuation of $1,183,000.

119.   NJUP, LLC submitted the highest bid in the amount of $1,500,000, also significantly below F/V QUINBY ALLIE's hull and permit valuation of $2,180,000.

120.    Truist filed a Motion to Confirm the Vessel Sales in the MA Arrest Actions, and the LLCs have filed Briefs in Opposition. At the time of this filing, that Honorable Court has not yet issued a ruling on Truist's Motions. If that Honorable Court confirms the judicial sales of F/V Bella Sky and F/V Quinby Allie, then that will cause the LLCs to lose their only assets.

121.    Since the Vessels have been detained in the Massachusetts Vessel Arrest Actions, Quinby Allie, LLC and Bella Sky, LLC have lost in excess of approximately $ $2,414,000, and $1,970,000, respectively, in income each Vessel would have earned from fishing trips had the Defendants not caused BB&T/Truist to arrest the Vessels. Dwyer has lost in excess of approximately $250,000 in lost salary as a vessel manager and in crew wages he would have earned as captain of the Vessels.

## RIGHT OF ACTION AND STANDING

122.    As set forth more fully herein, Dwyer has been unable to deal with the co-member of the LLCs, Amory, directly since September 11, 2020, has been unable after numerous requests by himself and by counsel over months prior to filing this action to obtain full and complete answers and accountings as to the business affairs of the LLCs, including how such large debts to LDA were incurred, has been locked out of access to the LLCs' bank accounts, and his recent written request for an accounting of information of the affairs and accounts of the LLCs was completely ignored.

123.    Dwyer, as set forth herein and below, has been oppressed by the actions and breaches of fiduciary duties of Amory, and Amory has exercised complete control and domination over the corporate affairs of the LLCs.

124.    Amory has actively concealed his actions related to the LLCs from Dwyer and has affirmatively blocked and obstructed Dwyer's efforts to gain access to the financial records of the LLCs.

125.    Based on the actions of Amory, and the actions he has caused LDA to take against the LLCs, including seizing their only assets for a judicial sale and informing the mortgage holders of the liens as an event of default, Amory is acting solely for his personal benefit, and/or for the benefit of LDA, a company which he manages and controls, and without any regard for his fiduciary duties owed to the LLCs.

126.    There are no other members or managers of the LLCs other than Dwyer and Amory. As such, the requirement in Va. Code § 13.1-1042(B) and/or Federal Rule of Civil Procedure 23.1, as applicable, that written demand be made on the LLCs to take suitable action prior to filing a derivative action on behalf of the LLCs should be waived here because such demand would be futile. *See Davis v. MKR Dev., LLC*, 295 Va. 488, 814 S.E.2d 179 (2018).

## COUNT ONE

**Wrongful Arrest – General Maritime Law**
**By Troy D. Dwyer, derivatively on behalf of Bella Sky, LLC and Quinby Allie, LLC**
**Against L. D. Amory and Company, Incorporated,**
**C. Meade Amory, and Quinby J. Amory**

127.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    On March 12, 2021, LDA filed an *in rem* action in this Court against the F/V BELLA SKY and F/V QUINBY ALLIE, claiming as the basis for such *in rem* relief maritime liens for necessaries.

129.    The wrongful arrest complaint was a sham pleading directed by Amory, as indicated by the fact he caused LDA, a company of which he is an officer, employee, and for

which he runs the day-to-day affairs, to sue himself personally, but the complaint made no allegations of misconduct by Amory.

130.    LDA knew or should have known that the purported debt of LDA did not create a maritime lien on the Vessels, yet it willfully, in bad faith, and or with gross negligence caused LDA to assert maritime liens and arrest the Vessels on the false authority of such liens.

131.    The vessel arrest, based on purported maritime liens arising from the LDA loans, was wrongful, in direct violation of established law, and wholly unsupported by evidence of actual indebtedness, notes payable, or receipt of loan funds by the LLCs.

132.    Defendant, Mrs. Amory, verified the truth of the complaint under penalty of perjury under U.S. law on March 10, 2021, identifying herself as president of LDA. See Verification, Exhibit N. Her Verification attests the matters set forth in the Complaint "are true of my own knowledge and belief except as to those matters stated on information and belief, and as to those matters, I believe them to be true." *Id.* Without a verification, the *in rem* action could not be properly filed and accepted by this Court.

133.    Mrs. Amory is not familiar with the business affairs and records of LDA, she has little to no knowledge of the purported loans LDA made over the years to the LLCs upon which the Verified Complaint and Vessel arrest was premised.  As such, her Verification was made in violation of 28 U.S.C. § 1746, and with gross negligence and/or reckless disregard for the truth.

134.    Amory is familiar with the business affairs and records of LDA, and he is the only officer of LDA with sufficient knowledge of LDA's transactions with the LLCs to provide the information used to draft the Verified Complaint.

135.    On March 13, 2021, as set forth above, pursuant to the *in rem* action, LDA caused the U.S. Marshal to seize the LLCs' sole assets, the Vessels, in order to recoup the purported debt owed to LDA in the action. *See* **Exhibit L**.

136.    On March 13, 2021, Dwyer, on behalf of the LLCs, retained counsel to move to quash the arrests as unlawful.  Said undersigned counsel worked through the weekend, negotiating with counsel for LDA in New Jersey, seeking a release of the Vessels and arguing there were no valid liens.  Ultimately, Dwyer, on behalf of the LLCs, and by counsel filed a Motion to Vacate Order of Warrant of Arrest, Quash the Arrest of the F/V QUINBY ALLIE and F/V BELLA SKY, for Attorneys' Fees and Costs, and Request for Emergency Hearing and Expedited Relief in the evening of Sunday, March 14, 2021. *See* Mem. in Supp. of Motion to Quash, attached hereto as **Exhibit R**; **Exhibit Q** (annotated ledger filed with memorandum).

137.    On the morning of March 15, 2021, counsel for LDA caused the Vessels to be released from arrest and later that day dismissed the entire action. As set forth more fully in the Motion to Quash, LDA had no documentation for the purported debt upon which it asserted liens, and LDA did not actually provide any necessaries to the LLCs that were the basis of the liens.  *See* **Exhibits Q & R**.

138.    As set forth more fully in the memorandum in support of the Motion to Quash the Arrest, there are numerous and various reasons why the debt claimed by LDA is invalid, unlawful, time barred, and unenforceable, and LDA knew or should have known this prior to arresting the Vessels. *See* **Exhibits Q & R.**

139.    Much of the debt claimed by LDA in the wrongful arrest action was for another LLC and another vessel, and as such could not by any theory create a lien for necessaries on the two Vessels seized by LDA. *See* **Exhibits Q & R**.

140.    LDA knew or show have known the debt it claims and claimed the LLCs owe it do not create maritime liens for necessaries on the Vessels. *See* **Exhibits Q & R**.

141.    As a result of the wrongful arrest of the Vessels, the LLC's have been damaged by incurring attorneys' fees, expenses, and other amounts as may be determined at trial.

142.    The Court should find both LDA, and Mrs. Amory for her acts in falsely and/or with gross negligence verifying the complaint so that the Vessels could be arrested, are liable to the LLCs, and award the LLCs compensatory damages proximately caused by the wrongful arrest, as well as punitive damages in the amount of $500,000.

## COUNT TWO

**Declaratory Relief that the Vessels are Not Subject to Maritime Liens Recorded by LDA under 46 U.S.C. § 31343(c)(2), and Demand for Attorneys' Fees and Costs By Troy D. Dwyer, derivatively on behalf of the LLCs Against L.D. Amory and Company, Incorporated and Quinby J. Amory**

143.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    A maritime lien for necessaries arises when a materialman provides "necessaries" to a vessel, which "includes repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4).

145.    A maritime lien arises by operation of law due to the nature of goods or services provided to a vessel on the order of the owner or person authorized by the owner, on the credit of the vessel, and not by contract or otherwise.  *See, e.g.,* 46 U.S.C. § 31342(a).

146.    On February 24, 2021, LDA recorded a notice of liens for necessaries with the United States Coast Guard against the Vessels, as follows: (a) against the F/V BELLA SKY in the amount of $ 499,175.00, with interests and costs accruing, for liens arising on multiple dates since July 31, 2014 through January 31, 2021, and (b) against the F/V QUINBY ALLIE in the

amount of $594,131.80, with interest and costs accruing, for liens arising on multiple dates since September 21, 2012, through January 31, 2021. *See* **Exhibit J.**

147.     These claims of lien are false, fraudulent, and asserted in bad faith. *See* **Exhibits Q & R**.

148.     Mrs. Amory executed each notice of claim of lien against the Vessels without any good faith basis for believing they were valid, and, as such, is personally liable for her individual action in causing the invalid liens to be recorded. *See* **Exhibit J**.

149.     The liens for necessaries claimed by LDA against the Vessels are not valid maritime liens for necessaries because LDA provided no goods or services to the Vessels that qualify as necessaries under maritime law or statute. *See* **Exhibit J.**

150.     LDA's claimed lien against the F/V BELLA SKY goes back to July 31, 2014, which is almost three years before the F/V BELLA SKY (Official No. 580932) was acquired by Bella Sky, LLC on April 4, 2017. *See* Abstract of Title, p.6, **Exhibit S**.

151.     Likewise, LDA's claimed lien against the F/V QUINBY ALLIE goes back to September 21, 2012, almost seven years before the Vessel was acquired by Quinby Allie, LLC on June 5, 2019 and before Quinby Allie, LLC existed. See Abstract of Title, p.6, **Exhibit T**.

152.     As such, a substantial portion of the lien amount LDA claims against the Vessels, in the approximate amount of $289,748.01, is based on a legal impossibility: amounts LDA purportedly advanced to or provided to the Vessels for necessaries before each respective Vessel was acquired by the LLCs. *See* **Exhibit Q** (entries noted in orange).

153.     LDA, by and through its president, Mrs. Amory, continues to assert these wrongful in invalid liens against the Vessels, even after dismissing its Vessel Arrest action against the Vessels.

154.     Further, to the extent the debt upon which the liens are based are time barred, as set forth in Count Five, this debt cannot form the basis of maritime liens and should be declared invalid and unenforceable.

155.     Accordingly, the Court should declare the F/V BELLA SKY and F/V QUINBY ALLIE are not subject to the liens claimed by LDA, and award the LLCs their costs and attorneys' fees and such other and further relief as it deems appropriate. Such relief should be ordered against both LDA, and also Mrs. Amory, for her own acts in signing and executing each Notice of Claim of Lien so that the wrongful liens could be recorded.

## COUNT THREE

**Breach of Fiduciary Duty**
**By Troy D. Dwyer, Derivatively on Behalf of the LLCs and Individually**
**Against C. Meade Amory**

156.     Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.     Dwyer brings this count derivatively on behalf of the LLCs against defendant, Amory. Amory breached his fiduciary duties to the LLCs as alleged below and described above. Amory further brings this count for his individual injuries separate and apart from the injuries of the LLCs.

158.     Amory, as manager and member of the LLCs, owed fiduciary duties to the LLCs. These fiduciary duties include duties of care, loyalty, good faith, and candor.

159.     Amory's fiduciary duty of loyalty prohibits him from acting in bad faith with respect to the use of funds and assets of the LLCs.

160.     Amory has in the past, and continues to this day, to possess complete and unfettered control and domination over the bank accounts, funds, and other financial resources of

the LLCs, to the point where Triplett at Amory's direction informed Dwyer, via his counsel, on January 13, 2021, that she denied requests to access the online accounts since "Troy has never had access to or been an authorized signer on the accounts."  *See* E-mails, **Exhibit U**.

161.    Until Amory froze the LLCs' accounts and credit cards, all funds received by the Vessels from all fishing trips or other sources were deposited into each LLC's respective bank account. As such, Amory has had complete and unfettered control and domination over the funds of the LLCs.

162.    Amory has mismanaged the funds of the LLCs, poorly managed the books and records of the LLCs, and failed to inform Dwyer when cash contributions were needed from the members. When in the past Dwyer suggested borrowing from a bank when he believed the Quinby Allie LLC might need additional funds for refitting the new vessel in the Summer and Fall of 2019, Amory refused.

163.    In direct, knowing, and willful violation of the LLCs' Operating Agreements, Amory caused the LLCs to purportedly contract debts, including notes payable, in the amount of $1,095,699.23. Such purported debt was incurred without a resolution of the members to incur debt, as the Operating Agreements of each LLC requires, was not the result of legitimate arms-length transactions, and provided no benefit whatsoever to the LLCs.

164.    Amory has engaged in self-dealing transactions that were not open, fair, and honest, including acts which serve Amory's personal motives, and that serve to benefit an entity, LDA, of which Amory is an officer, employee, and runs the day-to-day affairs. Amory's acts have resulted in the assets of the LLCs being wasted, actually seized by judicial process, subject to risk of foreclosure, and the accounts of the LLCs to be in such disarray that the LLCs are

subject to large, questionable debts and liens, and potential foreclosure on the Vessels by the mortgagees of the Vessels.

165.    First in Virginia, then again in Massachusetts, Amory, in a direct, knowing, and willful breach of his fiduciary duties to the LLCs, sought by way of improper use and abuse of judicial process to have the only assets of the LLCs, and the only means by which the LLCs could earn revenue, involuntarily sold. In so doing, Amory advanced his personal interests and those of LDA to the detriment of the LLCs.

166.    Amory's personal motivation further caused him to have LDA and Mrs. Amory to record unlawful and invalid liens against the Vessels and notify the mortgage holders in an attempt to force a foreclosure and bank sale of the Vessels, to the detriment of the LLCs.

167.    Amory, by and through Triplett, Mrs. Amory, and LDA, again caused the Vessels to be arrested by falsely notifying BB&T that LDA was owed combined debts of $1,092,699.23. *See* **Exhibit J.**

168.    Due to the willful misconduct of Amory, as set forth herein with the many instances of knowing breach of his fiduciary duty owed to each LLC, Amory is not entitled to the limitation of liability of members and managers under the Virginia LLC Act, Va. Code § 13.1-1025(A), or the business judgment rule, or any other provision of Virginia law.

169.    The wrongful arrest directed by Amory by and through Triplett and Mrs. Amory in Virginia caused the LLCs to incur substantial costs, including attorneys' fees and other expenses in such amount as may be proven at trial.

170.    The Vessel arrests by BB&T/Truist in Massachusetts initiated by Amory by and through Triplett and Mrs. Amory caused the LLCs to incur substantial costs, including lost

fishing revenue, fees incurred by BB&T/Truist for the arrest proceedings, as well as attorneys' fees and other expenses in such amount as may be proven at trial.

171.    As a result of Amory's breach of his fiduciary duty to each of the LLCs, each LLC has been damaged by the claims of substantial debts and liens as follows:

  a.  by the loss of fishing income each Vessel would have earned from fishing trips made after Amory effectively tied up the boats, as set forth above, in an amount in excess of $1,000,000;

  b.  by the loss of fishing income each Vessel would have earned from fishing trips made after Amory caused BB&T/Truist to arrest the Vessels in Massachusetts, as set forth above, in a combined amount in excess of $4,384,000;

  c.  the interest, *custodia legis,* attorneys' fees, and other costs claimed by BB&T/Truist incurred in the Massachusetts Vessel arrest actions in the amount of $234,902.24 for F/V QUINBY ALLIE and $145,704.19 for F/V BELLA SKY and accruing; and

  d.  other further damages in an amount to be determined at trial.

172.    Further as a result of Amory's breach of his fiduciary duty to each of the LLCs, Dwyer suffered a direct and individual injury separate and distinct from injury to the LLCs, and has been damaged by:

  a.  the loss of crew earnings in the approximate amount of $12,000 he would have earned from fishing trips he was unable to take on the Vessels after Amory effectively tied up the boats, as set forth above, and until Dwyer was able to unilaterally restart fishing activities, and

    b.   loss of salary from the LLCs from August 14, 2020 until February 20, 2021, until the time Dwyer was able to reinstate the LLCs' salary after he was able to unilaterally restart fishing activities by the Vessels in the approximate amount of $40,500;

    c.   loss of salary and crew earnings from the LLCs from May/June 2021 until present and accruing, in the approximate amount of $250,000 due to the Vessels being detained in the Massachusetts arrest actions;

    d.   exposure to personal liability as a result of his personal guarantees of the BB&T notes on the Vessels; and

    e.   other further damages in an amount to be determined at trial.

173.    The LLCs have further been damaged as a result of Amory's continuing breach of his fiduciary duties in an amount to be proven at trial, but not less than the wrongful and purported debt claimed by LDA against Bella Sky, LLC in the originally claimed amount of $501,567.43, and against Quinby Allie, LLC in the originally claimed amount of $594,131.80, which since has been revised to $261,685.57 against F/V QUINBY ALLIE and $202,101.40 against F/V BELLA SKY, plus an award of costs, pre-judgment and post-judgment interest as allowed by law, and such other and further relief as the Court deems appropriate.

174.    The Court should further order Amory (1) to make a full and complete accounting of all the receipts disbursements and financial affairs of the LLCs since their inception to the present, and, pursuant to Va. Code 13.1-1028(B)(1) and (2), to provide full access to the records of the LLCs and true and full information regarding the affairs of the LLCs.

## COUNT FOUR

**Removal as Manager of the LLCs and Dissociation as Member
of the LLCs under Va. Code § 13.1-1040.1(5)
By Troy D. Dwyer, derivatively on behalf of the LLCs
Against C. Meade Amory**

175.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

176.    Dwyer brings this Count derivatively on behalf of the LLCs against defendant, Amory.

177.    Due to the improper activities and willful misconduct of Amory, Amory should be removed as manager of the LLCs.

178.    In addition, Amory should be dissociated from the LLCs pursuant to Va. Code § 13.1-1040.1(5) because:

a.    Amory engaged in wrongful conduct that adversely and materially affected the business of the LLCs;

b.    Amory willfully and persistently committed a material breach of the Operating Agreement of each of the LLCs; and

c.    Amory engaged in conduct relating to the business of the LLCs which makes it not reasonably practicable to carry on the business with Amory.

179.    Accordingly, Amory should be removed as manager so that Dwyer can serve as the sole manager of the LLCs.

180.    Further Amory should be expelled from the LLCs, with such dissociation causing Amory, under Va. Code §§ 13.1-1039 and 1040.2(A), to no longer be entitled to participate in the management and affairs of the LLCs or to exercise any rights of a member of the LLCs.

37

## COUNT FIVE

**Declaratory Relief as to Validity and Amount of Debt, 28 U.S.C. § 2201**
**By Troy D. Dwyer, derivatively on behalf of Bella Sky, LLC and Quinby Allie, LLC**
**Against L.D. Amory and Company, Incorporated**

181.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    A present case or controversy exists between the LLCs and LDA with respect to the validity and amount of debt LDA claims is owed to it from the LLCs, and LDA has taken action to collect on the purported debt by wrongful use of judicial process and wrongful assertion of maritime liens against the LLCs Vessels.

183.    Given the actual controversy, and the immediate risk of the Vessels of the LLCs being seized again or foreclosed upon due to LDA's assertion of liens and notice by LDA to the Vessel mortgage holders, declaratory relief is proper under 28 U.S.C § 2201.

184.    LDA claims Bella Sky, LLC owes it $501,567.43, and Quinby Allie, LLC $594,131.80 as a result of the aforementioned unauthorized and unsupported debt. See Verified Complaint ¶ 19.

185.    Any debt allegedly incurred by the LLCs to LDA was incurred due to the unauthorized actions of manager and member Amory, in violation of the Operating Agreement of each LLC, and, in accordance with Va. Code § 13.1-1021.1(2), is not binding against the LLCs.

186.    LDA, through Amory, had actual knowledge the LLCs could not incur debts and liabilities without the consent of Dwyer, and further had actual knowledge that Dwyer had not given such consent. LDA, therefore, had actual knowledge that any such transactions were *ultra vires*.

187.    The Court should declare the debt asserted by LDA against the LLCs to be invalid and unenforceable against the LLCs.

188.    Alternatively, to the extent the Court finds any debt is owed by the LLCs to LDA, the Court should declare the debts asserted that are older than three years from the date of this filing, or approximately $443,202.15, are no longer actionable, enforceable, and collectible.  *See* **Exhibit Q** (entries marked in red and calculations noted); Va. Code § 8.01-246.4.

189.    Finally, should the Court find the LLCs owe debt to LDA in any amount, then Amory, as the manager and member whose actions caused the debts to be incurred, in willful and knowing violation of the Operating Agreements, should be held to be personally responsible for any such debts, and not the LLCs.

**COUNT SIX**
**Accounting**
**By Troy D. Dwyer, Individually**
**Against C. Meade Amory**

190.    Dwyer incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    Amory, as Manager of the LLCs, has always maintained complete control of the LLCs finances and owes a fiduciary duty to the LLCS.

192.    Amory has caused the LLCs to make unauthorized payments to himself and third parties for his personal benefit, unauthorized payments to LDA for his personal benefit, and diverted settlement proceeds from the Vessels' landings to himself.

193.    The LLCs' financial records managed by Amory reveal significant discrepancies in the application and use of the LLCs' assets.

194.    Dwyer is entitled to obtain an accounting of the LLCs pursuant to Va. Code §8.01-31.

195.    Accordingly, Dwyer moves this Court to order an accounting of the LLCs to make sure that the assets and liabilities of the LLCs are being equitably and appropriately accounted for and managed.

196.    Dwyer moves for Amory to bear the full cost of the accounting.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, Troy D. Dwyer, derivatively on behalf of the Bella Sky, LLC and Quinby Allie, LLC, and individually, demands judgment as follows:

**For Declaratory Relief of Debt and Maritime Liens:**

a.    Issuing a declaratory judgment that the debt and maritime liens claimed by LDA against the LLCs and the Vessels are invalid, non-binding, and unenforceable against the LLCs or the Vessels;

b.    Alternatively, issuing a declaratory judgment that Amory and no one else is liable personally for the debts of the LLCs owed to LDA, if any;

c.    Alternatively, issuing a declaratory judgment that the debts asserted by LDA against the LLCs that are older than three years are no longer actionable, enforceable, and collectible; and

d.    Awarding the LLCs their attorneys' fees and costs incurred in seeking to have the liens for necessaries declared invalid pursuant to 46 U.S.C. § 31343(c)(2), against LDA and Mrs. Amory, jointly and severally;

**For Wrongful Arrest:**

Awarding the LLCs compensatory damages in the amount of $100,000, or such other amount as may be proven at trial, for their attorneys' fees, costs, and expenses incurred as

a result of the wrongful arrest, and punitive damages of $500,000, against LDA, Amory, and Mrs. Amory, jointly and severally.

**For Breaches of Fiduciary Duties by C. Meade Amory:**

a.  Ordering Amory to make a full and complete accounting of the financial affairs, including all notes payable, loan agreements, receipts and disbursements of the LLCs and provide full information about the business and financial condition and other information regarding the affairs of the LLCs, including ordering Amory to provide direct access to the books and records of each LLC, from their inception to the present;

b.  Ordering that Amory be removed as manager for the LLCs, that he be expelled and dissociated from the LLCs, and that he be permanently barred from further participation in the management and affairs of the LLCs, pursuant to Va. Code § 13.1-1040.1(5);

c.  Awarding Dwyer compensatory damages for lost wages for the period when Amory cut off his salary from the LLCs until it was reinstated, and for lost crew wages for the period when the Vessels were unable to fish due to the actions of Amory in the approximate amount of $52,500, or such other amount as may be proven at trial against Amory;

d.  Awarding Dwyer compensatory damages for lost wages from his salary as a vessel manager and for lost crew wages for the period when the Vessels were first detained in the Massachusetts arrest actions caused by Amory from May 25, 2021 to the present date, in the approximate amount of $250,000, or such other amount as may be proven at trial against Amory;

e.  Awarding the LLCs their lost income in the combined amount of over $1,000,000 after Amory effectively tied up the Vessels in 2020, and approximately $4,384,000 for the

period of time when the Vessels were unable to fish from the dates of the Massachusetts arrests until the present date;

f.  Awarding the LLCs the total amount recovered by Truist against the Vessels and/or LLCs in the Massachusetts arrest actions, including but not limited to interest, *custodia legis*, attorneys' fees, and other costs in the amount of $234,902.24 for F/V QUINBY ALLIE and $145,704.19 for F/V BELLA SKY and other amount as may be proven at trial, against Amory;

g.  Awarding the LLCs, and each of them, punitive damages in the amount of $350,000 against Amory;

h.  Awarding the LLCs the costs and disbursements of this action, including reasonable attorneys' fees, accountant and expert fees, costs, and expense pursuant to Va. Code § 13.1-1045, against Amory; and

i.  Granting such other appropriate equitable relief to remedy the breaches of fiduciary duties as alleged herein.

**Accounting:**

a.  Ordering a neutral, third-party accountant to review the books, records, and accounts of the LLCs to adequately determine the present status of the same, history of all transactions of the LLCs between July 31, 2014 and the date of filing this Complaint, and to fix appropriate values for the LLC's assets for the purpose of liquidation during winding up.

b.  Ordering that Amory bear the full cost of the accounting.

Additionally, the Court should award pre-judgment and post-judgment interest at the legal and

judgment rate of interest as allowed by law, and grant such other and further relief as the Court

deems just and proper.

Respectfully submitted,

**TROY D. DWYER**, derivatively on behalf
of Bella Sky, LLC and Quinby Allie, LLC, and
Individually,


By: ___/s/ *Julia A. Rust*_____
      Of Counsel

Julia A. Rust, Esq. (VSB No.: 87270)
PIERCE MCCOY, PLLC
101 West Main Street, Suite 101
Norfolk, Virginia 23510
Telephone: (757) 216-0226
Facsimile: (757) 257-0387
julia@piercemccoy.com

and

By: ___/s/ *Kirby L. Aarsheim*_____
      Of Counsel, *Pro Hac Vice*

Kirby L. Aarsheim
BBO No.: 678774
FARRELL SMITH O'CONNELL
AARSHEIM APRANS LLP
27 Congress Street, Suite 109
Salem, MA 01970
Telephone: (978) 744-8918
Facsimile: (978) 666-0383
e-mail: kaarsheim@fsofirm.com

*Counsel for Troy D. Dwyer, derivatively on behalf*
*of Bella Sky, LLC and Quinby Allie, LLC, and*
*Individually*